**NON-CONFIDENTIAL**
**2014-1456**

In the

# United States Court of Appeals

## For the Federal Circuit

GILEAD SCIENCES, INC.,

*Plaintiff-Appellee,*

v.

SIGMAPHARM LABORATORIES, LLC,

*Defendant-Appellant,*

_____

2014-1456
_____

Appeals from the United States District Court for the
District of New Jersey in No. 2:10-cv-04931-SDW-MCA,
Judge Susan D. Wigenton.

**PRINCIPAL BRIEF OF DEFENDANT-APPELLANT**
**(NON-CONFIDENTIAL)**

JOHN E. ROSENQUIST
MARC R. WEZOWSKI
LEYDIG, VOIT & MAYER, LTD.
180 N. Stetson, Suite 4900
Chicago, IL 60601-6731
(312) 616-5600

*Counsel for Defendant-Appellant Sigmapharm Laboratories, LLC.*

K. Lee Marshall                           Ameer Gado
Robert L. Stolebarger                      Anthony Friedman
BRYAN CAVE LLP                             BRYAN CAVE LLP
560 Mission Street, Suite 2500             211 North Broadway, Suite 3600
San Francisco, CA 94105                    One Metropolitan Square
                                           St. Louis, MO 63102

*Counsel for Defendant-Appellant Sigmapharm Laboratories, LLC.*

July 7, 2014

## <u>CERTIFICATE OF INTEREST</u>

I, John E. Rosenquist, Counsel for Defendant-Appellant Sigmapharm Laboratories, LLC, certify the following:

1. The full name of every party or *amicus* represented by me is:

Sigmapharm Laboratories, LLC

2. The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

The parties named in the caption are the real parties in interest.

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

Not applicable

4. The names of all law firms and the partners or associates that appeared for the party or *amicus* now represented by me in the trial court or agency or are expected to appear in this court are:

Karen A. Confoy
FOX ROTHSCHILD LLP
997 Lenox Drive, Bldg. 3
Lawrenceville, New Jersey 08648

John E. Rosenquist
Marc R. Wezowski
LEYDIG, VOIT & MAYER, LTD.
Two Prudential Plaza, Suite 4900
180 N. Stetson Avenue
Chicago, IL 60601-6731

Kenneth Lee Marshall
Robert L. Stolebarger
BRYAN CAVE LLP
560 Mission Street, Suite 2500
San Francisco, CA 94105

Ameer Gado
Anthony Friedman
BRYAN CAVE LLP
211 North Broadway, Suite 3600
One Metropolitan Square
St. Louis, MO 63102

Dated:  July 7, 2014                    Respectfully submitted,

 /s/ John E. Rosenquist

John E. Rosenquist
LEYDIG, VOIT & MAYER, LTD.

# TABLE OF CONTENTS

CERTIFICATE OF INTEREST ............................................................. I

TABLE OF CONTENTS....................................................................III

TABLE OF AUTHORITIES ..............................................................V

TABLE OF ABBREVIATIONS ......................................................VIII

STATEMENT REQUESTING ORAL ARGUMENT...............................1

STATEMENT OF RELATED CASES ................................................1

STATEMENT OF THE ISSUES........................................................3

I.    STATEMENT OF THE CASE ..................................................4

II.   STATEMENT OF THE FACTS ................................................7

    A.    The '340 Patent .............................................................7

    B.    Prior Sales Relating to the "Invention" of the '340 Patent ..................8

    C.    Sigmapharm Amended Its ANDA So that It Does Not Infringe the '340 Patent ..................11

III.  SUMMARY OF THE ARGUMENT ..........................................12

IV.   STANDARD OF REVIEW ......................................................20

V.    ARGUMENT............................................................................20

    A.    Legal Standards .................................................................20

    B.    The District Court Applied the Wrong Legal Standards in Determining Whether to Award Attorney's Fees to Sigmapharm..................23

        1.    The District Court Committed Legal Error by Employing the Clear and Convincing Evidence Standard to Determine if the Case Is "Exceptional"....................23

2.      The Underlying Facts Support Sigmapharm's Request for
        Attorney's Fees Because This Is an "Exceptional Case" .........25

        (a)                           Redacted


                ...............................................................................26

        (b)     Gilead Litigated This Case in an Unreasonable
                Manner ...........................................................................31

        (c)     The District Court Correctly Held that
                Sigmapharm Is the "Prevailing Party" ...........................33

VI.   CONCLUSION..................................................................................34

**CONFIDENTIAL MATERIAL OMITTED:**
The Removed or Redacted Portions are Either Documents Which Are Covered
Under The Protective Order in the Court Below or Contain Excerpts from Those
Documents.

# TABLE OF AUTHORITIES

## Cases

*Abbott Laboratories v. Geneva Pharmaceuticals, et al.*,
182 F.3d 1315 (Fed. Cir. 1999) ................................................................ 19, 23, 31

*American Can Co. v. Crown Cork & Seal Co., Inc.*,
693 F.2d 653 (7th Cir. 1982) ................................................................29

*Brasseler U.S.A.I., LP v. Stryker Sales Corp.*,
182 F.3d 888 (Fed. Cir. 1999) ................................................................24, 29

*Brooks Furniture Mfg., Inc. v. Dutailier Int'l, Inc.*,
393 F.3d 1378 (2005) ................................................................ *passim*

*Cooter & Gell v. Hartmarx Corp.*,
496 U.S. 384 (1990) ................................................................21

*Corona Cord Tire Co. v. Dovan Chem. Corp.*,
276 U.S. 358 (1928) ................................................................20

*Hamilton Beach Brands, Inc. v. Sunbeam Products, Inc.*,
726 F.3d 1370 (Fed. Cir. 2013) ................................................................ 18, 23, 27, 28

*Highmark Inc. v. Allcare Health Management System, Inc.*,
134 S. Ct. 1744 (2014) ................................................................ 13, 21, 26, 35

*Highway Equip Co. v. FECO, Ltd.*,
469 F.3d 1027 (Fed. Cir. 2006) ................................................................35

*Hughes v. Novi Am., Inc.*,
724 F.2d 122 (Fed. Cir. 1984) ................................................................30

*IA Labs CA, LLC v. Nintendo Co., et al.*,
No. PJM 10-833, 2012 WL 1565296, at *2, *4-5
(D. Md. May 1, 2012) ................................................................30

*Intellect Wireless, Inc. v. Sharp Corp., at al.*,
No. 10 C 6763, 2014 WL 2443871
(N.D. Ill. May 30, 2014) ................................................................30

*Kobe Properties SARL v. Checkpoint Systems, Inc.*,
   134 S. Ct. 2134 (2014) ........................................................25

*Octane Fitness, LLC v. Icon Health & Fitness, Inc.*,
   134 S. Ct. 1749 (2014) ................................................. *passim*

*Pennwalt Corp. v. Akzona Inc.*,
   740 F.2d 1573 (Fed. Cir. 1984) ....................................18, 31

*Pfaff v. Wells Elec., Inc.*,
   525 U.S. 55, fn. 2 (1998) ................................. 19, 20, 23, 31

*Procter & Gamble Co. v. Teva Pharms. USA, Inc.*,
   566 F.3d 989 (Fed. Cir. 2009) .............................................21

*Salve Regina College v. Russell*,
   499 U.S. 225 (1991) ............................................................21

*Site Update Solutions, LLC v. Accor North America, Inc.*,
   No. 2013-1458, 2014 WL 1910424, at *1
   (Fed. Cir. May 14, 2014)....................................................25

*SmithKline Beecham v. Apotex*,
   365 F.3d 1306 (Fed. Cir. 2004) ....................................18, 31

*Special Devices, Inc. v. OEA, Inc.*,
   269 F.3d 1340 (Fed. Cir. 2001) ...........................................23

*Special Devices, Inc. v. OEA, Inc.*,
   270 F.3d 1353 (Fed. Cir. 2001) ...........................................23

*Zacharin v. U.S.*,
   213 F.3d 1366 (Fed. Cir. 2000) ...........................................23

**Statutes**

21 U.S.C. § 355(j)(2)(A)(vii)(IV) ................................................5

21 U.S.C. § 355(j)(2)(B) .............................................................5

28 U.S.C. § 1295(a)(1) ................................................................3

28 U.S.C. § 1338(a) ....................................................................3

35 U.S.C. § 102(b) ........................................................................................ *passim*

35 U.S.C. § 271(e)(2)(A) ........................................................................................5

35 U.S.C. § 285 ........................................................................................ *passim*

## Other Authorities

MPEP § 2001.04 ........................................................................................27

MPEP § 2133.03(b)(I) ........................................................................................23

# TABLE OF ABBREVIATIONS

| Parties | |
|---|---|
| Sigmapharm | Defendant-Appellant Sigmapharm Laboratories, LLC |
| Gilead | Plaintiff-Appellee, Gilead Sciences, Inc. |
| **Patents** | |
| '159 patent | U.S. Patent No. 5,663,159 (A92-111.) |
| '340 patent | U.S. Patent No. 6,451,340 (A37-91.) |
| **Defined Terms** | |
| §285 | 35 U.S.C. § 285 |
| AD | adefovir dipivoxil |
| ANDA | Abbreviated New Drug Application |
| ANDA Product | Sigmapharm's amorphous adefovir dipivoxil product to be marketed under ANDA No. 202051 |
| DMF | Drug Master File |
| FDA | U.S. Food and Drug Administration |
| NDA | New Drug Application |
| Orange Book | U.S. FDA Approved Drug Products with Therapeutic Equivalence Evaluations |
| USPTO | U.S. Patent and Trademark Office |

## **STATEMENT REQUESTING ORAL ARGUMENT**

Defendant-Appellant Sigmapharm Laboratories, LLC requests oral argument in this appeal.

## <u>STATEMENT OF RELATED CASES</u>

No appeal in or from the same civil action or proceeding in the lower court was previously before this Court or any other appellate court.

## **JURISDICTIONAL STATEMENT**

This appeal is from a patent infringement case before District Judge Susan D. Wigenton in the United States District Court for the District of New Jersey. The District Court had jurisdiction pursuant to 28 U.S.C. § 1338(a).

After Gilead Sciences, Inc. ("Gilead") executed and provided Sigmapharm Laboratories, LLC ("Sigmapharm") with a Covenant Not to Sue for infringement of U.S. Patent No. 6,451,340 ("the '340 patent") on or about March 15, 2013, and the District Court ordered dismissal with prejudice for all claims and counterclaims on October 8, 2013, Defendant-Appellant Sigmapharm brought a Motion for Attorney's Fees under 35 U.S.C. § 285 ("§285") on October 23, 2013.

On March 31, 2014, Judge Wigenton denied Defendant-Appellant Sigmapharm's motion for Attorney's Fees. Defendant-Appellant Sigmapharm timely appealed.

This Court has jurisdiction pursuant to 28 U.S.C. § 1295(a)(1).

## STATEMENT OF THE ISSUES

1.      Whether the trial court abused its discretion, and committed reversible error, in denying Sigmapharm's Motion for Attorney's Fees by, among other things,

(a) applying the incorrect legal standard relative to §285 Motions for Attorney's Fees in view of the intervening change of law under the United States Supreme Court's Opinion and Decision in *Octane Fitness, LLC v. Icon Health & Fitness, Inc.*, 134 S. Ct. 1749 (2014) and

(b) incorrectly finding that the "experimental use" exception to the 35 U.S.C. § 102(b) "on-sale" bar applied      Redacted

**Content omitted pursuant to the
Protective Order entered in the court below.**

, wherein the finding:

(i)      is not supported by the factual record; and

(ii)      is contrary to legal precedent concerning the "on-sale" bar.

## I.     STATEMENT OF THE CASE

Sigmapharm filed Abbreviated New Drug Application ("ANDA")

No. 202051 with the U.S. Food and Drug Administration ("FDA") seeking

approval to market a drug product ("ANDA Product") that Sigmapharm contends

is bioequivalent to, and refers to, Gilead's antiviral therapy drug product,

Hepsera®.  (A379-81.)  Pursuant to 21 U.S.C. § 355(j)(2)(A)(vii)(IV),

Sigmapharm's ANDA certified to the FDA that the '340 patent and U.S. Patent

No. 5,663,159 ("the '159 patent"), listed in the U.S. FDA's Approved Drug

Products with Therapeutic Equivalence Evaluations ("Orange Book") for

Hepsera®, are invalid, unenforceable, and/or will not be infringed by the

manufacture, use or sale of Sigmapharm's ANDA Product.  (A37-91; A380-381.)

Pursuant to 21 U.S.C. § 355(j)(2)(B), in a letter dated August 17, 2010,

Sigmapharm notified Gilead that it had filed its ANDA, which included a

Paragraph IV Certification with respect to the '340 and '159 patents.  (A380-81.)

On September 24, 2010, Gilead filed a complaint against Sigmapharm

alleging, *inter alia,* that the filing of Sigmapharm's ANDA infringed the '340 and

'159 patents under 35 U.S.C. § 271(e)(2)(A).  (*See* A293-304.)  On November 10,

2010, Sigmapharm filed an answer and counterclaims against Gilead asserting that

the '340 and '159 patents, including all claims thereof, are invalid and that its

ANDA Product will not infringe any valid and enforceable claim of the ’340 and ’159 patents. (A376-90.)

As discovery proceeded, Sigmapharm Redacted

**Content omitted pursuant to the Protective Order entered in the court below.**

and accordingly, on August 10, 2012, sought leave to amend its contentions to add an “on-sale” bar theory of invalidity for the ’340 patent. The District Court granted Sigmapharm leave to amend its contentions on September 19, 2012. (A411-27; A1832-33.)

On December 11, 2012, Gilead amended its Complaint, and Sigmapharm responded with an Amended Answer and Counterclaims on December 13, 2012, which added a defense and counterclaim of invalidity and unenforceability of the ’340 patent due to inequitable conduct, consistent with Sigmapharm’s discovery of facts relating to the “on-sale” bar. (A514-27; A528-50.) On December 20, 2012, Gilead moved to dismiss Sigmapharm’s affirmative defense and counterclaim of invalidity and unenforceability of the ’340 patent due to inequitable conduct based on Sigmapharm’s discovery of facts relating to the “on-sale” bar. (A1834-54.) Gilead’s Motion was denied on March 6, 2013. (A565.) In light of Sigmapharm being allowed to proceed with its inequitable conduct and “on-sale” bar defense,

[1] Adefovir Dipivoxil is also called “Bis(POM)PMEA” or “bis(POM)PMEA.”

Gilead immediately conceded, and nine days later on March 15, 2013 gave Sigmapharm a Covenant Not to Sue on all of the asserted claims of the '340[2] and '159 patents.  (A569-70.)

On March 22, 2013, a week after Gilead gave Sigmapharm the Covenant Not to Sue on all of the asserted claims of the '340 and '159 patents, Gilead again moved to dismiss Sigmapharm's amended counterclaims (and its own lawsuit against Sigmapharm for infringement of the '340 and '159 patents).  Gilead's Covenant Not to Sue, coupled with its Motion to Dismiss, brought discovery (which was still ongoing) to an immediate and complete stop.  Sigmapharm opposed this motion, and briefing followed.  On October 8, 2013, over Sigmapharm's objection, the District Court dismissed Gilead's suit against Sigmapharm for infringement of the '340 and '159 patents and Sigmapharm's counterclaims with prejudice, but permitted Sigmapharm to file a Motion for Attorney's Fees pursuant to 35 U.S.C. § 285.  (A895-96; A1763-73.)  Sigmapharm filed its Motion for Attorney's Fees on October 23, 2013.  (A897-923.)

---

[2] Of the forty-seven claims in the '340 patent, Gilead asserted claims 1, 2, 4-9, 19-24, 29-34, and 37-39 against Sigmapharm.  These claims are directed to forms of crystalline AD and compositions thereof, methods for making those compositions, or a method using them as an antiviral in humans.  (A37-91.)

On March 31, 2014 the District Court issued an Opinion and Judgment denying Sigmapharm's Motion for Attorney's Fees.  (A1-14.)  Sigmapharm timely filed this appeal on May 5, 2014.

Sigmapharm is appealing only the District Court's denial of Sigmapharm's Motion for Attorney's Fees with respect to the '340 patent.  In its Motion, Sigmapharm parsed out the Attorney's Fees it incurred litigating Gilead's charge that Sigmapharm's ANDA product infringed the '340 patent, separate and apart from the Attorney's Fees it incurred litigating Gilead's charge that Sigmapharm's ANDA product infringed the '159 patent.  (A920-21.)

## II.    STATEMENT OF THE FACTS

### A.    The '340 Patent

The '340 patent is directed to certain physical characteristics of AD and claims, *inter alia*, forms and compositions of crystalline AD, as well as methods of making such crystalline products and a method for using them as an antiviral in humans.  (A37-91.)  The application upon which the '340 patent issued was filed September 10, 2001, but claims priority to a provisional application filed on July 25, 1997.  Thus, a sale of crystalline AD and compositions containing crystalline AD, more than one year before the July 25, 1997 filing date (*i.e.*, the "on-sale" bar date—July 25, 1996) invalidates the claims of the '340 patent claiming crystalline AD, or compositions containing crystalline AD, under 35 U.S.C. § 102(b).  (*Id.*)

### B. Prior Sales Relating to the "Invention" of the '340 Patent

Redacted

**Content omitted pursuant to the
Protective Order entered in the court below.**

Redacted

**Content omitted pursuant to the Protective Order entered in the court below.**

Redacted

**Content omitted pursuant to the
Protective Order entered in the court below.**

Redacted

**Content omitted pursuant to the
Protective Order entered in the court below.**

**C.** **Sigmapharm Amended Its ANDA So that It Does Not Infringe the '340 Patent**

Redacted

**Content omitted pursuant to the
Protective Order entered in the court below.**

Redacted

## III.   SUMMARY OF THE ARGUMENT

There are two interrelated questions to be decided by this Court.  First, whether the District Court misapplied the law regarding an award of Attorney's Fees under §285, and second, whether the District Court improperly applied the "experimental use" exception                    Redacted

**Content omitted pursuant to the
Protective Order entered in the court below.**                    as

the basis for its denial of Sigmapharm's Motion for Attorney's Fees.

This Court must decide whether to reverse the District Court's refusal to award Attorney's Fees to Sigmapharm in view of the Supreme Court's intervening decisions in *Octane Fitness, LLC v. Icon Health & Fitness, Inc.*, 134 S. Ct. 1749 (2014) and *Highmark Inc. v. Allcare Health Management System, Inc.*, 134 S. Ct. 1744 (2014).  The District Court applied an outdated and overly rigid standard when it denied Sigmapharm's Motion for Attorney's Fees, particularly when it considered whether this case is "exceptional" under 35 U.S.C. § 285.  (A5, A14.); *See also, Brooks Furniture Mfg., Inc. v. Dutailier Int'l, Inc.*, 393 F.3d 1378 (2005).

---

[7] The '340 patent concedes that amorphous AD is in the prior art.  (A37-91 at Col. 1, ll. 27-29.)

This case is, in fact, "exceptional," because Gilead should never have brought suit against Sigmapharm on the '340 patent in the first place because it knew, or certainly should have known, that the '340 patent was invalid under 35 U.S.C. § 102(b)                    Redacted

**Content omitted pursuant to the
Protective Order entered in the court below.**

By way of background, claim 1 of the '340 patent, which has an "on-sale" bar date of July 25, 1996, broadly claims a "composition comprising crystalline adefovir dipivoxil"—*nothing more.*                    Redacted

**Content omitted pursuant to the
Protective Order entered in the court below.**

is also undisputed and was accepted by the District Court, that these sales continued up to and through the '340 patent's "on-sale" bar date.  Claim 21 of the '340 patent, broadly claims, simply, "contacting a crystallization solvent and adefovir dipivoxil"—*again, nothing more.*                    Redacted

**Content omitted pursuant to the
Protective Order entered in the court below.**

This case is "exceptional" because:

Redacted

**Content omitted pursuant to the
Protective Order entered in the court below.**

R

Redacted

**Content omitted pursuant to the Protective Order entered in the court below.**

Redacted

**Content omitted pursuant to the
Protective Order entered in the court below.**

Gilead's Covenant Not to Sue and its Motion to Dismiss its patent

infringement suit against Sigmapharm and Sigmapharm's counterclaims

effectively ended the litigation and discovery.

Based on the record before it, *see* A5, the District Court made substantive

factual findings regarding whether Sigmapharm carried its burden of showing that

the '340 patent is invalid due to the "on-sale" bar while applying the "experimental

use" exception to those facts—and further failed to support those findings with

citations to relevant supporting evidence.

Compounding these errors, the District Court also misapplied the law

regarding the "on-sale" bar when it ignored the law of the Supreme Court and this

Court and applied the "experimental use" exception to      Redacted

**Content omitted pursuant to the
Protective Order entered in the court below.**

This is contrary to this Court's holding in *Hamilton Beach Brands, Inc. v. Sunbeam*

*Products, Inc.*, 726 F.3d 1370 (Fed. Cir. 2013) (holding that if the invention is

reduced to practice and a sale occurs, the "experimental use" exception no longer

applies). The District Court completely ignored *Hamilton Beach* in its opinion.

Any argument that the "experimental use" exception applies under the

circumstances presented here is unsound, as it is well-settled in this Court that

experimentation to support an agency requirement for approval, *e.g.*, clinical

studies in support of an application to the FDA for approval of a new drug, is not

the same as the patent law-based "experimental use" exception to the "on-sale" bar. *See, e.g.*, *Pennwalt Corp. v. Akzona Inc.*, 740 F.2d 1573 (Fed. Cir. 1984); *SmithKline Beecham v. Apotex*, 365 F.3d 1306 (Fed. Cir. 2004) (a claim simply to "crystalline paroxetine hydrocholoride hemihydrate" was invalid, even though the product was being used in a clinical trial to show its safety and efficacy as required by the FDA for a new drug); *See also, Abbott Laboratories v. Geneva Pharmaceuticals, et al.*, 182 F.3d 1315 (Fed. Cir. 1999) (Abbott didn't even know it was buying a particular crystalline form of a drug product from a foreign supplier more than one year before the patent filing date, but that purchase constituted an invalidating sale because the drug product was "ready for patenting"—if the product offered for sale inherently possesses each limitation of the claims, then the invention is "on sale").                    Redacted

**Content omitted pursuant to the
Protective Order entered in the court below.**

Further highlighting the District Court's misapplication of the "experimental use" exception                    Redacted

**Content omitted pursuant to the
Protective Order entered in the court below.**                    , it is basic patent law that a composition, such as a tablet containing crystalline AD, is reduced to practice

when it is manufactured in physical form.  *Pfaff v. Wells Elec., Inc.*, 525 U.S. 55, fn. 2 (1998) (" 'A manufacture is reduced to practice when it is completely manufactured.  A composition of matter is reduced to practice when it is completely composed.' " (citing *Corona Cord Tire Co. v. Dovan Chem. Corp.*, 276 U.S. 358, 383 (1928))).                              Redacted

**Content omitted pursuant to the
Protective Order entered in the court below.**

The District Court abused its discretion and committed reversible error in relying on *Pfaff* as the basis for its conclusion that Sigmapharm       Redacted

**Content omitted pursuant to the
Protective Order entered in the court below.**                              A proper reading of *Pfaff* dictates the opposite holding.

As such, the District Court committed reversible error when it applied the standard of *Brooks Furniture* to determine whether this case is "exceptional" according to §285.  The District Court also committed reversible error when it applied the "experimental use" exception                   Redacted

19

Redacted

Accordingly, this Court should reverse both of the District Court's previously discussed misapplications of the law and award Attorney's Fees to Sigmapharm, or alternatively vacate and remand to the District Court for further consideration in view of *Octane* and *Highmark*, and with further instruction that the "experimental use" exception does not apply to the facts of this case.

## IV.   STANDARD OF REVIEW

Generally, "an Appellate Court should apply an abuse-of-discretion standard in reviewing all aspects of a District Court's § 285 determination." *Highmark*, 134 S. Ct. at 1749.  However, applying an erroneous view of the law "necessarily" constitutes an abuse of discretion by the District Court.  *Highmark*, 134 S. Ct. at fn. 2 (citing *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405 (1990)). Additionally, the District Court's conclusions of law are reviewed *de novo* by this Court.  *Procter & Gamble Co. v. Teva Pharms. USA, Inc.*, 566 F.3d 989, 993 (Fed. Cir. 2009); *See also, Salve Regina College v. Russell*, 499 U.S. 225, 231-32 (1991).

## V.   ARGUMENT

### A.   Legal Standards

Rule 54(d)(2)(ii) of the Federal Rules of Civil Procedure permits parties to recover for Attorney's Fees after showing grounds entitling the movant to the

award.  In the case of patent litigation, §285 states that the court may award

reasonable attorney fees to the prevailing party in "exceptional cases."

In *Brooks Furniture*, this Court held that "[a] case may be deemed

exceptional" under §285 only in two limited circumstances: "when there has been

some material inappropriate conduct," or when the litigation is both "brought in

subjective bad faith" and "objectively baseless."  *Octane*, 134 S. Ct. at 1752.

*Brooks Furniture* also held that because "[t]here is a presumption that the assertion

of infringement of a duly granted patent is made in good faith[,] . . . the underlying

improper conduct and the characterization of the case as exceptional must be

established by clear and convincing evidence."  *Octane*, 134 S. Ct. at 1754 (*citing*

*Brooks Furniture*, 393 F.3d at 1382).

In its recent *Octane* and *Highmark* decisions, the Supreme Court clarified

the legal standard for awarding Attorney's Fees under §285, and overturned the

too-rigid test set by *Brooks Furniture*.  *Id.* at 1755.  In its place, the Supreme Court

held that "an 'exceptional case' is simply one that stands out from others with

respect to the substantive strength of a party's litigating position (considering both

the governing law and the facts of the case) or the unreasonable manner in which

the case was litigated."  It remains the case that a party must be the "prevailing

party" to be awarded Attorney's Fees.  *Id.*

In addition, the Supreme Court further held that patent litigants need not establish their entitlement to Attorney's Fees by clear and convincing evidence. *Id.* at 1758 ("nothing in §285 justifies such a high standard of proof"). Rather, the Supreme Court held that §285 demands a simple discretionary inquiry, and further clarified that patent-infringement litigation has always been governed by a preponderance of the evidence standard, which is the generally applicable standard in civil actions. *Id.*

With respect to the "on-sale" bar, pursuant to 35 U.S.C. § 102(b), a "person shall be entitled to a patent unless . . . (b) the invention was . . . in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States." For the "on-sale" bar to apply, the Supreme Court has set forth two conditions that must be satisfied: (1) the claimed invention must be the subject of a commercial sale and (2) the invention must be ready for patenting. *Pfaff*, 525 U.S. at 67-68 (1998). A sale occurs where the "seller agrees 'to give and to pass rights of property' in return for the buyer's payment." (A490-502 (MPEP § 2133.03(b)(I).) The seller and buyer must be separate entities. (*Id.* at § 2133.03(b)(I(E).) A single transaction constitutes a sale. (*Id.* at § 2133.03(b)(I)(C).)

This Court's decision in *Hamilton Beach* confirms that there is no exception to the "on-sale" bar for suppliers, nor is there an exception if the sale took place in

secret.  726 F.3d at 1375; *See also, Special Devices, Inc. v. OEA, Inc.*, 269 F.3d

1340, 1344 (Fed. Cir. 2001); *Special Devices, Inc. v. OEA, Inc.*, 270 F.3d 1353,

1357 (Fed. Cir. 2001).  It is of no moment if the sale was made by a third party, or

constructed and made pursuant to the buyer's directions.  *Zacharin v. U.S.*, 213

F.3d 1366, 1371 (Fed. Cir. 2000) (citing *Abbott Laboratories v. Geneva*

*Pharmaceuticals, Inc.*, 182 F.3d 1315, 1318 (Fed. Cir. 1999) and *Brasseler*

*U.S.A.I., LP v. Stryker Sales Corp.*, 182 F.3d 888, 891 (Fed. Cir. 1999)).

### B. The District Court Applied the Wrong Legal Standards in Determining Whether to Award Attorney's Fees to Sigmapharm

The District Court committed reversible error and abused its discretion when

it applied the improper legal test of *Brooks Furniture* to determine whether

Sigmapharm is entitled to Attorney's Fees, and its judgment should be reversed, or

alternatively vacated and remanded, for the reasons set forth below.  (A4-5.)

### 1. The District Court Committed Legal Error by Employing the Clear and Convincing Evidence Standard to Determine if the Case Is "Exceptional"

As discussed above, the proper legal standard for determining whether a

party has established its entitlement to Attorney's Fees under 35 U.S.C. §285 is

one of the "totality of the circumstances" and not "clear and convincing evidence."

*See Octane*, 134 S. Ct. at 1756 ("District courts may determine whether a case is

'exceptional' . . . considering the totality of the circumstances.").

Because the District Court applied the rigid "clear and convincing evidence" legal standard described in *Brooks Furniture* that was overturned by the Supreme Court in *Octane*, the District Court never reached the question of whether, under the totality of the circumstances, Sigmapharm had established its entitlement to Attorney's Fees. Instead, the District Court found that "Sigmapharm [] failed to establish *by clear and convincing evidence* that this case is 'exceptional' within the meaning of 35 U.S.C. § 285," further stating that the underlying facts and background do not support such a finding. (A5.) (emphasis added) Importantly, the District Court, in finding that Sigmapharm failed to establish that the case is "exceptional," ignored the fact that Sigmapharm was prevented from developing a complete record because Gilead halted further discovery by giving Sigmapharm a Covenant Not to Sue, and *almost immediately* moving to dismiss its lawsuit for infringement of the '340 patent and Sigmapharm's counterclaims of inequitable conduct and invalidity based upon Gilead's purchase of crystalline AD from Raylo and tablets containing crystalline AD from Quintiles before the '340 patent's "on-sale" bar date.

This Court, following the Supreme Court's holding in *Octane*, has already vacated and remanded District Court decisions that do not comply with the totality of the circumstances standard set by *Octane*. *See, Site Update Solutions, LLC v. Accor North America, Inc.*, No. 2013-1458, 2014 WL 1910424, at *1 (Fed. Cir.

May 14, 2014) (vacating and remanding the District Court's denial of Attorney's

Fees for reconsideration in view of *Octane*, because the District Court required

"exceptional" case to be proven by clear and convincing evidence). The Supreme

Court has already done so as well. *See, Kobe Properties SARL v. Checkpoint*

*Systems, Inc.*, 134 S. Ct. 2134 (2014) (vacating this Court's judgment overturning

the District Court's award of Attorney's Fees, and remanding for further

consideration in view of *Octane*).

This Court should reverse the District Court's decision denying

Sigmapharm's Motion for Attorney's Fees, as the facts set forth below show that

this case is "exceptional" under §285 as applied by the Supreme Court in *Octane*,

or alternatively vacate the District Court's decision and remand for further

consideration in view of *Octane*.

## 2. The Underlying Facts Support Sigmapharm's Request for Attorney's Fees Because This Is an "Exceptional Case"

The Supreme Court's holdings in *Octane* and *Highmark* did not alter §285's

requirement that only a "prevailing party" may obtain Attorney's Fees. *Octane*,

134 S. Ct. at 1752. The Supreme Court, however, held that "an 'exceptional case'

is simply one that stands out from others with respect to the substantive strength of

a party's litigating position (considering both the governing law and the facts of the

case) *or* the unreasonable manner in which the case was litigated." *Id.* at 1755

(emphasis added). In the instant case Sigmapharm has actually shown that this case stands out with regard to *both* of those factors, as set forth below.

**(a)** Redacted

**Content omitted pursuant to the
Protective Order entered in the court below.**

As discussed at section II.B., *supra*, Redacted

**Content omitted pursuant to the
Protective Order entered in the court below.**

One of this Court's most recent decisions regarding the "on-sale" bar highlights how clear it was, or how clear it should have been, to Gilead that its '340 patent was invalid under 35 U.S.C. § 102(b), and thus never should have been asserted against Sigmapharm in the first place. In *Hamilton Beach*, the patent owner, Hamilton Beach, sourced manufacturing of a product from a foreign third

party supplier.  726 F.3d at 1375-76.  The product incorporated the patented

technology, and the overall design and engineering of the product was determined

by Hamilton Beach.  *Id.*  Before the "on-sale" bar date of its patent-in-suit,

Hamilton Beach, again, the patent-holder, ordered a number of the products

incorporating the patented technology from the foreign third party supplier, who in

turn responded that it was ready to fulfill Hamilton Beach's order.  *Id*. at 1376.

This Court agreed with the District Court that the "on-sale" bar applied because the

interaction between Hamilton Beach and the foreign third party supplier

constituted an offer for sale under 35 U.S.C. § 102(b)—delivery of the products

was not even required, just the agreement to do so.  *Id*. at 1375.

<div align="center">Redacted</div>


**Content omitted pursuant to the
Protective Order entered in the court below.**

Redacted        the District Court chose to completely ignore this Court's precedential holding in *Hamilton Beach* in its opinion denying Sigmapharm's Motion for Attorney's Fees. It committed reversible error when it did so.

Redacted

**Content omitted pursuant to the
Protective Order entered in the court below.**

In a similar case, decided even before the Supreme Court's *Octane* decision freed the attorney's fee award analysis from the more burdensome *Brooks Furniture* test, this Court granted Attorney's Fees where the patentee was involved in a sale of 3000 patented saw blades more than one year before the "on-sale" bar date of a patent it asserted in litigation. *See Brasseler*, 182 F.3d at 891-2. In *Brasseler*, the District Court had invalidated the patent on summary judgment based on the transaction, particularly noting the size of the sale and the fact that the

two companies were separate entities. *Id*. at 890; *See also, American Can Co. v. Crown Cork & Seal Co., Inc.*, 693 F.2d 653, 657-58 (7th Cir. 1982) (noting the "extent, duration and character" of the on-sale activities, and the lack of disclosure to the USPTO, was "adequate justification for the [attorney's fee] award standing alone"); *See also, Hughes v. Novi Am., Inc.*, 724 F.2d 122, 124-25 (Fed. Cir. 1984) (upholding an award of Attorney's Fees after the District Court found that the patentee engaged in sales of a "substantial magnitude" more than two years before the filing of the patents-in-suit); *IA Labs CA, LLC v. Nintendo Co., et al.*, No. PJM 10-833, 2012 WL 1565296, at *2, *4-5 (D. Md. May 1, 2012) (awarding Attorney's Fees where the patentee had asserted a patent that was held invalid under 35 U.S.C. § 102(b), *inter alia*, for prior public use and prior offer for sale). At least one District Court, following the *Octane* decision, has also found that inequitable conduct by the patentee rendered a case "exceptional" in favor of awarding Attorney's Fees to an accused infringer. *Intellect Wireless, Inc. v. Sharp Corp., at al.*, No. 10 C 6763, 2014 WL 2443871 (N.D. Ill. May 30, 2014).

Redacted

**Content omitted pursuant to the
Protective Order entered in the court below.**

Indeed, it is well settled law that the 35 U.S.C. § 102(b) "on-

sale" bar applies if an "invention" that is reduced to practice and ready for patenting is sold or offered for sale more than one year before the patent's filing date. *See, e.g.*, 35 U.S.C. § 102(b); *Pfaff*, 525 U.S. at fn. 2 ("A composition of matter is reduced to practice when it is completely composed."); *Pennwalt*, 740 F.2d at 1580-81 (the "experimental use" exception does not apply to a clinical study in support of an application to the FDA for approval of a new drug); *SmithKline Beecham*, 365 F.3d at 1318 (the drug product being used in a clinical trial to show safety and efficacy did not protect the patent claiming that drug from invalidity, particularly because the claims did not require safety and efficacy, just the compound itself); *Abbott Laboratories*, 182 F.3d at 1319 (if the product offered for sale inherently possesses each limitation of the claims, then the invention is ready for patenting and "on sale"—the product fell within the claims of the patent, thus the claims were invalid).

Redacted

**Content omitted pursuant to the Protective Order entered in the court below.**

Redacted

**Content omitted pursuant to the
Protective Order entered in the court below.**

Gilead knew, or should have known, that its litigating position with respect to infringement and validity of the '340 patent was weak beyond saving, and should never have been brought against Sigmapharm in the first place. As such, this case is "exceptional" under the first facet of the *Octane* standard, and Sigmapharm should be awarded Attorney's Fees for being forced to litigate the '340 patent on this basis. Alternatively, this case also fulfills the second facet of the *Octane* analysis, as discussed *infra*.

**(b)  Gilead Litigated This Case in an Unreasonable Manner**

For all of the reasons enumerated above in relation to the first facet of the *Octane* analysis, Gilead litigated this case in an unreasonable manner.

Redacted

**Content omitted pursuant to the
Protective Order entered in the court below.**

Redacted

**Content omitted pursuant to the
Protective Order entered in the court below.**

Additionally, after Gilead initiated this litigation, it continued to litigate this

case in an unreasonable manner.  As discussed, *supra*,

Redacted

**Content omitted pursuant to the
Protective Order entered in the court below.**

Even in the face of Sigmapharm's DMF amendment, Gilead maintained its

lawsuit on the '340 patent for months, requiring Sigmapharm to continue spending

over half a million dollars to defend itself against a patent that should reasonably

have been removed from the lawsuit (and, again, upon which suit for infringement

should have not been brought in the first place).  It wasn't until the District Court

denied Gilead's Motion to Dismiss Sigmapharm's counterclaims     Redacted

Redacted                                    that Gilead finally

surrendered and provided Sigmapharm with a Covenant Not to Sue on all claims of

the '340 patent.  (A569-70.)

As such, Gilead forced Sigmapharm to continue defending itself against the

'340 patent, a patent that Gilead knew, or should have known, was invalid and not

infringed, until the very last modicum of Gilead's hope was removed—when

Gilead couldn't convince the District Court to dismiss Sigmapharm's

counterclaims based on                              Redacted

**Content omitted pursuant to the
Protective Order entered in the court below.**              through technical

maneuvers and motion practice.  (A1834-54; A569-70.)

In view of the above, Gilead should never have brought its claims of

infringement of the '340 patent in the first place and, at the very least, should have

dropped them once Sigmapharm amended the DMF referenced by its ANDA, but

did not do so.  Therefore, Gilead litigated this case in an unreasonable manner, as

set forth in the *Octane* interpretation of §285.

> **(c)   The District Court Correctly Held that Sigmapharm
> Is the "Prevailing Party"**

Regarding the remaining requirement of §285, the District Court correctly

held that Sigmapharm is the "prevailing party" in this action.  (A4.)  Gilead also

conceded that Sigmapharm is the "prevailing party."  (A4.)  Indeed, the case law is

clear on this point—defendants who obtain a voluntary dismissal with prejudice are considered the "prevailing party."  *See, Highway Equip Co. v. FECO, Ltd.*, 469 F.3d 1027, 1035 (Fed. Cir. 2006).

## VI.    CONCLUSION

The District Court's judgment denying Attorney's Fees to Sigmapharm should be reversed or, alternatively, be vacated and remanded for further consideration in view of *Octane* and *Highmark*.  Further, the District Court's holding that the '340 patent claims are not invalid under 35 U.S.C §102(b) despite

Redacted

should also be reversed or, alternatively, be vacated and remanded back to the District Court with an instruction that the "experimental use" exception does not apply to these sales.

**Content omitted pursuant to the
Protective Order entered in the court below.**

Respectfully submitted,

  /s/ John E. Rosenquist
John E. Rosenquist
Marc R. Wezowski
LEYDIG, VOIT & MAYER, LTD.
Two Prudential Plaza, Suite 4900
180 North Stetson
Chicago, Illinois  60601
Telephone:   (312) 616-5600
Facsimile:    (312) 616-5700

*Counsel for Defendant-Appellant*
*Sigmapharm Laboratories, LLC*

*Gilead Sciences, Inc. v. Sigmapharm Laboratories, LLC, 14-1456*

# Addendum

1.  March 31, 2014 Order,
    *Gilead Sciences, Inc. v. Sigmapharm
    Laboratories, LLC, 14-1456* (D.N.J.)……………………………………A15

2.  March 31, 2014 Opinion,
    *Gilead Sciences, Inc. v. Sigmapharm
    Laboratories, LLC, 14-1456* (D.N.J.) ...……………………….…A1-A14

3.  United States Patent No. 6,451,340………….……………..…….A37-A91

4.  United States Patent No. 5,663,159………….……………...…..A92-A111

# Addendum 1

March 31, 2014 Order, *Gilead Sciences, Inc. v. Sigmapharm Laboratories, LLC, 14-1456* (D.N.J.)

A15

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

_____
                               :
GILEAD SCIENCES, INC.,         :
                               :
       Plaintiff/Counterclaim-Defendant,  :
v.                           :       Civil Action No. 10-4931 (SDW) (MCA)
                               :
SIGMAPHARM LABORATORIES, LLC,  :       **ORDER**
                               :
       Defendant/Counterclaim-Plaintiff.  :       March 31, 2014
                               :
_____  :

**WIGENTON, District Judge:**

This matter comes before the Court by way of the Motion of Defendant Sigmapharm Laboratories, Inc. ("Sigmapharm" or "Defendant") for Attorney's Fees Pursuant to 35 U.S.C. § 285 and Federal Rule of Civil Procedure 54.  (Dkt. No. 207).  Plaintiff Gilead Sciences, Inc. opposes this Motion. (Dkt. No. 210).

For the reasons set forth in this Court's opinion dated March 31, 2014, Defendant's Motion for Attorney's Fees is **DENIED**.

**SO ORDERED.**

                               s/**SUSAN D. WIGENTON**
                              **United States District Judge**

cc:         Hon. Madeline Cox Arleo, U.S.M.J
             All Parties
             Clerk

**A15**

# Addendum 2

March 31, 2014 Opinion, *Gilead Sciences, Inc. v. Sigmapharm Laboratories, LLC, 14-1456* (D.N.J.)

A1-A14

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW JERSEY

_____
:
GILEAD SCIENCES, INC.,                  :
                                        :
        Plaintiff/Counterclaim-Defendant, :
                                        :
v.                                      :        Civil Action No. 10-4931 (SDW) (MCA)
                                        :
SIGMAPHARM LABORATORIES, LLC,  :        **OPINION**
                                        :
        Defendant/Counterclaim-Plaintiff. :        March 31, 2014
                                        :
_____   :

**WIGENTON, District Judge:**

This matter comes before the Court by way of Motion of Defendant Sigmapharm Laboratories, Inc. ("Sigmapharm" or "Defendant") for Attorney's Fees Pursuant to 35 U.S.C. § 285 and Federal Rule of Civil Procedure 54.  (Dkt. No. 207).  Plaintiff Gilead Sciences, Inc. ("Gilead") opposes this Motion. (Dkt. No. 210).  This matter was decided without oral argument pursuant to Federal Rule of Civil Procedure 78.  For the reasons set forth below, Defendant's Motion for Attorney's Fees is **DENIED**.

## I.        BACKGROUND AND PROCEDURAL HISTORY

This case involved a Hatch-Waxman patent infringement action relating to a chemical compound called adefovir dipivoxil ("AD"), which is an active pharmaceutical ingredient used in the treatment of hepatitis B.  AD is protected by two United States patents assigned or licensed to Gilead, namely U.S. Patent No. 5,663,159 ("the '159 patent") and U.S. Patent No. 6,451,340 ("the '340 patent").  Gilead sells AD tablets under the brand name HEPSERA®.  These patents were approved on September 20, 2002 by the U.S. Food and Drug Administration ("FDA").  In June 2010, Sigmapharm submitted an Abbreviated New Drug Application ("ANDA") No. 202051, seeking approval from the FDA to manufacture and sell a generic version of Gilead's

HESPERA® 10-milligram tablets.  On September 24, 2010, Gilead filed its Complaint, alleging infringement of the '159 patent and the '340 patent (collectively "Patents-In-Suit"), as well as invalidity based on prior art.  (Dkt. No. 1, Compl.). Gilead asserts, inter alia, that Sigmapharm's proposed AD product will infringe the Patents-In-Suit.  On December 1, 2011, this Court held a Markman Hearing in this matter, and subsequently on May 31, 2012, the Court issued its opinion regarding the related claim constructions.  On December 11, 2012, Gilead filed its Amended Complaint.  (Dkt. No. 141.)  On December 20, 2012, Gilead filed a Motion to Dismiss Defendant's Sixth Counterclaim and to Strike Defendant's Sixth Affirmative Defense Directed to Inequitable Conduct.  (Dkt. No. 148.)  On March 1, 2013, this Court denied Gilead's Motion to Dismiss without prejudice subject to the right to renew as an in limine motion prior to trial or as otherwise directed by the Court. (Dkt. No. 163.)

On or about March 15, 2013, Gilead executed and provided Sigmapharm with an unconditional and irrevocable covenant not to sue for infringement of the Patents-In-Suit.  This covenant permits Sigmapharm to manufacture, produce, and sell the exact same proposed ANDA product under the same conditions set forth in Sigmapharm's original ANDA.  On March 22, 2013, Gilead submitted its final Motion to Dismiss the current action, requesting that all claims be dismissed with prejudice, including any claims for attorney's fees from Sigmapharm.  (Dkt. No. 170).  On October 8, 2013, this Court ordered dismissal with prejudice for all claims and counterclaims, but permitted Sigmapharm to file a motion for attorney's fees under 35 U.S.C. § 285.  (Dkt. No. 206).

Subsequently, on October 23, 2013, Sigmapharm filed the instant motion for attorney's fees claiming that this case is "exceptional" within the meaning of 35 U.S.C. § 285.  (Dkt. No. 208).  Sigmapharm argues that the case is "exceptional" because Gilead filed a patent

infringement suit on patents and claims that it knew to be invalid and/or unenforceable, and because it continued litigation even after it was clear it could not succeed.   Gilead, on the other hand, contends that it had a legitimate basis for asserting and maintaining its infringement claims for both patents, and that these patents were both valid and enforceable at the time the litigation was instituted and that they remain valid and enforceable today.

## II.   LEGAL STANDARD

The general rule, known as the "American Rule," is that "each party bears its own costs." Refac Int'l, Inc. v. IBM Corp., et al., 710 F. Supp. 569, 570 (D.N.J. 1989); Machinery Corp. of Am. v. Gullfiber AB, 774 F.2d 467, 471 (Fed. Cir. 1985).  A statutory exception to this rule can be found in 35 U.S.C. § 285, which provides: "[t]he court in exceptional cases may award reasonable attorneys' fees to the prevailing party."  This provision "is normally invoked only at the end of litigation."  SL Waber, Inc. v. Am. Power Conversion Corp., 135 F. Supp. 2d 521, 527 (D.N.J. 1999).  "The legislative history of § 285 indicates that Congress intended, even after trial, that it be used sparingly, since it represents a departure from the usual rule that counsel fees are not awardable to the prevailing party in an action at law, and the broad policy against allowing costs to be erected as an undue barrier to litigation."  Id.  Moreover, it "is limited to circumstances in which the award of fees is necessary 'to prevent a gross injustice.'"  Aspex Eyewear Inc. v. Clariti Eyewear, Inc., 605 F.3d 1305, 1314 (Fed. Cir. 2010) (citation omitted).

Overall, it is within the discretion of the court to award fees and expenses.  See Machinery Corp. of Am., 774 F.2d at 471.  "Only after the prevailing party has established the exceptional nature of the case by clear and convincing evidence should the district court decide whether or not to make the award."  Id.  However, even if the Court finds the case to be

exceptional, it still may decline to award fees based on the totality of the circumstances. See ADM Corp. v. Speedmaster Packing Corp., 525 F.2d 662, 664 (3d Cir. 1975).

Federal Rule of Civil Procedure 54(d) permits the parties to request and recover attorneys' fees after showing entitlement to such an award.

### III.   ANALYSIS

#### A.   Whether Sigmapharm is a "Prevailing Party"

First, the court must determine whether the party seeking fees and expenses is the "prevailing party." Defendants who obtain a voluntary dismissal with prejudice are considered prevailing parties. See Highway Equip. Co. v. FECO, Ltd., 469 F.3d 1027, 1035 (Fed. Cir. 2006); Newell v. Nagl Mfg. Co., No. 04-1875, 2007 WL 2033838, at *5 (D.N.J. July 11, 2007) (Wigenton, J.) (citation omitted). Gilead even concedes that "Sigmapharm may technically be considered the 'prevailing party' in this action." (Dkt. No. 210 at 7.) Thus, Sigmapharm has met the first requirement for obtaining attorney's fees.

#### B.   Whether this Case is "Exceptional"

Second, § 285 requires that the prevailing party demonstrate by clear and convincing evidence that the case is "exceptional." See 35 U.S.C. § 285. "To be considered exceptional, the court must find egregious misconduct." Newell, 2007 WL 2033838, at *5. "Exceptional cases usually feature some material, inappropriate conduct related to the matter in litigation, such as willful infringement, fraud or inequitable conduct in procuring the patent, misconduct during litigation, vexatious or unjustified litigation, conduct that violates Federal Rule of Civil Procedure 11, or like infractions." Serio-US Indus., Inc. v. Plastic Recovery Tech. Corp., 459 F.3d 1311, 1321-22 (Fed. Cir. 2006); Epcon Gas Sys., Inc. v. Bauer Compressors, Inc., 279 F.3d 1022, 1034 (Fed. Cir. 2002) (citation omitted); Wedgetail, Ltd. v. Huddleston Deluxe, Inc., 576

F.3d 1302, 1304 (Fed. Cir. 2009) (collecting cases).   "Absent misconduct in the litigation or in securing the patent," a case is exceptional only if (1) it was brought in subjective bad faith, and (2) the case is objectively baseless.  Serio-US Indus., Inc., 459 F.3d at 1322; Brooks Furniture Mfg., Inc. v. Dutailer Int'l, Inc., 393 F.3d 1378, 1381 (Fed. Cir. 2005).

Sigmapharm contends that this case is exceptional and that it is entitled to attorney's fees because Gilead filed a patent infringement suit on patents that it knew not to be infringed, were invalid and/or unenforceable, and because Gilead failed to dismiss its claims once circumstances relating to the infringement changed during the litigation.  Thus, Sigmapharm appears to argue that this case is exceptional because the litigation was both brought and maintained in bad faith and was objectively baseless, and due to misconduct by Gilead in the procurement of the '340 patent.  Gilead, on the other hand, contends that it had a legitimate basis for asserting and maintaining its infringement claims for both the '159 and '340 patents because both patents were valid and enforceable at the time the suit was filed, and remain valid and enforceable today.

As an initial matter, this Court notes that the issues of non-infringement and invalidity of Gilead's patents were never reached in the underlying litigation.  Rather, all of the claims and counterclaims were dismissed with prejudice when Gilead signed a covenant not to sue.  For the reasons set forth herein, this Court finds that Sigmapharm has failed to establish by clear and convincing evidence that this case is "exceptional" within the meaning of 35 U.S.C. § 285.  The underlying facts and background of this case do not support such a finding.

### i.  The '159 Patent

With respect to the '159 patent, Sigmapharm contends that the patent was invalid because it was clearly "obvious" due to the Holy 1989 reference.  Gilead, on the other hand, contends that it had the right to sue Sigmapharm for infringement because the '159 patent is presumed to be

valid and enforceable.  See 35 U.S.C. § 282 ("A patent shall be presumed valid."); McNiel-PPC, Inc. v. L. Perrigo Co., 337 F.3d 1362, 1372 (Fed. Cir. 2003) (reversing the grant of attorney's fees, even where patent-in-suit was invalidated after trial, noting that "[a] patent owner has the 'right to exclude others from making, using, and selling the invention and to enforce those rights until [its patents are] held invalid [or expire].'") (citation omitted)).  This Court agrees.

To begin, Gilead's patents are presumed to be valid and enforceable.  Microsoft v. i4i Ltd. P'ship, 131 S. Ct. 2238, 2246 (2011) (explaining that the presumption of validity remains unless and until the presumption is overcome with "clear and convincing evidence of error") (citations omitted).  Patent holders have a right to sue for infringement of their patents until its patent is held invalid or expires.  McNiel-PPC, Inc., 337 F.3d at 1372.  Moreover, "[t]here is a presumption that the assertion of infringement of a duly granted patent is made in good faith." Brooks Furniture Mfg., 393 F.3d at 1382.  As such, Gilead was well within its right to assert its claim for patent infringement against Sigmapharm.

Second, this Court is satisfied that the existence of the Holy 1989 reference does not make the assertion of patent infringement "objectively baseless," nor was the case asserted in "bad faith."   Gilead notes that the Holy 1989 reference was cited on the face of the patent and was thus before the patent examiner during prosecution of the application, which was subsequently granted.  See Glaxo Grp. Ltd. v. Apotex, Inc., 376 F.3d 1339, 1348 (Fed. Cir. 2004) (noting that the burden of proving invalidity by clear and convincing evidence "is 'especially difficult' when, as is the present case, the infringer attempts to rely on prior art that was before the patent examiner during prosecution") (citation omitted)).  Based on this reference and the fact that the patent was issued, Gilead had no reason to question the validity of the

patent, let alone know that it was invalid. Accordingly, this Court concludes that Gilead had a good faith and objectively reasonable basis to assert patent infringement of the '159 patent.

Sigmapharm also contends that Gilead should have dismissed its remaining infringement allegations concerning the '159 patent after August 10, 2012, when Sigmapharm admitted that it infringed the claims of the '159 patent that read on adefovir dipivoxil. However, according to Gilead, Sigmapharm only stipulated to infringement of the bis-POM PMEA claims of the '159 patent. Gilead contends that after August 10, 2012, it continued to pursue infringement claims 2, 4, and 14-17 of the '159 patent, which were directed to mono-POM PMEA[1]. As previously noted, patent holders, Gilead included, have a right to sue for infringement of their patents. To find that it was improper for Gilead to sue for infringement of the mono-POM PMEA claims of '159 patent would encroach upon Gilead's patent rights. McNiel-PPC, Inc., 337 F.3d at 1372.

Sigmapharm also contends that Gilead could not prove infringement of the remaining claims because Gilead itself did not test Sigmapharm's product for the presence of mono-POM PMEA. Gilead contends that it did not need to test Sigmapharm's product because Sigmapharm had already tested it, had concluded the product contained mono-POM PMEA, and had reported those results to the FDA. This Court finds that whether Gilead was or was not required to perform further testing does not demonstrate that the case was brought in bad faith or that it was objectively baseless, particularly where, as here, Gilead claims it relied on Sigmapharm's testing.

### ii. The '340 Patent

Sigmapharm also contends that this case is "baseless" because Gilead filed for infringement of the '340 patent when it knew or should have known that the patent was invalid due to undisclosed prior sales. See 35 U.S.C. § 102 (A person shall be entitled to a patent unless, inter alia, "the claimed invention was . . . on sale . . . before the effective filing date of the

---

[1] Adefovir dipivoxil and mono-POM PMEA are prodrugs covered by the '159 patent.

claimed invention."). Sigmapharm claims that Gilead's purchase of massive quantities of crystalline AD from third parties, Raylo Chemicals and Quintilies, which occurred years before the critical date of July 25, 1996 for the '340 patent, were invalidating commercial sales. Sigmapharm also alleges that Gilead had a duty to disclose these sales to the USPTO and failed to do so. Gilead, on the other hand, contends that the '340 patent was valid and enforceable when it brought suit, and that it remains valid and enforceable today. Gilead also alleges that it had a subjective good faith basis as well as an objective basis for viewing any alleged "sales" of AD prior to the critical date as non-invalidating sales because they were made primarily for the purposes of experimentation.

A person is entitled to a patent unless, <u>inter alia</u>, "the invention was . . . on sale in this country, more than one year prior to the date of the application for patent in the United States." <u>Electromotive Div. of GMC v. Transp. Sys. Div. of GE</u>, 417 F.3d 1203, 1209 (Fed. Cir. 2005) (citing 35 U.S.C. § 102(b)). In <u>Pfaff v. Wells Elecs., Inc.</u>, 525 U.S. 55 (1998), the Supreme Court set forth a two-part test for application of the on-sale bar. First, the claimed invention must be the subject of a commercial sale. <u>Pfaff</u>, 525 U.S. at 67. Second, the claimed invention must be ready for patenting. <u>Id.</u> at 67-68. The first prong of the <u>Pfaff</u> test entails an assessment of whether the circumstances surrounding a pre-critical date sale objectively show that it was primarily made for experimentation. <u>Electromotive</u>, 417 F.3d at 1210. The Federal Circuit has explained that:

> The question posed by the experimental use doctrine . . . is not whether the invention was under development, subject to testing, or otherwise still in its experimental stage at the time of the asserted sale. Instead, the question is whether the transaction constituting the sale was not incidental to the primary purpose of experimentation, i.e., whether the primary purpose of the inventor at the time of the sale, as determined from an objective evaluation

**A8**

> of the facts surrounding the transaction, was to conduct experimentation.

Id. (quoting Allen Eng'g Corp. v. Bartell Indus., Inc., 299 F.3d 1336, 1354 (Fed. Cir. 2002)).  If the sale was primarily for experimentation rather than commercial gain, then the sale is not invalidating under § 102(b).  Monon Corp. v. Stoughton Trailers, Inc., 239 F.3d 1253, 1258 (Fed. Cir. 2001) ("Evidence that the . . . sale of the patented device was primarily experimental may negate an assertion of invalidity.").  In Allen Eng'g Corp. v. Bartell Indus., 299 F.3d 1336, 1353 (Fed. Cir. 2002), the Court set forth a list of factors that are instructive for determining commercial versus experimental uses:

> (1) the necessity for public testing, (2) the amount of control over the experiment retained by the inventor, (3) the nature of the invention, (4) the length of the test period, (5) whether payment was made, (6) whether there was a secrecy obligation, (7) whether records of the experiment were kept, (8) who conducted the experiment, (9) the degree of commercial exploitation during testing, (10) whether the invention reasonably requires evaluation under actual conditions of use, (11) whether testing was systematically performed, (12) whether the inventor continually monitored the invention during testing, and (13) the nature of contacts made with potential customers.

Id. (quotation and alteration marks omitted).

"A use may be experimental only if it is designed to (1) test claims features of the invention or (2) to determine whether an invention will work for its intended purpose—itself a requirement of patentability."  Clock Spring, L.P. v. Wrapmaster, Inc., 560 F.3d 1317, 1327 (Fed. Cir. 2009); In re Omeprazole Patent Litig., 536 F.3d 1361, 1373-75 (Fed. Cir. 2008).  "In other words, an invention may not be ready for patenting if claimed features or overall workability are being tested.  But, there is no experimental use unless claimed features or overall workability are being tested for purposes of the filing of a patent application."  Clock Spring, 560 F.3d at 1327; EZ Dock v. Schafer Sys., 276 F.3d 1347, 1354 (Fed. Cir. 2002).  "Indeed, the

experimental use negation of the § 102(b) bar only exists to allow an inventor to perfect his discovery through testing without losing his right to obtain a patent for his invention." Clock Spring, 560 F.3d at 1327; EZ Dock, 276 F.3d at 1352. Clinical trials conducted to determine the efficacy of a drug candidate have been found to be an example of experimental use negation of the statutory bar. See Bayer Schering Pharma AG v. Barr Labs., Inc., No. 05-cv-2308, 2008 WL 628592 (D.N.J. Mar. 3, 2008). "If there is adequate proof that a device was sold primarily for experimentation, the first prong of Pfaff would not be met and it would be unnecessary to consider either whether the device was an embodiment of the claimed invention or whether the invention was 'ready for patenting' at the time of the sales." Allen Eng'g, 299 F.3d at 1353.

Sigmapharm alleges that more than one year prior to the filing of the '340 patent, Gilead directed Raylo Chemicals to manufacture multiple bulk lots of crystalline AD and purchased the resulting lots. Sigmapharm claims that these purchases began in September 1994, almost two years before the critical date and continued regularly through June 1996. Sigmapharm also contends that Gilead purchased over thirteen thousand ("13,000") bottles of crystalline AD tablets from Quintilies. Sigmapharm further alleges that the invention claims in the '340 patent were not only "ready for patenting" but were actually reduced to practice in 1993, well before Gilead began purchasing AD. According to Sigmapharm, these purchases negate any assertion that the prior sales and/or uses were for research purposes.

Gilead, on the other hand, contends that it had a subjective good faith basis as well as an objective basis for viewing any alleged "sales"/"purchases" of AD prior to the critical date as non-invalidating sales because they were made primarily for purposes of experimentation. Gilead argues that the four batches that Sigmapharm relies on were intended for clinical use and were used in clinical studies or in other "non-clinical research." (Dkt. No. 210, at 16); (see also

**A10**

Dkt. No. 210-7, Ex. 9, GH000474070, "A Review of Adefovir Dipivoxil Manufacturing at Raylo ARS," (discussing the process development period and showing that Raylo lots 2166-A-2P and 2166-A-6P were "rejected for clinical use" for containing unacceptably high impurity levels and thus the batches were re-processed for "non-clinical research"; "[a]ll other batches were released for clinical use"); (Dkt. No. 210-8, Ex. 10, GH000403678, "Summary of Drug Substance Lots," (showing that Raylo lots 2166-A-4P, 2166-A-5P and 2166-A-7P were for use in toxicology, clinical, and stability studies)).   Gilead argues that the allegedly invalidating sales consist of transactions between Gilead and Raylo, whom Gilead contracted to manufacture AD for the purposes of the clinical tests and other studies.   Gilead also claims that Sigmapharm has failed to provide any evidence regarding the sales from Quintilies.   Furthermore, Gilead contends that the reason it needed a large quantity of drugs was to develop an FDA-compliant manufacturing practice and protocols to administer the drug to humans in clinical trials, but that does not mean that the purchases were "commercial" batches.

Based on the record, this Court finds that Sigmapharm has not demonstrated by clear and convincing evidence that the sales were commercial and invalidating.   To the contrary, Gilead has put forth adequate proof that the prior sales/purchases were primarily for experimentation. This evidence negates the assertion of invalidity.   Accordingly, this Court finds that Gilead had a subjective good faith basis as well as an objective basis for asserting claims of infringement of the '340 patent against Sigmapharm.

Sigmapharm also alleges that Gilead filed infringement claims relating to the '340 patent despite knowing it was unenforceable.   Sigmapharm essentially argues that Gilead committed "inequitable conduct" in the procurement of the '340 patent.   However, there has been no finding or stipulation of unenforceability, much less a finding that Gilead somehow knew that the '340

patent was unenforceable.  Moreover, Sigmapharm's inequitable conduct claim was dismissed with prejudice by agreement of the parties.  (Dkt. No. 206).  To prove inequitable conduct, Sigmapharm would need to demonstrate, by clear and convincing evidence, that a person having a duty of candor to the PTO "misrepresented or omitted material information with the specific intent to deceive the PTO."  Therasense, Inc. v. Becton, Dickinson and Co., 649 F.3d 1276, 1287 (Fed. Cir. 2011) (internal citation omitted).  Sigmapharm has failed to allege that the '340 patent inventors or prosecuting attorneys acted with specific intent to deceive.  Instead, Sigmapharm offers only that the purchases of AD were "made with the knowledge of inventors of the '340 patent and the prosecution team," and that they failed to disclose such purchases to the PTO. (Dkt. No. 208, at 19.)  Sigmapharm cites to meeting minutes that were supposedly circulated to some of the inventors and attorneys responsible for prosecuting the '340 patent.   However, the mere existence of such a document does not establish knowledge of any purchases.  In addition, Sigmapharm deposed two of the '340 patent inventors, but never asked either of them why such purchases were not mentioned to the PTO.  The evidence before this Court is insufficient to demonstrate that Gilead had a specific intent to deceive the PTO.  Accordingly, this Court finds that Sigmapharm has failed to prove that Gilead committed inequitable conduct in procurement of the '340 patent.

Further, Sigmapharm contends that Gilead should have discontinued the litigation as to the '340 patent after Sigmapharm amended its Drug Master File ("DMF").   Originally, Sigmapharm imported a solid AD precursor, ADDMC, into the United States.   Sigmapharm subsequently amended its manufacturing process whereby it contended that it would only import liquid ADDMC.  However, based on the evidence before the Court, including letters to the FDA (Dkt. No. 210-11, Ex. 13) and Sigmapharm's Amended Answer (Dkt. No. 145), it appears that

Sigmapharm never abandoned its original process, which is why Gilead continued its litigation against Sigmapharm as to the '340 patent. Moreover, when Sigmapharm amended its DMF to add the amended manufacturing process, Gilead amended its Complaint accordingly. (See Dkt. No. 140, Amended Compl., at ¶¶ 35-48). This Court finds that, even after Sigmapharm amended its DMF, Gilead had both a subjective and objective good faith basis and an objective basis for maintaining its infringement claims with respect to the '340 patent.

Finally, Sigmapharm contends that the timing of the covenant not to sue is significant, as it arrived mere days before the scheduled depositions of seven of Gilead's experts for the '340 patent and two weeks after the Court denied Gilead's motion to dismiss Sigmapharm's claims of inequitable conduct for the '340 patent. Gilead, on the other hand, explains that it chose to terminate this lawsuit because the landscape of the hepatitis B market changed during the course of the litigation and by early 2013 it no longer made sense for Gilead to pursue this case. Gilead contends that there were better and more efficacious alternatives such as Viread® and another generic product that were on the doorstep of entering the market.

As previously discussed, it is within the court's discretion whether or not to award attorney's fees. Machinery Corp. of Am., 774 F.2d at 471; Badalamenti v. Dunham's, Inc., 896 F.2d 1359, 1364 (Fed. Cir. 1990). It is equally clear that the defendant bears the burden of proving, by clear and convincing evidence, that this case is exceptional. Badalamenti, 896 F.2d at 1364. There must be some finding of unfairness, bad faith, or inequitable conduct on the part of the plaintiff. Based on the evidence before this Court, Sigmapharm has failed to establish any misconduct on the part of Gilead during the litigation or in the procurement of its patents, or that the litigation was objectively baseless and brought in subjective bad faith. Accordingly, this Court finds that this case is not "exceptional" within the meaning of 35 U.S.C. § 285.

IV.     **CONCLUSION**

Defendant has not met the exceedingly high burden of presenting clear and convincing evidence that this case is "exceptional" within the meaning of 35 U.S.C. § 285 warranting the imposition of attorney's fees.  Therefore, this Court **DENIES** Defendant's Motion for Attorney's Fees.

s/**SUSAN D. WIGENTON**
**United States District Judge**

cc:        Hon. Madeline Cox Arleo, U.S.M.J
           All Parties
           Clerk

# Addendum 3

United States Patent No. 6,451,340

A37-A91



UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office

January 23, 2013

THIS IS TO CERTIFY THAT ANNEXED HERETO IS A TRUE COPY FROM
THE RECORDS OF THIS OFFICE OF:

U.S. PATENT: 6,451,340
ISSUE DATE: September 17, 2002

By Authority of the
Under Secretary of Commerce for Intellectual Property
and Director of the United States Patent and Trademark Office

P. SWAIN
Certifying Officer



US006451340B1

(12) **United States Patent**
Arimilli et al.

(10) Patent No.: **US 6,451,340 B1**
(45) Date of Patent: **Sep. 17, 2002**

(54) **NUCLEOTIDE ANALOG COMPOSITIONS**

(75) Inventors: **Murty N. Arimilli**, Fremont; **Daphne E. Kelly**, San Francisco; **Thomas T. K. Lee**, Redwood City; **Lawrence V. Manes**, Moss Beach; **John D. Munger, Jr.**, Alviso; **Ernest J. Prisbe**, Los Altos; **Lisa M. Schultze**, San Carlos, all of CA (US)

(73) Assignee: **Gilead Sciences, Inc.**, Foster City, CA (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/950,031**

(22) Filed: **Sep. 10, 2001**

**Related U.S. Application Data**

(63) Continuation of application No. 09/121,163, filed on Jul. 23, 1998, now abandoned.
(60) Provisional application No. 60/053,771, filed on Jul. 25, 1997.

(51) Int. Cl.[7] ................................................ A61K 9/20
(52) U.S. Cl. ...................... 424/464; 424/465; 424/489; 514/449
(58) Field of Search ................................. 424/464, 465; 424/489; 514/449

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,476,248 A | | 10/1984 | Gordon et al. |
| 5,663,159 A | | 9/1997 | Starrett, Jr. et al. ......... 514/181 |
| 5,795,909 A | * | 8/1998 | Shashoua et al. ........... 514/449 |
| 2002/0035085 A1 | * | 3/2002 | Sommadossi et al. ........ 514/45 |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 0 481 214 A1 | 4/1992 |
| EP | 0 632 048 A1 | 6/1994 |
| EP | 0 647 649 A1 | 4/1995 |

| | | | | |
|---|---|---|---|---|
| WO | WO 92/09611 | 6/1992 | | |
| WO | WO 00/16755 A2 | * | 3/2000 | ......... A61K/31/00 |

OTHER PUBLICATIONS

Benzaria et al., "New Prodrugs of 9–(2–Phosphonomethoxyethyl) Adenine [PMEA]: Synthesis and Stability Studies", 14(3–5):563–565, NUCLS & NUCLT, 1995.
Berge et al., "Pharmaceutical Salts", 66(1):1–19, J Pharm Sci, Jan. 1977.
Cundy et al., "Oral bioavailability of the antiretroviral agent 9–(2–phosphonylmethoxyethyl)adenine (PMEA) from three formulations of the prodrug bis(pivaloyloxymethyl)–PMEA in fasted male cynomolgus monkeys", 11(6):839–843, Pharm Res, 1994.
Gordon et al., "Common Solvents for Crystallization", pp. 442–443, The Chemist's Companion, 1972.
Iyer et al., "Synthesis of Acyloxyalkyl Acylphosphonates as Potential Prodrugs of the Antiviral, Trisodium Phosphonoformate (Foscarnet Sodium)", 30(51):7141:7144, Tet Lett, 1989.
Landgrebe, John A., "Crystallization and Filtration", 3rd edition, pp. 65–77, Theory and Practice in the Organic Laboratory, 1982.
Lee et al., "Characterization of the Thermal Decomposition of Adefovir Dipivoxil in the Solid State", Poster, AAPS, Apr. 24 & 25, 1997.
MIT Student Manual, "Purification of Solids", Chapter 5, pp. 1–18, (precedes filing date).

(List continued on next page.)

Primary Examiner—Thurman K. Page
Assistant Examiner—Robert M. Joynes
(74) Attorney, Agent, or Firm—Max D. Hensley

(57) **ABSTRACT**

The invention provides crystalline forms of adefovir dipivoxil and methods to prepare the crystals. The compositions and methods of the present invention have desirable properties for large scale synthesis of crystalline adefovir dipivoxil or for its formulation into therapeutic dosages. Invention compositions include an anhydrous crystal form of adefovir dipivoxil.

**47 Claims, 29 Drawing Sheets**



Copy provided by USPTO from the PIRS Image Database on 01/22/2013

## US 6,451,340 B1
Page 2

### OTHER PUBLICATIONS

Munzel, K., "Der Einfluss der Formgebung auf die Wirkung eines Arzneimittels", 14:309–321, Ritte Der Arzneimittel-forschung, 1970.

Myerson, Allan S. (editor), "Solutions and Solution Properties", p. 1–165, Handbook of Industrial Crystallization, 1993.

Serafinowska et al., "Synthesis and in Vivo Evaluation of Prodrugs of 9–[2–(Phosphonomethoxy)ethoxy]adenine", 38:1372–1379, J Med Chem, 1995.

Starrett et al, "Synthesis and in vitro evaluation of a phosphonate prodrug: bis(pivaloyloxymethyl) 9–(2–phosphonyl-methoxyethyl)adenine", 19:267–273, Antiviral Res, 1992.

Starrett et al., "Synthesis, Oral Bioavailability Determination, and in Vitro Evaluation of Prodrugs of the Antiviral Agent 9–[2–(Phosphonomethoxy)ethyl]adenine (PMEA)", 37:1857–1864, J Med Chem, 1994.

* cited by examiner

Copy provided by USPTO from the PIRS Image Database on 01/22/2013



Figure 1

Copy provided by USPTO from the PIRS Image Database on 01/22/2013



**U.S. Patent**   Sep. 17, 2002   Sheet 2 of 29   US 6,451,340 B1



Figure 2

Copy provided by USPTO from the PIRS Image Database on 01/22/2013

A41



Figure 3

Copy provided by USPTO from the PIRS Image Database on 01/22/2013



Figure 4

Copy provided by USPTO from the PIRS Image Database on 01/22/2013

A43



Figure 5

Copy provided by USPTO from the PIRS Image Database on 01/22/2013

A44



## Figure 6



Figure 7

Case: 14-1456 CASE PARTICIPANTS ONLY Document: 76 Page: 24 Filed: 07/07/2014



## Figure 8

Copy provided by USPTO from the PIRS Image Database on 01/22/2013



Figure 9

Copy provided by USPTO from the PIRS Image Database on 01/22/2013

A48



Figure 10

Copy provided by USPTO from the PIRS Image Database on 01/22/2013



Figure 11





**Figure 12**

Copy provided by USPTO from the PIRS Image Database on 01/22/2013



Figure 13

Copy provided by USPTO from the PIRS Image Database on 01/22/2013



Figure 14

Copy provided by USPTO from the PIRS Image Database on 01/22/2013



Figure 15

Copy provided by USPTO from the PIRS Image Database on 01/22/2013

Case: 14-1456 CASE PARTICIPANTS ONLY Document 24 Filed: 07/07/2014



Figure 16

Copy provided by USPTO from the PIRS Image Database on 01/22/2013



Figure 17

Copy provided by USPTO from the PIRS Image Database on 01/22/2013

Case: 14-1456 Case: 14-456 PARTICIPANTS-ON-25 Document: 86 Page: 24 Filed: 07/30/2014 Filed: 07/07/2014



Figure 18

Copy provided by USPTO from the PIRS Image Database on 01/22/2013

Case: 14-1456 Case: 14-56 PARTICIPANTS ONLY Document: 87 Page: 87 of 24 Filed: 07/07/2014 Filed: 07/07/2014





Figure 19

Copy provided by USPTO from the PIRS Image Database on 01/22/2013



Figure 20

Copy provided by USPTO from the PIRS Image Database on 01/22/2013

A59



Figure 21

Copy provided by USPTO from the PIRS Image Database on 01/22/2013



Figure 22

Copy provided by USPTO from the PIRS Image Database on 01/22/2013

A61





Figure 23

Copy provided by USPTO from the PIRS Image Database on 01/22/2013

Case: 14-1456 CASE PARTICIPANTS ONLY Document: 25 Page: 92 Filed: 07/07/2014



Figure 24

Copy provided by USPTO from the PIRS Image Database on 01/22/2013

A63

Case: 14-1456 CASE PARTICIPANTS ONLY Document: 25 Page: 93 Filed: 07/07/2014



Figure 25

Copy provided by USPTO from the PIRS Image Database on 01/22/2013

Case: 14-1456 CASE PARTICIPANTS ONLY Document: 24 Page: 94 Filed: 07/07/2014



Figure 26

Copy provided by USPTO from the PIRS Image Database on 01/22/2013

A65



Figure 27

Copy provided by USPTO from the PIRS Image Database on 01/22/2013

A66



Figure 28

Copy provided by USPTO from the PIRS Image Database on 01/22/2013

(a) Observed:



(b) Calculated:



Figure 29

Copy provided by USPTO from the PIRS Image Database on 01/22/2013

US 6,451,340 B1

1

# NUCLEOTIDE ANALOG COMPOSITIONS

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation of application Ser. No. 09/121,163, filed Jul. 23, 1998, now abandoned, and a continuation-in-part of provisional application Ser. No. 60/053,771, filed Jul. 25, 1997, now abandoned.

## BACKGROUND OF THE INVENTION

The invention relates to the nucleotide analog 9-[2-[[bis [(pivaloyloxy)methoxy]phosphinyl]methoxy]ethyl]adenine ("adefovir dipivoxil" or "AD") and to its use. The present invention also relates to methods to synthesize AD.

AD is the bis-pivaloyloxymethyl ester of the parent compound 9-[2-(phosphonomethoxy)ethyl]adenine ("PMEA"), which has antiviral activity in animals and in humans. AD and PMEA have been described, e.g., U.S. Pat. Nos. 4,724,233 and 4,808,716, EP 481 214, Benzaria et al., *Nucleosides and Nucleotides* (1995) 14(3–5):563–565, Holy et al., *Collect. Czech. Chem. Commun.* (1989) 54:2190–2201, Holy et al., *Collect. Czech. Chem. Commun.* (1987) 52:2801–2809, Rosenberg et al., *Collect. Czech. Chem. Commun.* (1988) 53:2753–2777, Starrett et al., *Antiviral Res.* (1992) 19:267–273; Starrett et al., *J. Med. Chem.* (1994) 37:1857–1864. Heretofore, AD has been provided only as a noncrystalline or amorphous form. It has not been reported to have been prepared as a crystalline material.

Methods for crystallizing organic compounds per se are described in J. A. Landgrebe, *Theory and Practice in the Organic Laboratory*, 2nd edition, 1977, D.C. Heath and Co., Lexington, Mass., p. 43–51; A. S. Myerson, *Handbook of Industrial Crystallization*, 1993, Butterworth-Heinemann, Stoneham, Mass., p. 1–101).

## OBJECTS OF THE INVENTION

The invention provides one or more compositions or methods that meet one or more of the following objects.

A principal object of the invention is to provide compositions comprising novel AD forms having desirable properties for large scale synthesis or for formulation into therapeutic dosages.

Another object is to provide AD having good melting point, and/or flow or bulk density properties, which facilitates manufacturing and formulation of compositions containing AD.

Another object is to provide storage-stable forms of AD.

Another object is to provide AD which can be readily filtered and easily dried.

Another object is to provide highly purified AD having at least about 97% (w/w) purity and preferably at least about 98%.

Another object is to eliminate or minimize by-products made during AD synthesis.

Another object is to provide a method for purifying AD that avoids expensive and time-consuming column chromatography.

## SUMMARY OF THE INVENTION

The invention accomplishes its primary objects by providing crystalline AD, in particular, an anhydrous crystalline form (hereafter "Form 1"), a hydrated form, $C_{20}H_{32}N_5O_8P_1.2H_2O$, (hereafter "Form 2"), a methanol solvate form, $C_{20}H_{32}N_5O_8P_1.CH_3OH$, (hereafter "Form 3"),

2

a fumaric acid salt or complex, $C_{20}H_{32}N_5O_8P_1.C_4H_4O_4$ (hereafter "Form 4"), a hemisulfate salt or complex, a hydrobromide salt or complex, a hydrochloride salt or complex, a nitrate salt or complex, a mesylate ($CH_3SO_3H$) salt or complex, an ethyl sulfonate salt ($C_2H_5SO_3H$) or complex, a β-naphthylene sulfonic acid salt or complex, an α-naphthylene sulfonic acid salt or complex, an (S)-camphor sulfonic acid salt or complex, a succinic acid salt or complex, a maleic acid salt or complex, an ascorbic acid salt or complex and a nicotinic acid salt or complex.

Invention embodiments include (1) crystalline Form 1 AD essentially having an X-ray powder diffraction ("XRD") spectrum using Cu—Kα radiation, expressed in degrees 2θ at any one or more (in any combination) of about 6.9, about 11.8, about 12.7, about 15.7, about 17.2, about 20.7, about 21.5, about 22.5, and about 23.3; (2) crystalline Form 2 AD essentially having an XRD spectrum using Cu—Kαradiation, expressed in degrees 2θ at any one or more (in any combination) of about 8.7–8.9, about 9.6, about 16.3, about 18.3, about 18.9, about 19.7, about 21.0, about 21.4, about 22.0, about 24.3, about 27.9, about, 30.8, and about 32.8; (3) crystalline Form 3 AD essentially having an XRD spectrum using Cu—Kα radiation, expressed in degrees 2θ at any one or more (in any combination) of about 8.1, about 8.7, about 14.1, about 16.5, about 17.0, about 19.4, about 21.1, about 23.4, about 24.2, about 25.4, and about 30.9; and crystalline Form 4 AD essentially having an XRD spectrum using Cu—Kα radiation, expressed in degrees 2θ at any one or more (in any combination) of about 9.8, about 15.2, about 15.7, about 18.1, about 18.3, about 21.0, about 26.3 and about 31.7.

Invention embodiments include AD crystals having the crystal morphologies shown in any one or more of FIGS. 4–10.

In other embodiments, the invention provides methods to produce AD crystals by allowing crystals to form from a crystallization solution comprising about 6–45% AD and about 55–94% crystallization solvent wherein the crystallization solvent is selected from the group consisting of (1) a mixture between about 1:10 v/v to about 1:3 v/v of acetone:di-n-butyl ether, (2) a mixture between about 1:10 v/v to about 1:3 v/v of ethyl acetate:di-n-propyl ether, (3) a mixture between about 1:10 v/v to about 10:1 v/v of t-butanol:di-n-butyl ether, (4) a mixture between about 1:10 v/v to about 1:3 v/v of methylene chloride:di-n-butyl ether, (5) a mixture between about 1:10 v/v to about 10:1 v/v of diethyl ether:di-n-propyl ether, (6) a mixture between about 1:10 v/v to about 1:3 v/v of tetrahydrofuran:di-n-butyl ether, (7) a mixture between about 1:10 v/v to about 1:3 v/v of ethyl acetate:di-n-butyl ether, (8) a mixture between about 1:10 v/v to about 1:3 v/v of tetrahydropyran:di-n-butyl ether, (9) a mixture between about 1:10 v/v to about 1:3 v/v of ethyl acetate:diethyl ether, (10) t-butyl-methyl ether, (11) diethyl ether, (12) di-n-butyl ether, (13) t-butanol, (14) toluene, (15) isopropyl acetate, (16) ethyl acetate, (17) a mixture consisting essentially of (A) a first crystallization solvent consisting of a first dialkyl ether of the formula $R^1$—O—$R^2$ wherein $R^1$ is an alkyl group having 1, 2, 3, 4, 5 or 6 carbon atoms, $R^2$ is an alkyl group having 2, 3, 4, 5 or 6 carbon atoms or both $R^1$ and $R^2$ are linked together to form a 5-, 6-, 7-, or 8-membered ring, provided that the dialkyl ether is not methyl-ethyl ether, and (B) a second crystallization solvent selected from the group consisting of (a) a second dialkyl ether of the formula $R^1$—O—$R^2$, wherein the second dialkyl ether is different from the first dialkyl ether, but is not methyl ethyl ether, (b) toluene, (c) tetrahydrofuran, (d) t-butanol, (e) ethyl acetate, (f) methylene chloride, (g) propyl acetate and (h) isopropanol.

Copy provided by USPTO from the PIRS Image Database on 01/22/2013

US 6,451,340 B1

**3**

Invention embodiments include purified crystalline AD (e.g., form 1 and/or form 2). Invention embodiments also include compositions comprising crystalline AD (e.g., form 1 and/or form 2) and one or more compounds, such as pharmaceutical excipients or compounds present in reaction mixtures that contain the crystalline AD.

Invention embodiments include a method to produce AD crystals comprising dissolving AD in methanol and allowing crystals to form.

Another embodiment is crystalline AD suitable for pharmaceutical compositions or uses comprising, e.g., one or more of Form 1, Form 2, Form 3 and/or Form 4 AD and a pharmaceutically acceptable carrier(s) for treating viral conditions for which PMEA is known to be active, such as a retroviral infection (HIV, SIV, FIV) or hepatitis B virus or other hepadnavirus infections, or DNA virus infection (human cytomegalovirus or herpesvirus, e.g., HSV1 or HSV2) in humans or animals.

The invention provides a method to produce crystalline Form 2 AD comprising forming AD crystals in the presence of water.

In another embodiment, a method for preparing AD comprises contacting PMEA with chloromethyl pivalate in N-methylpyrrolidinone (NMP, 1-methyl-2-pyrrolidinone) and a trialkylamine such as triethylamine (TEA) and recovering AD.

In a further embodiment, a PMEA composition containing less than about 2% salt is provided, which may be used in a method comprising contacting PMEA containing less than about 2% salt.

In a further embodiment, an AD product is obtained by a process comprising preparing wet granules from a mixture comprising a liquid, Form 1 adefovir dipivoxil and an acceptable excipient and, optionally drying the wet granules.

**BRIEF DESCRIPTION OF THE FIGURES**

FIG. 1 shows a Form 1 crystal XRD pattern.

FIG. 2 shows a thermogram obtained by differential scanning calorimetry of Form 1 crystals.

FIG. 3 shows a Fourier transform infrared absorption spectrum of Form 1 crystals.

FIGS. 4–10 are pictures of a photograph showing embodiments of Form 1 crystals at 100x magnification. FIGS. 4–10 are copies of the photographs made at a 128% enlargement.

FIG. 11 shows an XRD pattern of Form 2 crystals.

FIG. 12 shows a thermogram obtained by differential scanning calorimetry of Form 2 crystals.

FIG. 13 shows a Fourier transform infrared absorption spectrum of Form 2 crystals.

FIG. 14 shows an XRD pattern of Form 3 crystals.

FIG. 15 shows a thermogram obtained by differential scanning calorimetry of Form 3 crystals.

FIG. 16 shows a Form 4 crystal XRD pattern.

FIG. 17 shows a thermogram obtained by differential scanning calorimetry of Form 4 crystals.

FIG. 18 shows an AD hemisulfate salt crystal XRD pattern.

FIG. 19 shows an AD hydrobromide salt crystal XRD pattern.

FIG. 20 shows an AD nitrate salt crystal XRD pattern.

FIG. 21 shows an AD mesylate salt crystal XRD pattern.

FIG. 22 shows an AD ethyl sulfonate salt crystal XRD pattern.

**4**

FIG. 23 shows an AD β-naphthylene sulfonate salt crystal XRD pattern.

FIG. 24 shows an AD α-naphthylene sulfonate salt crystal XRD pattern.

FIG. 25 shows an AD (S)-camphor sulfonate salt crystal XRD pattern.

FIG. 26 shows an AD succillic acid salt crystal XRD pattern.

FIG. 27 is a packing diagram showing unit cell of form 1 AD.

FIG. 28 is the atomic numbering scheme for form 1 AD.

FIGS. 29(a) and 29(b) are the powder X-ray diffraction patterns for form 1 AD that were observed (FIG. 29(a)) and calculated (FIG. 29(b)).

**DETAILED DESCRIPTION OF THE INVENTION**

Unless otherwise indicated, temperatures are in degrees Celsius (°) Room temperature means about 18–23°.

As used herein, alkyl means linear, branched and cyclic saturated hydrocarbons. "Alkyl" or "alkyl moiety" as used herein, unless stated to the contrary, is a hydrocarbon containing 1, 2, 3, 4, 5, 6, 7, 8, 9, 10, 11 or 12 normal, secondary, tertiary or cyclic structures. The term $C_{1-10}$ alkyl means alkyl groups having 1, 2, 3, 4, 5, 6, 7, 8, 9 or 10 carbon atoms. Examples are $-CH_3$, $-CH_2CH_3$, $-CH_2CH_2CH_3$, $-CH(CH_3)_2$, $-CH_2CH_2CH_2CH_3$, $-CH_2CH(CH_3)_2$, $-CH(CH_3)CH_2CH_3$, $-C(CH_3)_3$, $-CH_2CH_2CH_2CH_2CH_3$, $-CH(CH_3)CH_2CH_2CH_3$, $-CH(CH_2CH_3)_2$, $-C(CH_3)_2CH_2CH_3$, $-CH(CH_3)CH(CH_3)_2$, $-CH_2CH_2CH(CH_3)_2$, $-CH_2CH(CH_3)CH_2CH_3$, $-CH_2C(CH_3)_3$, $-CH_2CH_2CH_2CH_2CH_3$, $-CH(CH_3)CH_2CH_2CH_2CH_3$, $-CH(CH_2CH_3)(CH_2CH_2CH_3)$, $-C(CH_3)_2CH_2CH_2CH_3$, $-CH(CH_3)CH(CH_3)CH_2CH_3$, $-CH(CH_3)CH_2CH(CH_3)_2$, $-C(CH_3)(CH_2CH_3)_2$, $-CH(CH_2CH_3)(CH_2CH_2CH_3)$, $-C(CH_3)_2CH(CH_3)_2$, $-CH(CH_3)C(CH_3)_3$, cyclopropyl, cyclobutyl, cyclopropylmethyl, cyclopentyl, cyclobutylmethyl, 1-cyclopropyl-1-ethyl, 2-cyclopropyl-1-ethyl, cyclohexyl, cyclopentylmethyl, 1-cyclobutyl-1-ethyl, 2-cyclobutyl-1-ethyl, 1-cyclopropyl-1-propyl, 2-cyclopropyl-1-propyl, 3-cyclopropyl-1-propyl, 2-cyclopropyl-2-propyl, and 1-cyclopropyl-2-propyl.

"Alkoxide" as used herein, unless stated to the contrary, is a hydrocarbon containing 1, 2, 3, 4, 5 or 6 carbon atoms, as defined herein for alkyl, linked to an oxygen atom. Examples are $-OCH_3$, $-OCH_2CH_3$, $-OCH_2CH_2CH_3$, $-OCH(CH_3)_2$, $-OCH_2CH_2CH_2CH_3$, $-OCH_2CH(CH_3)_2$, $-OCH(CH_3)CH_2CH_3$, $-OC(CH_3)_3$, $-OCH_2CH_2CH_2CH_2CH_3$, $-OCH(CH_3)CH_2CH_2CH_3$, $-OCH(CH_2CH_3)_2$, $-OC(CH_3)_2CH_2CH_3$, $-OCH(CH_3)CH(CH_3)_2$, $-OCH_2CH_2CH(CH_3)_2$, $-OCH_2CH(CH_3)CH_2CH_3$, $-OCH_2C(CH_3)_3$, $-OCH(CH_3)CH_2CH_2CH_2CH_3$, $-OCH(C_2H_5)(CH_2)_2CH_3$, $-OC(CH_3)_2CH(CH_3)_2$, $-CH_2C(CH_3)_3$, $-OCH_2CH(CH_3)_2CH_3$, and $-OCH_2CH_2CH_2CH_2CH_2CH_3$.

"Trialkylamine" means an nitrogen atom substituted with three $C_{1-6}$ alkyl moieties, which are independently chosen. Examples are nitrogen substituted with 1, 2 or 3 $-CH_3$, $-CH_2CH_3$, $-CH_2CH_2CH_3$, $-CH(CH_3)_2$, $-CH_2CH_2CH_2CH_3$, $-CH_2CH(CH_3)_2$, $-CH(CH_3)CH_2CH_3$, $-C(CH_3)_3$, $-CH_2CH_2CH_2CH_3$, $-CH(CH_3)CH_2CH_2CH_3$, $-CH(CH_2CH_3)_2$, $-C(CH_3)_2CH_2CH_3$, $-CH(CH_3)CH(CH_3)_2$, $-CH_2CH(CH_3)CH_2CH_3$, $-CH_2C(CH_3)_3$,

Copy provided by USPTO from the PIRS Image Database on 01/22/2013

US 6,451,340 B1

5

$-CH_2CH_2CH_2CH_2CH_2CH_3$,    $-CH(CH_3)$
$CH_2CH_2CH_2CH_3$, $-CH(CH_3)_2(CH_2CH_2CH_3)$,
$-C(CH_3)_2CH_2CH_2CH_3$, $-CH(CH_3)CH(CH_3)CH_2CH_3$,
$-CH(CH_3)CH_2CH(CH_3)_2$, $-CH_2CH_2CH(CH_3)_2$, $-CH$
$(CH_2CH_3)CH(CH_3)_2$, $-C(CH_3)_2CH(CH_3)_2$ or $-CH(CH_3)$
$C(CH_3)_3$ moieties.

"Heteroaryl" as used herein includes by way of example and not limitation these heterocycles described in Paquette, Leo A.; *Principles of Modern Heterocyclic Chemistry* (W. A. Benjamin, New York, 1968), particularly Chapters 1, 3, 4, 6, 7, and 9; *The Chemistry of Heterocyclic Compounds, A series of Monographs* (John Wiley & Sons, New York, 1950 to present), in particular Volumes 13, 14, 16, 19, and 28; and *J. Am. Chem. Soc.*, (1960) 82:5566.

Examples of heterocycles include by way of example and not limitation pyridyl, thiazolyl, tetrahydrothiophenyl, sulfur oxidized tetrahydrothiophenyl, pyrimidinyl, furanyl, thienyl, pyrrolyl, pyrazolyl, imidazolyl, tetrazolyl, benzofuranyl, thianaphthalenyl, indolyl, indolenyl, quinolinyl, isoquinolinyl, benzimidazolyl, piperidinyl, 4-piperidonyl, pyrrolidinyl, 2-pyrrolidonyl, pyrrolinyl, tetrahydrofuranyl, tetrahydroquinolinyl, tetrahydroisoquinolinyl, decahydroquinolinyl, octahydroisoquinolinyl, azocinyl, triazinyl, 6H-1,2,5-thiadiazinyl, 2H,6H-1,5,2-dithiazinyl, thienyl, thianthrenyl, pyranyl, isobenzofuranyl, chromenyl, xanthenyl, phenoxathinyl, 2H-pyrrolyl, isothiazolyl, isoxazolyl, pyrazinyl, pyridazinyl, indolizinyl, isoindolyl, 3H-indolyl, 1H-indazoly, purinyl, 4H-quinolizinyl, phthalazinyl, naphthyridinyl, quinoxalinyl, quinazolinyl, cinnolinyl, pteridinyl, 4aH-carbazolyl, carbazolyl, b-carbolinyl, phenanthridinyl, acridinyl, pyrimidinyl, phenanthrolinyl, phenazinyl, phenothiazinyl, furazanyl, phenoxazinyl, isochromanyl, chromanyl, imidazolidinyl, imidazolinyl, pyrazolidinyl, pyrazolinyl, piperazinyl, indolinyl, isoindolinyl, quinuclidinyl, morpholinyl, oxazolidinyl, benzotriazolyl, benzisoxazolyl, oxindolyl, benzoxazolinyl, and isatinoyl.

By way of example and not limitation, carbon bonded heterocycles are bonded at position 2, 3, 4, 5, or 6 of a pyridine, position 3, 4, 5, or 6 of a pyridazine, position 2, 4, 5, or 6 of a pyrimidine, position 2, 3, 5, or 6 of a pyrazine, position 2, 3, 4, or 5 of a furan, tetrahydrofuran, thiofuran, thiophene, pyrrole or tetrahydropyrrole, position 2, 4, or 5 of an oxazole, imidazole or thiazole, position 3, 4, or 5 of an isoxazole, pyrazole, or isothiazole, position 2 or 3 of an aziridine, position 2, 3, or 4 of an azetidine, position 2, 3, 4, 5, 6, 7, or 8 of a quinoline or position 1, 3, 4, 5, 6, 7, or 8 of an isoquinoline. Still more typically, carbon bonded heterocycles include

2-pyridyl, 3-pyridyl, 4-pyridyl, 5-pyridyl, 6-pyridyl, 3-pyridazinyl, 4-pyridazinyl, 5-pyridazinyl, 6-pyridazinyl, 2-pyrimidinyl, 4-pyrimidinyl, 5-pyrimidinyl, 6-pyrimidinyl, 2-pyrazinyl, 3-pyrazinyl, 5-pyrazinyl, 6-pyrazinyl, 2-thiazolyl, 4-thiazolyl, or 5-thiazolyl.

By way of example and not limitation, nitrogen bonded heterocycles are bonded at position 1 of an aziridine, azetidine, pyrrole, pyrrolidine, 2-pyrroline, 3-pyrroline, imidazole, imidazolidine, 2-imidazoline, 3-imidazoline, pyrazole, pyrazoline, 2-pyrazoline, 3-pyrazoline, piperidine, piperazine, indole, indoline, 1H-indazole, position 2 of a isoindole, or isoindoline, position 4 of a morpholine, and position 9 of a carbazole, or β-carboline. Still more typically, nitrogen bonded heterocycles include 1-aziridyl, 1-azetedyl, 1-pyrrolyl, 1-imidazolyl, 1-pyrazolyl, and 1-piperidinyl.

As used herein, AD that is a "crystalline material", "crystalline" or "crystal" means a solid AD having an

6

ordered arrangement of substantially all of the constituent molecule(s) in a definite three-dimensional spatial pattern or lattice. Crystalline or crystal AD may comprise one or more than one type of composition, e.g., AD.fumaric acid or AD.2H₂O. A crystalline material or crystal may occur in one or more than one crystal habits, e.g., tablets, rods, plates or needles.

Unless specified otherwise explicitly or by context, we express percentage amounts as % by weight (w/w). Thus, a solution containing at least about 40% AD is a solution containing at least about 40% w/w AD. Solid AD containing 0.1% water means 0.1% w/w water is associated with the solid.

Crystalline AD substantially free of noncrystalline AD means a solid composition in which more than about 60% of the AD is present in the composition as crystalline material. Such compositions typically contain at least about 80%, usually at least about 90%, of one or more AD crystal forms, with the remaining AD being present as noncrystalline AD.

Invention compositions optionally comprise salts of the compounds herein, including pharmaceutically acceptable salts comprising, for example, an uncharged moiety or a monovalent anion. Salt(s) include those derived by combination of appropriate anions such as inorganic or organic acids. Suitable acids include those having sufficient acidity to form a stable salt, preferably acids of low toxicity. For example, one may form invention salts from acid addition of certain organic and inorganic acids, e.g., HF, HCl, HBr, HI, H₂SO₄, H₃PO₄, or from organic sulfonic acids, organic carboxylic acids to basic centers, typically amines. Exemplary organic sulfonic acids include C₆₋₁₆ aryl sulfonic acids, C₆₋₁₆ heteroaryl sulfonic acids and C₁₋₁₆ alkyl sulfonic acids such as phenyl, α-naphthyl, β-naphthyl, (S)-camphor, methyl, ethyl, n-propyl, i-propyl, n-butyl, s-butyl, i-butyl, t-butyl, pentyl and hexyl sulfonic acids. Exemplary organic carboxylic acids include C₁₋₁₆ alkyl, C₆₋₁₆ aryl carboxylic acids and C₄₋₁₆ heteroaryl carboxylic acids such as acetic, glycolic, lactic, pyruvic, malonic, glutaric, tartaric, citric, fumaric, succinic, malic, maleic, hydroxymaleic, benzoic, hydroxybenzoic, phenylacetic, cinnamic, salicylic and 2-phenoxybenzoic. Salts also include the invention compound salts with one or more amino acids. Many amino acids are suitable, especially the naturally-occurring amino acids found as protein components, although the amino acid typically is one bearing a side chain with a basic or acidic group, e.g., lysine, arginine or glutamic acid, or a neutral group such as glycine, serine, threonine, alanine, isoleucine, or leucine. Salts are usually biologically compatible or pharmaceutically acceptable or non-toxic, particularly for mammalian cells. Salts that are biologically toxic are generally used with synthetic intermediates of invention compounds. The salts of AD are typically crystalline, such as Form 4 described herein.

Embodiments include compositions that transiently occur when a method step or operation is performed. For example, when a sodium alkoxide is brought into contact with a 9-(2-hydroxyethyl)adenine solution, the composition at the initiation of mixing will contain negligible amounts of the sodium alkoxide. This composition will be generally be present as a non-homogenous mixture prior to sufficient agitation to mix the solution. Such a composition usually comprises negligible reaction products and comprises mostly reactants. Similarly, as a reaction proceeds, the proportions of reactants, products and by-products will change relative to each other. These transient compositions are intermediates that arise when a process step is performed and they are expressly included as invention embodiments.

Copy provided by USPTO from the PIRS Image Database on 01/22/2013

US 6,451,340 B1

| 7 | 8 |

### Crystalline forms of AD

AD prepared and recovered as described (Starrett et al., *J. Med. Chem.* (1994) 19:1857–1864) and as recovered from a silica gel column in a solution of methanol (about 4%) and methylene chloride (about 96%) by rotary evaporation under reduced pressure at about 35° precipitates as a noncrystalline or an amorphous solid. We now have discovered that AD can be prepared in crystalline form.

We have identified several different crystalline AD forms. We have characterized them by several methods, usually by XRD and DSC thermogram. Workers commonly use XRD to characterize or identify crystal compositions (see, e.g., U.S. Pharmacopeia, volume 23, 1995, method 941, p 1843–1845, U.S.P. Pharmacopeial Convention, Inc., Rockville, Md.; Stout et al, *X-Ray Structure Determination; A Practical Guide*, MacMillan Co., New York, N.Y. 1968). The diffraction pattern obtained from a crystalline compound is often diagnostic for a given crystal form, although weak or very weak diffraction peaks may not always appear in replicate diffraction patterns obtained from successive batches of crystals. This is particularly the case if other crystal forms are present in the sample in appreciable amounts, e.g., where Form 1 crystals have become partially hydrated to Form 2 crystals. The relative intensities of bands, particularly at low angle X-ray incidence values (low 2θ), may vary due to preferred orientation effects arising from differences in, e.g., crystal habit, particle size and other conditions of measurement. Thus, the relative intensities of the diffraction peaks are not conclusively diagnostic of the crystal form in question. Instead, one should look to the relative positioning of the peaks rather than their amplitude to determine if an AD crystal is one of the forms described herein. Individual XRD peaks in different samples are generally located within about 0.3–1 2θ degree for broad peaks. Broad XRD peaks may consist of two or more individual peaks located closely together. For sharp isolated peaks under reproducible conditions, the peak is usually found within about 0.1 2θ degrees on successive XRD analyses. Assuming one uses the same instrument to measure a compound's XRD spectrum on successive XRD analyses, the differences in XRD peak locations under typical conditions are due primarily to differences in sample preparation or the purity of the sample itself. When we identify a sharp isolated XRD peak at a given position as being located at, e.g., about 6.9, this means that the peak is at 6.9±0.1. When we identify a broad XRD peak at a given position as being located at about a given 2θ value, this means that the peak is at that 2θ value±0.3.

Note that it is not necessary to rely on all bands that one observes in the highly purified AD reference samples herein; even a single band may be diagnostic of a given crystal form of AD, e.g., 6.9 for Form 1. Identification should focus on band position and general pattern, particularly the selection of bands unique to the various crystal forms.

Additional diagnostic techniques that one can optionally use to identify crystalline AD include differential scanning calorimetry (DSC), melting point measurements and infra-red absorption spectroscopy (IR). DSC measures thermal transition temperatures at which a crystal absorbs or releases heat when its crystal structure changes or it melts. Thermal transition temperatures and melting points are typically within about 2° C. on successive analyses, usually within about 1 degree. When we state that a compound has a DSC peak or a melting point at a given value, it means that the DSC peak or a melting point is within ±2° C. DSC and melting points provide an alternate means for one to distin-

guish between different AD crystal forms. Different crystal forms may be identified, at least in part, based on their different transition temperature profiles. IR measures absorption of infrared light caused by the presence of particular chemical bonds associated with groups in a molecule that vibrate in response to the light. DSC and/or IR can thus provide physicochemical information one can use to describe AD crystals.

### Form 1

Single crystal X-ray crystallography was used to characterize Form 1 AD. Cell constants and an orientation matrix obtained from a least squares refinement using the measured positions of 3242 reflections with I>10σ in the range 3.00<2θ<45.00° corresponded to a C-centered monoclinic cell specified as follows: a=12.85 Å, b=24.50 Å, c=8.28 Å, β=100.2°, Z=4, space group Cc.

The Form 1 XRD pattern usually shows a peak(s) at about 6.9, typically at about 6.9 and about 20.7, or more typically at about 6.9, about 15.7 and about 20.7 and ordinarily at least at about 6.9, about 11.8, about 15.7 and about 20.7. Typically the XRD peak at about 6.9, or usually either (1) this peak plus one or two peaks additional peaks or (2) the peak at about 6.9 plus one or two other peaks coupled with differential scanning calorimetry data or melting point data, is sufficient to distinguish Form 1 crystals from other forms or to identify Form 1 itself. The Form 1 spectrum commonly has peaks at about 6.9, about 11.8, about 12.7, about 15.7, about 17.2, about 20.7, about 21.5, about 22.5 and about 23.3. The Form 1 XRD pattern usually shows a peak(s) at any one (or combination) of about 6.9 and/or 11.8 and/or 15.7 and/or 17.2 and/or 20.7 and/or 23.3. FIG. 1 shows a typical Form 1 crystal X-ray diffraction pattern. It should be understood, however, that FIGS. 1–26 are only exemplary and that diagnostic representations of other crystalline AD preparations may depart from these depictions.

Form 1 AD is anhydrous, containing little or no detectable water. In general, Form 1 crystals ordinarily will contain less than about 1%, typically less than about 0.5%, and usually less than about 0.2% of water. Moreover, Form 1 crystals ordinarily will contain less than about 20%, typically will contain less than about 10%, often less than about 1%, and usually less than about 0.1% noncrystalline AD. Often, Form 1 crystals will contain no noncrystalline AD that is detectable by DSC, XRD or polarized light microscopy at 100× magnification. Form 1 AD is typically substantially free of crystallization solvent, i.e., typically less than about 1%, usually less than about 0.6%, if adequately recovered from the crystallization bath, and it does not contain lattice-entrained solvent molecules.

Form 1 crystals generally have a median size by light scattering of about 25–150 μm, usually about 30–80 μm. Individual Form 1 preparations usually contain crystals that have a length range of about 1–200 μm and have a typical maximum dimension for individual crystals in a preparation of about 60–200 μm. In some Form 1 preparations, about 1–10% of the crystals in a preparation will have a maximum dimension of greater than 250 μm. The Form 1 crystals shown in FIGS. 4–10 typically have tablet, plate, needle and/or irregular habits. Aggregates of Form 1 crystals also occur with a typical diameter range of about 25–150 μm.

Form 1 crystals exhibit a DSC endothermic transition at about 102° C. (see FIG. 2) and an IR spectrum essentially as depicted in FIG. 3. Different Form 1 crystal preparations have a bulk density of about 0.15–0.60 g/mL, usually about 0.25–0.50 g/mL, with a surface area of about 0.10–2.20

Copy provided by USPTO from the PIRS Image Database on 01/22/2013

US 6,451,340 B1

9

$m^2/g$, usually about 0.20–0.60 $m^2/g$. Form 1 AD is thus characterized by an XRD spectrum peak using Cu—Kα radiation, expressed in degrees 2θ at any one (or combination) of about 6.9 and/or 11.8 and/or 15.7 and/or 20.7 and an endothermic transition as measured by differential scanning calorimetry at about 102° C. Form 1 AD is alternatively characterized by an obvious XRD spectrum peak using Cu—Kα radiation, expressed in degrees 2θ at 6.9±0.1, 11.8±0.1, 15.7±0.1, 17.2±0.1, 20.7±0.1 and an endothermic transition peak as measured by differential scanning calorimetry at 102.0±2° and/or an endothermic onset at 99.8±2°.

### Form 2

The Form 2 XRD pattern, an example of which is depicted in FIG. 11, usually shows a peak(s) at about 22.0, typically at about 18.3 and about 22.0, or more typically at about 9.6, about 18.3 and about 22.0 and ordinarily at least at about 9.6, about 18.3, about 22.0 and about 32.8. Typically any two or four of these four characteristic XRD peaks, or usually either (1) four peaks or (2) two or three of these peaks coupled with differential scanning calorimetry data or melting point data, is sufficient to distinguish Form 2 crystals from other forms or to identify Form 2 itself. The Form 2 XRD pattern usually shows a peak(s) at any one (or combination) of about 8.7–8.9, about 9.6, about 16.3, about 18.3, about 18.9, about 19.7, about 21.0–21.3, about 21.4, about 22.0, about 24.3, about 27.9, about 30.8 and about 32.8.

Form 2 crystals are AD dihydrate, and they usually contain essentially no detectable crystallization solvent, other than water. Form 2 crystals ordinarily will contain less than about 30%, typically less than about 10%, often less than about 1%, usually less than about 0.1% of noncrystalline AD. Generally, the crystals will contain no noncrystalline AD that is detectable by DSC, XRD or polarized light microscopy at 100× magnification. Form 2 crystals typically have a median size of about 15–85 μm by light scattering, ordinarily about 25–80 μm. Individual Form 2 preparations usually contain crystals that have a length range of about 1–300 μm. Form 2 crystals have a DSC endothermic transition at 73° C. (see FIG. 12) and an IR spectrum substantially as shown in FIG. 13. Form 2 AD is thus characterized by an XRD spectrum peak using Cu—Kα radiation, expressed in degrees 2θ at any one (or combination) of about 9.6 and/or 18.3 and/or 22.0 and/or 32.8 and an endothermic transition as measured by differential scanning calorimetry at about 73° C. Form 2 AD is alternatively characterized by an obvious XRD spectrum peak using Cu—Kα radiation, expressed in degrees 2θ at 9.6±0.1, 18.3±0.1, 22.0±0.1, 24.3±0.1 and 32.8±0.1 and an endothermic transition peak as measured by differential scanning calorimetry at 72.7±2° and/or an endothermic onset at 69.5±2°.

### Form 3

A Form 3 XRD pattern such as that shown in FIG. 14 usually shows a peak(s) at about 8.1, typically at about 8.1 and about 25.4, or more typically at about 8.1, about 19.4 and about 25.4. Typically any one or two of these three characteristic XRD peaks, or usually either (1) three or four of these peaks or (2) two or three of these peaks coupled with differential scanning calorimetry data or melting point data, is sufficient to distinguish Form 3 crystals from other forms or to identify Form 3 itself. Form 3 AD has an endothermic transition at about 85° as measured by differential scanning

10

calorimetry (FIG. 15). The Form 3 spectrum commonly has peaks at any one (or combination) of about 8.1, about 8.7, about 14.1, about 16.5, about 17.0, about 19.4, about 21.1, about 22.6, about 23.4, about 24.2, about 25.4 and about 30.9.

Unlike Forms 1 and 2, Form 3 crystals contain about one equivalent of methanol in the crystal lattice. The methanol typically is donated by crystallization solvent. However, Form 3 contains essentially no other detectable solvent or water. Form 3 crystals ordinarily will contain less than about 20%, typically less than about 10%, often less than about 1%, usually less than about 0.1% of noncrystalline AD. The crystals will contain no noncrystalline AD that is detectable by DSC, XRD or polarized light microscopy at 100× magnification. Form 3 crystals typically have a median size of about 20–150 μm by light scattering, ordinarily about 30–120 μm. Individual Form 3 preparations usually contain crystals that have a length range of about 1–300 μm.

### Form 4

A Form 4 XRD pattern such as that shown in FIG. 16 usually shows a peak(s) at about 26.3, typically at about 26.3 and about 31.7, or typically at about 26.3, about 31.7 and about 15.2, or usually at about 26.3, about 31.7, about 15.2 and about 21.0. Typically these four characteristic XRD peaks, or usually either (1) three of these peaks or (2) two or three of these peaks coupled with differential scanning calorimetry data or melting point data, to distinguish Form 4 crystals from other forms or to identify Form 4 itself. Form 4 AD has endothermic transitions at about 121° and about 148° as measured by differential scanning calorimetry (FIG. 17). The Form 4 spectrum commonly has peaks at any one (or combination) of about 9.8, about 15.2, about 15.7, about 18.1, about 18.3, about 21.0, about 26.3, and about 31.7.

The invention includes compositions comprising mixtures of two or more different crystal types or forms, e.g., Form 1 and Form 2 crystals, Form 1, Form 2 and Form 4 crystals, or Form 2 and Form 4 crystals. Mixtures of Form 1 and Form 2 AD crystals may be present in pharmaceutical formulations or their manufacture, and typically such mixtures comprise at least about 70% Form 1, usually at least about 90%, but in some instances up to about 70% of such a mixture may comprise Form 2.

### Crystalline Salts of Organic and Inorganic Acids

FIGS. 18–26 show XRD spectra obtained from crystalline salts or, alternatively, complexes of AD and organic and inorganic acids. These salts are a hemisulfate salt or complex (FIG. 18), a hydrobromide salt or complex (FIG. 19), a nitrate salt or complex (FIG. 20), a mesylate ($CH_3SO_3H$) salt or complex (FIG. 21), an ethyl sulfonate salt ($C_2H_5SO_3H$) or complex (FIG. 22), a β-naphthylene sulfonic acid salt or complex (FIG. 23), an α-naphthylene sulfonic acid salt or complex (FIG. 24), an (S)-camphor sulfonic acid salt or complex (FIG. 25) and a succinic acid salt or complex (FIG. 26). These XRD spectra show a number of peaks that characterize the compounds and allow one to identify each compound from other crystalline forms.

FIG. 18 shows that the hemisulfate salt or complex has distinctive XRD peaks in degrees 2θ at any one (or combination) of about 8.0, about 9.5, about 12.0, about 14.6, about 16.4, about 17.0, about 17.5–17.7, about 18.3, about 19.0, about 20.2, about 22.7, about 24.1 and about 28.2. The salt or complex has a melting point of about 131–134° C. It is thus characterized as having four of these distinctive XRD

Copy provided by USPTO from the PIRS Image Database on 01/22/2013

A73

11

peaks at about 12.0, about 14.6, about 16.4 and about 17.5–17.7. One may further characterize the compound as having three or four of these XRD peaks and having a melting point of about 131–134° C. The hemisulfate of AD is alternatively characterized by an obvious XRD spectrum peak using Cu—Kα radiation, expressed in degrees 2θ at 8.0±0.1, 12.0±0.1, 14.6±0.1, 16.4±0.1 and 17.5–17.7±0.3 and a melting point of 131–134±2.0°.

FIG. 19 shows that the hydrobromide salt or complex has distinctive XRD peaks in degrees 2θ at any one (or combination) of about 13.2, about 14.3, about 15.9, about 17.8, about 20.7, about 21.8, about 27.2 and about 28.1. The salt or complex decomposes on heating at about 196–199° C. It is thus characterized as having four distinctive XRD peaks at about 13.2, about 14.3, about 17.8 and about 28.1. One may further characterize the compound as having three or four of these XRD peaks and decomposing on heating to about 196–199° C. The hydrobromide of AD is alternatively characterized by an obvious XRD spectrum peak using Cu—Kα radiation, expressed in degrees 2θ at 13.2±0.1, 14.3±0.1, 17.8±0.1, 20.7±0.1 and 27.2±0.1 and a decomposition point of 196–199±2.0°.

FIG. 20 shows that the nitrate salt or complex has distinctive XRD peaks in degrees 2θ at any one (or combination) of about 8.0, about 9.7, about 14.1, about 15.2, about 16.7, about 17.1, about 18.3, about 18.9, about 19.4, about 20.0, about 21.2, about 22.3, about 23.2, about 24.9, about 27.6, about 28.2, about 29.4 and about 32.6. The salt or complex decomposes at about 135–136° C. It is thus characterized as having four distinctive XRD peaks at about 14.1, about 23.2, about 29.4 and about 32.6. One may further characterize the compound as having three or four of these XRD peaks and having a melting point of about 131–134° C. The nitrate of AD is alternatively characterized by an obvious XRD spectrum peak using Cu—Kα radiation, expressed in degrees 2θ at 8.0±0.1, 14.1±0.1, 23.2±0.1, 29.4±0.1 and 32.6±0.1 and a decomposition point of 135–136±2.0°.

FIG. 21 shows that the mesylate salt or complex has distinctive XRD peaks in degrees 2θ at any one (or combination) of about 4.8, about 15.5, about 16.2, about 17.5, about 18.5, about 20.2, about 24.8, about 25.4 and about 29.5. The salt or complex has a melting point of about 138–139° C. It is thus characterized as having four distinctive XRD peaks at about 4.8, about 15.5, about 20.2 and about 24.8. One may further characterize the compound as having three or four of these XRD peaks and having a melting point of about 138–139° C. The mesylate of AD is alternatively characterized by an obvious XRD spectrum peak using Cu—Kα radiation, expressed in degrees 2θ at 4.8±0.1, 15.5±0.1, 16.2±0.1, 20.2±0.1 and 24.8±0.1 and a melting point of 138–139±2.0°.

FIG. 22 shows that the ethyl sulfonate salt or complex has distinctive XRD peaks in degrees 2θ at any one (or combination) of about 4.4, about 8.8, about 18.8, about 23.0–23.3 and about 27.3. The salt or complex has a melting point of about 132–133° C. It is thus characterized as having four distinctive XRD peaks at about 4.4, about 8.8, about 18.8 and about 27.3. One may further characterize the compound as having three or four of these XRD peaks and having a melting point of about 132–133° C. The ethyl sulfonate of AD is alternatively characterized by an obvious XRD spectrum peak using Cu—Kα radiation, expressed in degrees 2θ at 4.4±0.1, 8.8±0.1, 18.8±0.1, 23.0–23.3±0.3 and 27.3±0.1 and a melting point of 132–133±2.0°.

FIG. 23 shows that the β-naphthylene sulfonic acid salt or complex has distinctive XRD peaks in degrees 2θ at any one

12

(or combination) of about 9.8, about 13.1, about 16.3, about 17.4, about 19.6, about 21.6–22.3, about 23.4, about 24.1–24.5 and about 26.6. The salt or complex has a melting point of about 156–157° C. It is thus characterized as having four distinctive XRD peaks at about 13.1, about 17.4, about 23.4 and about 26.2. One may further characterize the compound as having three or four of these XRD peaks and having a melting point of about 156–157° C. The β-naphthylene sulfonate of AD is alternatively characterized by an obvious XRD spectrum peak using Cu—Kα radiation, expressed in degrees 2θ at 9.8±0.1, 13.1±0.1, 17.4±0.1, 23.4±0.1 and 26.2±0.1 and a melting point of 156–157±2.0°.

FIG. 24 shows that the α-naphthylene sulfonic acid salt or complex has distinctive XRD peaks in degrees 2θ at any one (or combination) of about 8.3, about 9.8, about 11.5, about 15.6, about 16.3, about 16.7–17.4, about 19.6, about 21.0, about 22.9, about 23.7, about 25.0 and about 26.1. The salt or complex has a melting point of about 122–128° C. It is thus characterized as having four distinctive XRD peaks at about 9.8, about 15.6, about 19.6 and about 26.1. One may further characterize the compound as having three or four of these XRD peaks and having a melting point of about 122–128° C. The α-naphthylene sulfonate of AD is alternatively characterized by an obvious XRD spectrum peak using Cu—Kα radiation, expressed in degrees 2θ at 9.8±0.1, 15.6±0.1, 19.6±0.1, 21.0±0.1 and 26.1±0.1 and a melting point of 122–128±2.0°.

FIG. 25 shows that the (S)-camphor sulfonic acid salt or complex has distinctive XRD peaks in degrees 2θ at any one (or combination) of about 5.4, about 6.5, about 13.7, about 15.5, about 16.8–17.2, about 19.6, about 20.4–20.7, about 21.2, about 23.1, about 26.1, about 27.5, about 28.4, about 31.3 and about 32.2. The salt or complex has a melting point of about 160–161° C. It is thus characterized as having four distinctive XRD peaks at about 5.4, about 6.5, about 13.7 and about 16.8–17.2. One may further characterize the compound as having three or four of these XRD peaks and having a melting point of about 160–161° C. The (S)-camphor sulfonate of AD is alternatively characterized by an obvious XRD spectrum peak using Cu—Kα radiation, expressed in degrees 2θ at 5.4±0.1, 6.5±0.1, 13.7±0.1, 16.8–17.2±0.3 and 19.6±0.1 and a melting point of 160–161±2°.

FIG. 26 shows that the succinic acid salt or complex has distinctive XRD peaks in degrees 2θ at any one (or combination) of about 4.7, about 9.5, about 10.6, about 14.9, about 16.3, about 17.4, about 17.9, about 19.9, about 20.8, about 22.1, about 23.9–24.2, about 26.5, about 27.6 and about 28.2. The salt or complex has a melting point of about 122–124° C. It is thus characterized as having four distinctive XRD peaks at about 4.7, about 9.5 about 14.9 and about 17.4. One may further characterize the compound as having three or four of these XRD peaks and having a melting point of about 122–124° C. The succinate of AD is alternatively characterized by an obvious XRD spectrum peak using Cu—Kα radiation, expressed in degrees 2θ at 9.5±0.1, 14.9±0.1, 16.3±0.1, 17.4±0.1 and 23.9–24.2±0.6 and a melting point of 122–124±2.0°.

Invention embodiments include compositions comprising a crystalline salt, e.g., a salt as characterized above, of adefovir dipivoxil and a pharmaceutically acceptable excipient(s). Other embodiments include a process to prepare a pharmaceutically acceptable composition by contacting a crystalline salt, e.g., a salt as characterized above, of adefovir dipivoxil and a pharmaceutically acceptable excipient(s). Other embodiments include the product produced by the process of contacting a crystalline salt, e.g., a

Copy provided by USPTO from the PIRS Image Database on 01/22/2013

US 6,451,340 B1

**13**

salt as characterized above, of adefovir dipivoxil and a pharmaceutically acceptable excipient(s).

## Methods for AD Synthesis

Diagram A below shows a representative process flow diagram for making AD and Form 1 AD crystals.

<center>Diagram A</center>



One can increase or decrease the scale of the process steps shown in Diagram A and described below if desired.

## Methods for Diethyl p-toluenesulfonyloxymethylphosphonate Synthesis

In an embodiment, synthesis of diethyl p-toluenesulfonyloxymethylphosphonate, shown in Diagram A, Step 1, is described as follows. In a reactor having an inert atmosphere, e.g., nitrogen, a mixture of diethylphosphite (0.8 kg), paraformaldehyde (0.22 kg), and triethylamine (0.06 kg) in toluene (2.69 kg) is heated to 87° C. (84 to 110° C.) for 2 hours with agitation, then heated to reflux

**14**

and maintained for at reflux for 1 hour, until the reaction is complete. Reaction completion is monitored by TLC (trace or no diethyl phosphite detectable) and confirmed by $^1$H NMR showing no more than 1% of the diethyl phosphite peak at δ 8.4–8.6 ppm. The solution is cooled to about 1° C. (−2 to 4° C.) and p-toluenesulfonyl chloride (1.0 kg) is added and then triethylamine (0.82 kg) at no more than 10°

C. is slowly added (over about 3–6 hours in an exothermic reaction). The resulting mixture is warmed to 22° C. (19–25° C.) and stirred for at least 5 hours (typically about 16–24 hours), until the reaction is complete. Reaction completion is monitored by TLC (trace or no p-toluenesulfonyl chloride detectable) and confirmed by $^1$H NMR (p-toluenesulfonyl chloride doublet at δ 7.9 ppm no longer detected). The solids are removed by filtration and rinsed with toluene (0.34 kg). The combined washings and filtrate are washed either twice with water (1.15 kg each), or optionally with a sequence of water (1.15 kg), 5% aqueous sodium carbonate (3.38 kg), and twice with water (1.15 kg each). In the event emulsion occurs, brine may be added to the first organic/water mix-

Copy provided by USPTO from the PIRS Image Database on 01/22/2013

15

ture. The organic phase, which is at no more than 50° C., is distilled in vacuo (to LOD no more than 10% and water content, by KF (Karl Fischer) titration, no more than 0.5%), affording the title compound as an oil of about 85–95% purity, exclusive of toluene. The oil may become viscous on cooling.

## Methods for 9-(2-Hydroxyethyl)adenine Synthesis

In an embodiment, synthesis of 9-(2-hydroxyethyl) adenine, shown in Diagram A, Step 2, is described as follows. In a reactor having an inert atmosphere, e.g., nitrogen, sodium hydroxide (6 g) is added to a slurry of adenine (1.0 kg) and molten ethylene carbonate (0.72 kg, m.p. 37–39° C.), in DMF (2.5 kg) and the mixture is heated to 125° C. (95° C. to reflux) with agitation until the reaction is complete (about 3–9 hours if the mixture temperature is at 110° C. to reflux or about 15–48 hours if at 95 to 110° C.). Reaction completion is monitored by HPLC (no more than 0.5% adenine remaining). The mixture is cooled to below 50° C. and diluted with toluene (3.2 kg). The resulting slurry is cooled to 3° C. (0–6° C.) and agitated for at least 2 hours. The slurry is filtered and the filter cake is washed twice with cold (0–5° C.) toluene (0.6 kg each). The filter cake is dried in vacuo at 35 to 70° C. (no more than 2% toluene, by ¹H NMR or LOD) and optionally milled, affording the title compound as a white to off-white powdery solid.

## Methods for 9-[2-(Diethylphosphonomethoxy)ethyl] adenine Synthesis

This compound is prepared using a composition comprising sodium alkoxide ($C_{1-6}$ alkyl) and 9-(2-hydroxyethyl) adenine. One contacts sodium alkoxide, typically sodium t-butoxide or sodium i-propoxide, with 9-(2-hydroxyethyl) adenine in a solvent such as DMF, at a temperature of about 20–30° over about 1–4 hours. The synthesis typically gives good results with 1 molar equivalent of 9-(2-hydroxyethyl) adenine and about 1.2–2.2 molar equivalents of sodium alkoxide.

In an embodiment, synthesis of 9-[2-(diethylphosphonomethoxy)ethyl]adenine, shown in Diagram A, Step 3, is described as follows. In a reactor having an inert atmosphere, e.g., nitrogen, a slurry of 9-(2-hydroxyethyl)adenine (1.0 kg) and DMF (4.79 kg) is warmed to about 130° (125–135°) for 30–60 minutes. The reactor contents are rapidly cooled with vigorous agitation to about 25° C. (20–30°) and sodium tert-butoxide (0.939 kg) is added in portions over about 1–3 hours while maintaining vigorous agitation and the contents temperature at about 25° (20–30°). The agitation and temperature is maintained for about 15–45 minutes after all sodium tert-butoxide has been added. Then the reactor contents are cooled to about –10° (–13 to 0°) and a solution of diethyl p-toluenesulfonyloxymethyl-phosphonate (2.25 kg on a pure basis) in DMF (1.22 kg) is added over about 5–10 hours. The mixture is kept at about –5° (–10 to 0°) until the reaction is complete, which is typically about 0.5–2 hours after the final portion of diethyl p-toluenesulfonyloxymethyl-phosphonate has been added. Reaction completion is monitored by HPLC (not more than 3% 9-(2-hydroxyethyl)adenine remaining). Glacial acetic acid (0.67 kg) is added, with the pot temperature controlled to no more than 20°. The mixture at about 22° (15–25°) is agitated for about 15–45 minutes. The quenched mixture is concentrated in vacuo until distillation stops and the contents are then cooled to below 40°. Dichloromethane (16.0 kg) is added and the contents at 20° (15–25°) are agitated for

16

at least 1 hour. If the DMF content versus total solids (NaOTs (sodium tosylate), NaOAc, $Et_2$PMEA) is greater than 20% (by ¹H NMR) the mixture is concentrated in vacuo until distillation stops, the contents are cooled to below 40° C., dichloromethane (16 kg) is added and the reactor contents at about 20° (15–25°) are agitated for at least 1 hour. Diatomaceous earth (0.5 kg) is added and the contents, which are at about 20° (15–25°), are agitated for at least 1 hour. The solids are removed by filtration and rinsed 3 times with $CH_2Cl_2$ (about 1 kg each). The filtrate and rinses at no more than 80° are concentrated in vacuo until distillation stops, the reactor contents are cooled to below 40°, dichloromethane (5.0 kg) is added to the residue and the contents at about 25° (20–40°) are agitated to dissolve the solids. The resulting solution at no more than 80° is concentrated in vacuo until distillation stops. Dichloromethane (7.0 kg) is added and the contents at about 25° (20–40°) are agitated to dissolve the solids. If the DMF content compared to diethyl PMEA is greater than 12%, the mixture at no more than 80° is concentrated in vacuo, the contents are cooled to below 40°, dichloromethane (7.0 kg) is added and the contents at about 25° (20–40°) are agitated to dissolve the solids. The mixture is washed with water (0.8 kg) at about 25° (22–30°) by agitating for about 15–45 minutes. The phases are allowed to separate for 4 hours and the phases are then separated. The aqueous phase is back-extracted twice with dichloromethane (1.5 kg per wash) by agitation for about 15–45 minutes with the solution maintained at about 25° (22–30°), followed by allowing the phases to separate for at least 2 hours. The combined organics at no more than 80° are then concentrated in vacuo until distillation stops. Toluene (3.0 kg) is added, agitated at about 25° (22–30°) for about 15–45 minutes and the resulting mixture at no more than 80° is azeotroped in vacuo. Toluene (3.0 kg) is added and the mixture is heated to about 80° (75–85°), agitated for about 15–45 minutes, cooled to below 30° over about 60–90 minutes and then cooled to about 0° (–3 to 6°). After at least 12 hours at about 0° with slow agitation, the resulting slurry is filtered and the filter cake is rinsed three times with cold (about 0–6°) toluene (about 0.2 kg per rinse). The wet cake is dried in vacuo at about 50° (35 to 65°) and the dried product is milled. Product drying is monitored for water removal (no more than 0.3% water detected by KF titration). The inert atmosphere is maintained throughout step 3.

## Methods for PMEA Synthesis

In an embodiment, synthesis of PMEA, shown in Diagram A, Step 4, is described as follows. In a reactor having an inert atmosphere, e.g., nitrogen, a mixture of diethyl PMEA (1.00 kg), acetonitrile (2.00 kg), and bromotrimethylsilane (1.63 kg) is heated to and maintained at reflux for about 1–3 hours with agitation, until the reaction is complete. Reaction completion is monitored by ³¹P NMR or HPLC (no diethyl PMEA and no more than 2% monoethyl PMEA detected). The solution at ≤80° C. is distilled in vacuo to a semi-solid, which is taken up in water (2.00 kg) and warmed to about 55° C. (52–58° C.) for about 30–60 minutes with agitation to dissolve all solids. The resulting mixture is cooled to about 22° C. (19–25° C.), adjusted to pH 3.2 with aqueous sodium hydroxide, the contents are heated to about 75° C. (72–78° C.) until the consistency thins (about 15–120 minutes), cooled to about 3° C. (0–6° C.), and stirred for at least 3 hours (3–6 hours). The slurry is filtered and the filter cake is rinsed with water (1.00 kg). The wet cake is suspended in water (3.75 kg) and the suspension is heated to about 75° C. (72–78° C.) with vigorous stirring. After stirring for about 2 hours, the slurry

Copy provided by USPTO from the PIRS Image Database on 01/22/2013

US 6,451,340 B1

**17**

is cooled to about 3° C. (0–6° C.) and stirred for at least another 2 hours. The slurry is filtered and the filter cake is rinsed sequentially with two portions of water (0.50 kg per rinse) and two portions of acetone (1.00 kg per rinse). The isolated solid is dried in vacuo at no more than about 90° C. to a low water content (no more than about 0.5% water detected by KF titration), to provide PMEA as white crystals. The product is milled to a fine particle size.

### Methods for AD Synthesis

An exemplary method to prepare AD comprises suspending 1 molar equivalent of PMEA in a volume of about 5.68–56.8 equivalents of NMP/equivalent PMEA and, after one suspends the PMEA, adding about 2–5 molar equivalents, often about 2.5–3.5, usually about 3 molar equivalents, of triethylamine ("TEA") to the solution using mild to moderate agitation. One then adds about 3–6 molar equivalents, often about 4.5–5.5 molar equivalents, usually about 5 equivalents, of chloromethyl pivalate to obtain a reaction mixture. We usually prepare the reaction mixture at room temperature. One heats the reaction mixture to maintain a temperature of about 66°, typically about 28–65°, usually between about 55–65° for about 2–4 hours to conduct the reaction. The time needed to heat the reaction mixture to about 28–65° is not critical and can vary depending on the reaction mixture volume and the capacity of the apparatus used to heat the mixture. Mild or moderate agitation maintains solids in suspension during the reaction and this minimizes extensive splashing of the reactants in the reaction vessel. This method results in a product comprising AD produced by the process of reacting the listed reactants, typically under the given conditions.

In an embodiment, conversion of PMEA to AD, shown in Diagram A, Step 5, is described as follows. In a reactor having an inert atmosphere, e.g., nitrogen, a mixture of 1-methyl-2-pyrrolidinone (3.15 kg), PMEA (1.00 kg), triethylamine (1.11 kg), and chloromethyl pivalate (2.76 kg) is heated to about 60±3° C. (no more than 66° C.) and stirred using moderate agitation for ≦4 hours (1–4 hours) until the reaction is complete, as indicated by $^{31}P$ NMR or HPLC (no more than 15% mono(POM)PMEA). The mixture is diluted with isopropyl acetate (12.00 kg), cooled to 25±3° C., and agitated for about 30 minutes. The solids are removed by filtration and washed with isopropyl acetate (5.0 kg). The combined organics are washed twice with water (3.70 kg per wash) by moderately agitating the mixture at a mixture temperature of 25±3° C. for about 15–45 minutes. The combined aqueous washes are back-extracted twice with isopropyl acetate (4.00 kg per extraction) at a mixture temperature of 25±3° C. by agitation for 15–45 minutes. The combined organics at 25±3° C. are washed with water (1.80 kg) by agitation for 15–45 minutes and then the organics at about 35±5° C. (no more than 40° C.) are concentrated in vacuo to approximately 40% of the original volume. After a polishing filtration (1 μm filter), and a rinse forward with 1.5 kg of isopropyl acetate, the concentration of the organics in vacuo is resumed until a pale oil remains the organics at about 35±5° C. (no more than 50° C.). The oil typically comprises about 6–45% AD, usually about 30–42%.

### Methods for AD Crystallization

AD Crystallization from the organic oil is usually accomplished by (1) using a relatively low volume of NMP in the AD synthesis reaction as compared to the amount of PMEA present as a reactant, i.e., less than about 10 mL NMP per gram PMEA, and/or (2) by minimizing the amount of

**18**

isopropyl acetate that remains entrained in the organic oil after vacuum distillation by allowing sufficient time for vacuum distillation, i.e., usually at least about 4–6 hours. The aggregate of reaction starting materials, e.g., NMP or PMEA, in the oil can account for about 2–20% of the crystallization solution, but generally less than about 1–2%. When crystals are prepared from organic oil, about 20–45%, often about 30–42%, and usually about 35–42% of AD is present in the oil before adding crystallization solvents.

One optionally crystallizes AD optionally from a super-saturated solution. Nucleation occurs in such supersaturated solutions, and readily leads to crystal formation. Nucleation rates typically increase when the degree of supersaturation and the temperature increases. Supersaturated solutions typically are prepared by changing the temperature (usually decreasing it), solvent evaporation or altering solvent composition, e.g., by adding a miscible nonsolvent or poor solvent. Combinations of these methods also generate super-saturated AD solutions, e.g., using evaporation under reduced pressure to both cool the solution while increasing the solute concentration.

Crystalline AD is prepared by crystal formation in an AD composition, usually from a solution of AD in a crystallization mixture containing at least about 6%, typically at least about 30%, usually at least about 35%, of AD. One would ordinarily conduct crystallizations by preparing an AD solution comprising about 6–45% AD and about 55–94% crystallization solvent. The upper limit of solubility of AD is about 10–41% for most crystallization solvents at room temperature. AD is not freely soluble in some crystallization solvents, e.g., AD solubility in di-n-butyl ether is less than about 0.3 mg/mL, and adding these solvents to an AD solution increases the degree of saturation or supersaturation of the solution. One usually uses organic solutions containing an amount of AD that is near the upper solubility limit in the crystallization solvent(s). The lower amount, about 6%, is the minimum amount of AD needed in a solution to consistently yield crystals. Certain solvents, e.g., methanol or $CH_2Cl_2$, can contain more than about 50% AD.

The temperature at which crystallization is conducted is not critical and can vary, as the crystallization process usually proceeds spontaneously over a range of temperatures. Crystallization at temperatures above about 35°, especially about 45–50° may result in reduced yield and/or in an increase in impurities associated with the crystals. Crystallizations are generally conducted at temperature ranges of about −5° to about 50°, often about 0–35°, usually about 4–23°. One can optionally use crystallization temperatures below about −5° to increase the crystal yield or to enhance the crystal formation rate, but a low temperature process may result in increased by-products. Thus it is generally more convenient and economic to use solvents either at approximately ambient temperatures (about 15–23°) or at the typical cooling temperatures that most cooling apparatus or methods can easily reach (about 0–4°). When a solution contains relatively low concentrations of AD, i.e., about 10–20%, crystallization at a relatively low temperature, i.e., about 0–15° will often enhance crystal yields.

Heating the solution containing AD and crystallization solvent(s) to a point above room temperature, preferably to about 35°, appears to facilitate crystallization, presumably by increasing the nucleation rate. The time to heat the crystallization mixture to about 35° is not critical and can vary according to the capacity of the apparatus used, generally over a period of about 20–45 minutes. Heating is then discontinued and the temperature is reduced by cooling or by allowing the temperature to fall for about 10–120 min-

Copy provided by USPTO from the PIRS Image Database on 01/22/2013

US 6,451,340 B1

19

utes. During this time, crystals form and continue to form over a period of at least about 4–36 hours. Crystallization usually begins immediately or shortly after the crystallization mixture has reached 35°. We usually conduct crystallizations by allowing the temperature to fall to about 0–23° C. after the solution reaches 35°. Crystallizations conducted with or without mild to moderate agitation, typically with mild agitation, routinely give good results.

Appreciable crystallization usually occurs over a period of about 5 minutes to about 72 hours and about 10–16 hours routinely give good results regardless of the solvents used. The time of crystallization is not critical and can vary, although relatively short crystallization times (about 30–90 minutes) may result in reduced AD recovery. When one adds crystallization solvents to reaction mixtures containing other organic solvents, e.g., NMP, crystallization usually begins immediately once the temperature has reached about 35° or less and the solution becomes hazy.

Crystallizations are conducted in common laboratory or manufacturing plant apparatus, e.g., round bottom flasks, Erlenmeyer flasks, stainless steel reactors or glass lined reactors. One will usually conduct the crystallizations using standard laboratory scale or commercial scale manufacturing apparatus for mechanical agitation and temperature control.

When using crystallization systems containing two different solvents, one generally adds the most polar solvent to the AD first, followed by addition of the least polar solvent. One optionally removes undissolved components, if any, from the solution after one has added the first crystallization solvent, e.g., by filtration or centrifugation. For example, when one uses acetone and di-n-butyl ether to prepare Form 1 crystals from an organic solution containing AD and components from the AD synthesis reaction, one usually adds acetone first. Similarly, one would add n-butanol before adding di-n-butyl ether or one would add ethyl acetate before di-n-propyl ether. A solution containing the first polar solvent may become hazy due to precipitation of mono (POM) PMEA which may be present. The mono(POM) PMEA can then be removed from the solution by standard physical methods, e.g., filtration or centrifugation, followed by adding the second solvent, e.g., di-n-butyl ether.

Crystallization solvents we use to prepare Form 1 crystals generally contain less than about 0.2% of water. When a significant amount of water is present in the crystallization solvent, i.e., about 1–2%, the crystallization process yields varying amounts of Form 2 crystals, that are also recovered together with Form 1 crystals. The amount of water that is present in a crystallization reaction is optionally reduced by conventional means, including using anhydrous reagents or by drying solvents using molecular sieves or other known drying agents. One optionally reduces the amount of water that might be present in organic solutions containing AD, e.g., from AD synthesis reactions containing by-products and solvents such as the organic oil described above, by using an azeotroping co-solvent such as isopropyl acetate to reduce water prior to adding crystallization solvents.

In an embodiment, crystallization of Form 1 AD, shown in Diagram A, Step 6, is described as follows. The pale oil containing AD described above is dissolved in acetone (1.0 kg), heated to 35±3° C., and diluted with di-n-butyl ether (5.00 kg) in about 4 portions while maintaining a temperature of about 32–38° C. and moderate agitation. The clear solution is cooled to about 25–30° C. over about 30–60 minutes (no more than 90 minutes), seeded with a small quantity of Form 1 AD crystals (about 5 g), and the contents

20

are then cooled to 22±3° C. over about 30–60 minutes (no more than 90 minutes) while maintaining moderate agitation. Moderate agitation of the mixture is continued at 22±3° C. for a minimum of about 3 hours. The resulting slurry is filtered and the filter cake is washed with a premixed solution of acetone (0.27 kg) in di-n-butyl ether (2.4 kg) (1:9 v/v). The wet solids are optionally further purified by adding premixed acetone (0.57 kg) and di-n-butyl ether (4.92 kg), maintaining the temperature of the contents at 22±3° C. for about 15–24 hours with moderate agitation. The solids are then filtered, and the filter cake is washed with premixed acetone (0.27 kg) and di-n-butyl ether (2.4 kg). The filter cake maintained at ≦35° C. (about 25–35° C.) is dried in vacuo for about 1–3 days (LOD no more than 0.5%), affording Form 1 AD as a white to off-white powdery solid. The dried product is milled.

The invention includes methods to prepare Form 2 crystals. Form 2 crystals are conveniently prepared by hydrating Form 1 crystals, although the hydrate can be obtained by crystallizing AD from crystallization solvents containing an amount of water which does not interfere with crystallization, but which provides the requisite water of hydration. The water may be present as ice, liquid water or water vapor. Typically in placed into physical contact with Form 1 crystals under conditions for formation of Form 2 crystals. Form 1 crystals are optionally contacted with water vapor in a gas such as air, carbon dioxide or nitrogen, at a relative humidity of at least about 75% to obtain complete conversion of Form 1 to Form 2 crystals. Form 1 crystals are usually contacted with air at least about 75% relative humidity for about 1–10 days at about 18–30° or typically at room temperature to obtain complete conversion to Form 2. However, Form 1 crystals are essentially non-hygroscopic at 54% relative humidity in air at room temperature, with no increase in water content after 13 days exposure.

The process of hydrating Form 1 to Form 2 crystals generates compositions comprising a mixture of Form 1 and Form 2 AD crystals where the proportion of Form 1 AD crystals varies from about 100% to 0%, with the balance of the AD being Form 2. Thus, the proportion of Form 2 crystals increases from 0% to 100% during the conversion process. These compositions may comprise formulations such as tablets.

As noted above Form 2 crystals are also prepared by conducting AD synthesis in the presence of water, e.g., where about 2–5% water is present in the crystallization solvent(s) otherwise used to make Form 1 AD. Crystallization occurs essentially as described above for Form 1 crystals, e.g., over about 4–36 hours at about 0–23°. Such preparations can contain some Form 1 crystals, but any residual Form 1 crystals are converted to Form 2 crystals by exposure to water vapor as described above, or by adding sufficient additional water to the crystallization solvent.

One usually prepares Form 3 crystals by allowing crystals to grow in an anhydrous methanol solution of AD. One obtains AD in methanol by mixing sufficient noncrystalline or crystalline AD in methanol for about 10–15 minutes at room temperature or as needed to dissolve the solid AD to obtain a solution having at least about 100–150 mg AD/mL methanol. AD solubility in methanol at room temperature is greater than 600 mg/mL. Crystallization then proceeds for about 4 to about 48 hours at a temperature of about –5° to about 25°, usually at about 0–23°.

Crystals obtained using isopropyl acetate as the sole crystallization solvent typically are primarily rods which can

Copy provided by USPTO from the PIRS Image Database on 01/22/2013

US 6,451,340 B1

21

be relatively long, i.e., measuring up to about 500 $\mu$m in length, with a few needles also present. FIG. **8** shows rod-shaped crystals about 20–500 $\mu$m in length obtained by crystallization in isopropyl acetate at temperatures above about 15°.

Crystallization from supersaturated and from saturated or some unsaturated AD solutions is optionally facilitated or enhanced by adding seed crystals of AD to the solution, but seed crystals are not mandatory. For example, Form 1 AD is obtained by adding a small amount of crystalline Form 1 AD to an organic solution as described above, e.g., organic oil to which crystallization solvent has been added, but without heating to 35°. The seeded crystals facilitate formation of Form 1 crystals. Form 2 and Form 3 crystals can similarly be obtained by seeding suitable solutions with the respective crystal form, e.g., an organic solution containing ethyl acetate and about 2% water for Form 2 crystals or a saturated solution of AD in anhydrous methanol for Form 3 crystals. The amount of crystals used for seeding are optionally varied to obtain optimal results. Generally about 0.1–01.0 g of crystals per L of AD recrystallization solution is sufficient.

One can optionally recrystallize crystalline AD as desired, e.g., to increase the purity of the crystals.

For example, one recrystallizes Form 1 AD by essentially the same methods used to prepare Form 1 crystals described above. For example, recrystallization using acetone and di-n-butyl ether is accomplished by dissolving crystalline AD in acetone, about 0.2–0.4 g/mL, at about 30–35°, followed by optionally removing undissolved components, e.g., by filtering or centrifuging the solution, which is usually hazy. An undissolved component is typically mono (POM) PMEA. One then warms the solution to about 35–40° and adds about 5.2–6.2 mL (usually about 5.7 mL) of warmed (about 35–40°) di-n-butyl ether per 0.2–0.4 g of crystals that were initially used in the recrystallization. The recrystallization mixture is then allowed to cool to room temperature over about 4–4.5 hours. The recrystallization mixture will cool to room temperature more rapidly if relatively small volumes, e.g., about 1–3 L, are used. The time to cool the mixture is not critical and can vary.

Recrystallization generally begins shortly after completion of adding and mixing the di-n-butyl ether and one then allows recrystallization to proceed for about 4–36 hours, usually about 6–24 hours. Additional yield of crystals from recrystallization at room temperature for about 4–36 hours is usually obtained by cooling the recrystallization mixture to about 4–10° and allowing the mixture to stand about 1–6 hours at the reduced temperature. Usually, the amount of AD one uses in a recrystallization will be sufficient to form a saturated or nearly saturated solution, i.e., about 0.4 g/mL using acetone. Dissolution of AD in acetone is complete in about 2–8 minutes using moderate agitation. Material remaining undissolved after this initial mixing period is removed and discarded, followed by adding the second less polar solvent of the solvent pair to the mixture containing the first crystallization solvent.

One optionally recrystallizes Form 1 crystals using a single solvent such as acetone. In this embodiment, one dissolves sufficient crystals in the solvent at room temperature, to afford a saturated or nearly saturated solution followed by removal of undissolved components. One then warms the mixture to 35° and allows it to cool as described for recrystallization using the acetone and di-n-butyl ether solvent pair.

Recrystallization of Form 2 crystals will proceed as described for recrystallizing Form 1 crystals but will use

22

Form 2 crystals dissolved in the recrystallization solvents. The Form 1 crystals that are obtained from recrystallization are optionally converted to Form 2 crystals as described herein for conversion of Form 1 to Form 2 crystals. Recrystallization of Form 2 to Form 1 crystals may also be accomplished. In this case, molecular sieves or other solvent drying means can optionally be used to limit the amount of water that is present after the Form 2 crystals are dissolved in the first solvent and during the recrystallization process. One can also recrystallize Form 2 crystals using solvents containing about 1–2% water to directly obtain Form 2 crystals.

One conducts a Form 3 recrystallization in methanol in the same manner as described herein for preparation of Form 3 crystals. A saturated or nearly saturated methanol solution is used to prepare the crystals, i.e., at least about 0.6 g/mL AD.

One optionally prepares salts from acid addition of certain organic and inorganic acids with the basic center in adenosine of AD. One generally prepares acid salts by standard methods, including dissolving AD free base in an aqueous, aqueous-alcohol or aqueous-organic solution containing the selected acid or counterion of the acid, optionally allowing crystallization and optionally accompanied by evaporating, agitating or cooling the solution. One will usually react the free base in an organic solution containing the acid or counterion, in which case the salt usually separates directly or one can seed the solution with crystals or concentrate the solution to facilitate salt precipitation. Embodiments include solutions comprising AD, a solvent, usually a crystallization solvent, and a sulfonic acid such as a $C_{6-16}$ aryl sulfonic acid, a $C_{6-16}$ heteroaryl sulfonic acid or a $C_{1-16}$ alkyl sulfonic acid. Embodiments also include solutions comprising AD, a solvent, usually a crystallization solvent, and a carboxylic acid, such as a tricarboxylic acid, a dicarboxylic acid or a monocarboxylic acid, any of which carboxylic acids comprise about 1–12 carbon atoms.

## Pharmaceutical Formulations and Routes of Administration

Invention compositions that comprise crystalline AD, typically Form 1, (hereafter referred to as the active ingredients), are administered by any route appropriate to the condition to be treated, suitable routes including oral, rectal, nasal, topical (including ocular, buccal and sublingual), vaginal and parenteral (including subcutaneous, intramuscular, intravenous, intradermal, intrathecal and epidural). Generally, the invention compositions are administered orally, but compositions containing crystalline AD can be administered by any of the other routes noted above.

While it is possible for AD to be administered as a pure compound it is preferable to present it as a pharmaceutical formulation. The formulations of the present invention comprise AD, together with one or more pharmaceutically acceptable excipients or carriers ("acceptable excipients") and optionally other therapeutic ingredients. The excipient (s) must be "acceptable" in the sense of being compatible with the other ingredients of the formulation and not deleterious to the patient.

The formulations include those suitable for topical or systemic administration, including oral, rectal, nasal, buccal, sublingual, vaginal or parenteral (including subcutaneous, intramuscular, intravenous, intradermal, intrathecal and epidural) administration. The formulations are in unit dosage form and are prepared by any of the methods well known in the art of pharmacy. Such methods include the step

Copy provided by USPTO from the PIRS Image Database on 01/22/2013

US 6,451,340 B1

23

of bringing into association the active ingredient with the carrier or excipient which constitutes one or more accessory ingredients. In general the formulations are prepared by uniformly and intimately bringing into association the active ingredient with either liquid carriers or finely divided solid carriers or both, and then, if necessary, drying or shaping the product.

Formulations of the present invention suitable for oral administration may be presented as discrete units such as sachets, cachets or tablets each containing a predetermined amount of the active ingredient; as a powder or granules; as solution or a suspension in an aqueous liquid or a non-aqueous liquid; or as an oil-in-water liquid emulsion or a water-in-oil liquid emulsion. The active ingredient may also be presented as a bolus, electuary or paste.

Invention formulations include compositions comprising AD and an acceptable excipient. Such excipients include binders, diluents, disintegrants, preservatives, dispersants, glidants (antiadherents) and lubricants. Such compositions optionally comprise unit dosages, including tablets and capsules. Such compositions optionally comprise tablets containing about 5–250 mg AD, usually about 5–150 mg, including tablets comprising about 60 mg or 120 mg per tablet. Such tablets optionally comprise about 1–10% binder, about 0.5–10% disintegrant, about 50–60% diluent or about 0.25–5% lubricant. Such compositions also comprise wet granules containing liquid, e.g., water, AD and one or more acceptable excipients selected from the group consisting of binders, diluents, dispersants and disintegrants.

A tablet may be made by compression or molding, optionally with one or more accessory ingredients or excipients. Tablets will typically comprise about 5–250 mg of crystalline AD per tablet, usually about 30–120 mg and usually predominantly Form 1 AD, e.g., about 60 mg per tablet or about 120 mg per tablet of Form 1 AD, where only limited amounts, usually less than about 20%, of Form 2 crystals, other crystal types or noncrystalline AD are present. Compressed tablets may be prepared by compressing on a suitable machine, AD in a free-flowing form such as a powder or granules, optionally mixed with a binder, disintegrant, lubricant, inert diluent, preservative, surface active or dispersing agent. Molded tablets may be made by molding in a suitable machine a mixture of the powdered compound usually moistened with a liquid diluent. The tablets may optionally be coated and printed, embossed, or scored and may be formulated so as to provide slow or controlled release of the active ingredient therein. Embodiments include a product made by the process of compressing a mixture containing crystalline AD, typically Form 1 or Form 2, and an acceptable excipient, e.g., dried wet granules containing, e.g., lactose, pregelatinized starch, croscarmellose sodium, talc and magnesium stearate.

Formulations containing crystalline AD and an excipient(s) may also contain L-carnitine or salts of L-carnitine, e.g., L-carnitine-L-tartrate (2:1). Release of pivalic acid from the pivaloyloxymethyl moiety of AD in vivo appears to lower the levels of L-carnitine in patients. Tablets containing L-carnitine-L-tartrate and AD may decrease the effect of pivalic acid on L-carnitine depletion in patients taking AD. The amount of L-carnitine to be included will be apparent to the clinician in view of the extent of depletion in patients.

Typical formulation ingredients for tablets or related dosage forms include one or more binders, diluents, disintegrants or lubricants. These excipients increase formulation stability, facilitate tablet compression during manufacture or formulation disintegration after ingestion. The tablets are

24

typically made by wet granulation of one or more excipients with AD in a mixture, followed by wet milling the granules and drying to a loss on drying of about 3% or less. A binder such as pregelatinized starch or povidone, which enhances processing, is optionally present at a level of about 1–10%. A disintegrant such as microcrystalline cellulose or a cross-linked cellulose such as coscarmellose sodium is optionally present at a level of about 0.5–5% to facilitate tablet dissolution. A diluent such as a monosaccharide or disaccharide is optionally present at a level of about 40–60% to mask the physical properties of AD or to facilitate tablet dissolution. A lubricant such as magnesium stearate, talc or silicon dioxide is optionally present at a level of about 0.25–10% to facilitate tablet ejection during manufacture. The tablets may optionally contain scavengers such as lysine or gelatin to trap formaldehyde that may be released on storage of AD. Excipients have been described, e.g., Monograph for "Pregelatinized Starch", Handbook of Pharmaceutical Excipients, Second Edition, American Pharmaceutical Association, 1994, pp: 491–493; Monograph for "Croscarmellose Sodium", Handbook of Pharmaceutical Excipients, Second Edition, American Pharmaceutical Association, 1994, pp: 141–142; Monograph for "Lactose Monohydrate", Handbook of Pharmaceutical Excipients, Second Edition, American Pharmaceutical Association, 1994, pp: 252–261; Monograph for "Talc", Handbook of Pharmaceutical Excipients, Second Edition, American Pharmaceutical Association, 1994, pp: 519–521; Monograph for "Magnesium Stearate", Handbook of Pharmaceutical Excipients, Second Edition, American Pharmaceutical Association, 1994, pp: 280–282.

Typical containers for storage of Form 1 AD formulations will limit the amount of water that is present in the container. Typically unit formulations or dosages are packaged with a desiccant such as silica gel or activated carbon, or both. The containers are typically induction sealed. Silica gel packaging alone is a sufficient desiccant for storage of tablets containing AD at ambient temperature. AD contains two pivaloyloxymethyl moieties per molecule. Silica gel is thus suitable as a single desiccant for compounds such as therapeutic agents that contain one or more pivaloyloxymethyl moieties. Water permeation characteristics of containers have been described, e.g., Containers—Permeation, Chapter, USP 23, United States Pharmacopeial Convention, Inc., 12601 Twinbrook Parkway, Rockville, Md. 20852, pp: 1787 (1995).

For infections of the eye or other external tissues, e.g. mouth and skin, the formulations are preferably applied as a topical ointment or cream containing the active ingredient(s) in an amount of, for example, 0.01 to 10% w/w (including active ingredient(s) in a range between 0.1% and 5% in increments of 0.1% w/w such as 0.6% w/w, 0.7% w/w, etc), preferably 0.2 to 3% w/w and most preferably 0.5 to 2% w/w. When formulated in an ointment, the active ingredients may be employed with either a paraffinic or a water-miscible ointment base. Alternatively, the active ingredients may be formulated in a cream with an oil-in-water cream base.

If desired, the aqueous phase of the cream base may include, for example, at least 30% w/w of a polyhydric alcohol, i.e. an alcohol having two or more hydroxyl groups such as propylene glycol, butane 1,3-diol, mannitol, sorbitol, glycerol and polyethylene glycol (including PEG 400) and mixtures thereof. The topical formulations may desirably include a compound which enhances absorption or penetration of the active ingredient through the skin or other affected areas. Examples of such dermal penetration enhancers include dimethyl sulphoxide and related analogs.

Copy provided by USPTO from the PIRS Image Database on 01/22/2013

US 6,451,340 B1

25

The oily phase of the emulsions of this invention may be constituted from known ingredients in a known manner. While the phase may comprise merely an emulsifier (otherwise known as an emulgent), it desirably comprises a mixture of at least one emulsifier with a fat or an oil or with both a fat and an oil. Preferably, a hydrophilic emulsifier is included together with a lipophilic emulsifier which acts as a stabilizer. It is also preferred to include both an oil and a fat. Together, the emulsifier(s) with or without stabilizer(s) make up the emulsifying wax, and the wax together with the oil and fat make up the emulsifying ointment base which forms the oily dispersed phase of the cream formulations.

Emulgents and emulsion stabilizers suitable for use in the formulation of the present invention include Tween® 60, Span® 80, cetostearyl alcohol, benzyl alcohol, myristyl alcohol, glyceryl mono-stearate and sodium lauryl sulfate.

The choice of suitable oils or fats for the formulation is based on achieving the desired cosmetic properties. Thus the cream should preferably be a non-greasy, non-staining and washable product with suitable consistency to avoid leakage from tubes or other containers. Straight or branched chain, mono- or dibasic alkyl esters such as di-isoadipate, isocetyl stearate, propylene glycol diester of coconut fatty acids, isopropyl myristate, decyl oleate, isopropyl palmitate, butyl stearate, 2-ethylhexyl palmitate or a blend of branched chain esters known as Crodamol CAP may be used, the last three being preferred esters. These may be used alone or in combination depending on the properties required. Alternatively, high melting point lipids such as white soft paraffin and/or liquid paraffin or other mineral oils can be used.

Formulations suitable for topical administration to the eye also include eye drops wherein the active ingredient is dissolved or suspended in a suitable carrier, especially an aqueous solvent for the active ingredient. The active ingredient is suitably present in such formulations in a concentration of 0.01 to 20%, in some embodiments 0.1 to 10%, and in others about 1.0% w/w.

Formulations suitable for topical administration in the mouth include lozenges comprising the active ingredient in a flavored basis, usually sucrose and acacia or tragacanth; pastilles comprising the active ingredient in an inert basis such as gelatin and glycerin, or sucrose and acacia; and mouthwashes comprising the active ingredient in a suitable liquid carrier.

Formulations for rectal administration may be presented as a suppository with a suitable base comprising for example cocoa butter or a salicylate.

Formulations suitable for nasal or inhalational administration, wherein the carrier is a solid, include a powder having a particle size for example in the range 1 to 500 microns (including particle sizes in a range between 20 and 500 microns in increments of 5 microns such as 30 microns, 35 microns, etc). Suitable formulations wherein the carrier is a liquid, for administration as for example a nasal spray or as nasal drops, include aqueous or oily solutions of the active ingredient. Formulations suitable for aerosol administration may be prepared according to conventional methods and may be delivered with other therapeutic agents. Inhalational therapy is readily administered by metered dose inhalers.

Formulations suitable for vaginal administration may be presented as pessaries, tampons, creams, gels, pastes, foams or spray formulations containing in addition to the active ingredient such carriers as are known in the art to be appropriate.

26

Formulations suitable for parenteral administration are sterile and include aqueous and non-aqueous injection solutions which may contain anti-oxidants, buffers, bacteriostats and solutes which may render the formulation isotonic with the blood of the intended recipient; and aqueous and non-aqueous sterile suspensions which may include suspending agents and thickening agents. The formulations may be presented in unit-dose or multi-dose containers, for example sealed ampoules and vials with elastomeric stoppers, and may be stored in a freeze-dried (lyophilized) condition requiring only the addition of the sterile liquid carrier, for example water for injections, immediately prior to use. Extemporaneous injection solutions and suspensions may be prepared from sterile powders, granules and tablets of the kind previously described. Preferred unit dosage formulations are those containing a daily dose or unit daily sub-dose, as recited above, or an appropriate fraction thereof, of an active ingredient.

In addition to the ingredients particularly mentioned above the formulations of this invention may include other agents conventional in the art having regard to the type of formulation in question, for example those suitable for oral administration may include flavoring agents.

The present invention further provides veterinary compositions comprising at least one active ingredient as above defined together with a veterinary carrier therefor.

Veterinary carriers are materials useful for the purpose of administering the composition to cats, dogs, horses, rabbits and other animals and may be solid, liquid or gaseous materials which are otherwise inert or acceptable in the veterinary art and are compatible with the active ingredient. These veterinary compositions may be administered orally, parenterally or by any other desired route.

Compounds of the invention can be used to provide controlled release pharmaceutical formulations containing a matrix or absorbent material and as active ingredient one or more compounds of the invention in which the release of the active ingredient can be controlled and regulated to allow less frequent dosing or to improve the pharmacokinetic or toxicity profile of the compound. Controlled release formulations adapted for oral administration in which discrete units comprising one or more compounds of the invention can be prepared according to conventional methods.

All references cited herein are expressly incorporated by reference with specificity.

EXAMPLES

The following examples further exemplify and do not to limit the invention.

Example 1

Preparation of Form 1 Crystals

To a 500 mL single-neck round bottom flask equipped with a magnetic stirring bar was added PMEA (27.3 g, 100 mmol). To this was added, under nitrogen, N-methylpyrrolidinone (109.3 mL) and triethylamine (50.6 g, 69.8 mL, 500 mmol), and the resulting suspension stirred vigorously. Chloromethyl pivalate (75.2 g, 72.0 mL, 500 mmol) was added and the stirring suspension was placed in a 45° oil bath for 18.5 hours. The resulting thick, light yellow suspension was diluted with isopropyl acetate (1.0 L) and stirred for 1 hour. The solid was removed by filtration (a Kimax glass funnel with a "C" glass frit) and washed with more isopropyl acetate (250 mL). The wash was combined with the filtrate and this organic phase extracted with water

Copy provided by USPTO from the PIRS Image Database on 01/22/2013

US 6,451,340 B1

27

(200 mL×2). The aqueous extracts were combined and back-extracted with isopropyl acetate (250 mL×2). All organic phases were combined, and measured 1975 mL. Isopropyl acetate was added to bring the total volume of the organic phase up to 2.0 L. For the purpose of an internal control on this experiment, the organic phase was divided into two equal, 1.0 L portions. One portion was worked-up using a brine wash and sodium sulfate treatment while the other portion was processed without these steps (see below).

The 1.0 L organic phase sample for this new procedure was concentrated to an oil directly using a standard (Büchi) rotary evaporator employing a bath temperature of 45° and a vacuum of 50–70 mm throughout the procedure. The weight of the oil was 32.4 g, and it appeared perfectly clear, with no visible salts present. The oil was diluted with acetone (25 mL) and again a perfectly clear solution resulted with no visible precipitated salts present. After standing at room temperature for about 3 hours, the solution still remained perfectly clear. This solution was placed in an oil bath set at 45° C. and di-n-butyl ether (140 mL) was added slowly, keeping the internal temperature near 40° C. The flask was then removed from the oil bath and allowed to cool to room temperature and stirred at room temperature for about 16 hours resulting in the precipitation of Form 1 AD. The solid product was collected by filtration (a Kimax glass funnel with a "M" glass frit). The solid was washed with a 10% acetone in 90% di-n-butyl ether solution (v/v) (40 mL) and dried in a vacuum oven for 12 hours (ambient temperature, nitrogen bleed, 28" vacuum). This yielded 12.2 g (48.8% theoretical yield, based on a 50 mmol reaction scale) of a white solid, identified (HPLC) as AD of 99.8% purity versus external standard.

The remaining 1.0 L of organic phase was used as control for the above results, and was worked-up as follows. This organic phase was washed with brine (25 mL), dried over sodium sulfate (25 g, 12 hours drying time), and concentrated as described above. This afforded 27.4 g of an oil, which was crystallized as described above from acetone (25 mL) and butyl ether (135 mL). The solid was collected by filtration and dried as described above, affording 12.3 g (48.9% theoretical yield) of a white solid, identified (HPLC) as AD of 98.7% purity versus external standard.

### Example 2

#### Preparation of Form 1 Crystals

9.7 kg of NMP at room temperature was added to 3 kg of PMEA in a 30 gallon glass-lined steel reactor vessel (Pfaudler, Rochester, N.Y., model P20-30-150-115) and the mixture was moderately agitated after NMP was added. The moderate agitation used was sufficient to maintain solid PMEA in suspension and prevent splashing of reactor contents on the walls. 5.6 kg of TEA was then added, followed by addition of 8.3 kg of chloromethyl pivalate. An additional 2.7 kg of NMP was then added to wash residual materials from the transfer lines used to feed the reactor. The temperature was adjusted to about 48° and the temperature was maintained between 38–48° for 18 hours with moderate agitation. After the reaction was complete, 48 kg of isopropyl acetate at room temperature was added to the reactor and to the resulting mixture, under moderate agitation, was maintained for 1 hour at 43–48°, before filtration to remove the solids (Tyvek™ filter, 15.5" diameter, Kavon Filter Products, Wall, N.J., model No. 1058-D). The 30 gallon vessel was washed forward through the filter with 12 kg of additional isopropyl acetate. The filtrate was transferred to a 50 gallon glass-lined steel reactor vessel (Pfaudler, model

28

No. P24-50-150-105) while maintaining the temperature at 43–48°. The temperature was allowed to drop to ambient during subsequent steps.

The mixture was then washed with 22 kg of water by vigorous agitation for about 1.5–2 minutes. Agitation was discontinued and the phases were allowed to completely separate (about 10 min). The lower aqueous phase (about 26 L) was transferred to the 30 gallon glass-lined steel reactor vessel. Another 22 kg of water was added to the organic phase left in the 50 gallon reactor and the phases were vigorously agitated for about 1.5–2 minutes. Agitation was discontinued and the phases were allowed to completely separate (about 1 hour 40 min). The lower aqueous phase was transferred to the 30 gallon glass-lined steel reactor vessel which now contained both aqueous washes. 24 kg of isopropyl acetate was added to the aqueous washes in the 30 gallon reactor and the phases were vigorously agitated for about 1.5–2 minutes, followed by discontinued agitation for sufficient time to obtain complete phase separation (about 10 min). The upper organic phase was retained and mixed with the organic phase previously retained in the 50 gallon reactor. 24 kg of isopropyl acetate was added to the aqueous washes in the 30 gallon reactor and the phases were vigorously agitated for about 1.5–2 minutes, followed by discontinued agitation for sufficient time to obtain complete phase separation (about 20 min). The upper organic phase was retained and mixed with the organic phase previously retained in the 50 gallon reactor. The combined organic phases were then washed with a brine solution (7 kg water, 3.9 kg NaCl) by vigorous agitation for about 1.5–2 minutes followed by discontinued agitation to allow the phases to completely separate (about 5 min). The brine phase was discarded. 18 kg of sodium sulfate was added to the reactor and the mixture was agitated vigorously for about 1.5–2 minutes and then allowed to stand for 1 hour. The organic phase weighed 98.5 kg at this point.

The reactor contents were then gently agitated and filtered through a bag filter (American Felt and Filter Co, model No. RM C S/S 122). The organic solution containing AD was transferred to a clean 50 gallon reactor and the volatile organics were removed by vacuum distillation at 33°–41° C. at a vacuum of 26–30" Hg until 50–55 L of condensate had collected. The organic phase was transferred from the 50 gallon reactor to a clean 30 gallon reactor via vacuum filtration through a cartridge filter (Memtec America, Corp., model No. 910044) containing a cotton spun wound cartridge and washed forward with 8.6 kg of isopropyl acetate. The solution was held overnight at 5° then concentrated under a vacuum at 26°–41° for 3 hours to obtain about 7–9 L of oil. 5.4 kg of acetone was added to the oil which yielded a clear solution. The solution was then agitated and warmed to 43° C. and 27 kg of room temperature di-n-butyl ether was added over a period of about 4 minutes followed by warming to return the temperature to 43° C. An additional 15 kg of di-n-butyl ether was added over about 4 minutes and the temperature was returned to 43°–44° C. at which time the temperature was allowed to drop to 20° C. over about 7 hours 15 minutes. During this time AD crystals formed in the reactor. The crystals were recovered by filtration (Nutche filter) and dried. 2.40 kg of AD was obtained (45.1%).

### Example 3

#### Preparation of Form 1 Crystals

A 3 neck, 12 L, round bottom flask was charged with 546.3 g PMEA (2 mole), followed by 2.18 L of NMP at room

**29**

temperature. Slow mechanical agitation was initiated (sufficient to keep solid PMEA suspended but without splashing flask contents) to suspend the PMEA and 1.39 L of TEA was then charged to the flask, followed by addition of 1.44 L of pivaloyloxymethyl chloride. The flask was then purged with nitrogen and the reaction was heated to 60° C. over 30–45 minutes. Gentle agitation was maintained for 2–2.5 hours with the reaction at 60°. Completion of the reaction was determined by HPLC. The reaction was terminated by charging the flask with 7.48 L of cold (0–3°) isopropyl acetate when the yield of AD reached 65–68% by area normalization. The agitation was increased to moderate agitation (moderate vortex but no splashing of contents) and the mixture remained at room temperature for 30 minutes under moderate agitation while solids (e.g., TEA.HCl mono (POM) PMEA) precipitated from the solution.

The reaction mixture was then filtered using a glass-sinter funnel (40–60 μm) and the filter cake was washed with 2.51 L of isopropyl acetate at room temperature.

The filtrate was then extracted twice with 2.0 L of potable water at room temperature. The combined aqueous phases were back extracted twice with 2.51 L of isopropyl acetate (room temperature). All organic phases were combined and extracted once with 985 mL of potable water. The organic phase was isolated and concentrated in vacuo for about 1–2 hours at a temperature of 35–39° at a vacuum of about 30 mm Hg to obtain 1.24 kg of yellow oil.

The oil was transferred to a 3 neck, 12 L flask and cooled to room temperature over about 30 minutes. The flask was charged with 628 mL of room temperature acetone and then with 3.14 L of di-n-butyl ether. Slow agitation was initiated and the solution was heated to 35° over about 5–20 minutes. When the temperature reached 35°, heating was discontinued and no further temperature increase occurred. The solution was cooled to below 30° (20–29°) over about 30 minutes. During the cooling period Form 1 crystals formed in the crystallization mixture while slow agitation was maintained, followed by continued slow agitation for 14–20 hours at room temperature. The crystals were then filtered (Tyvek™ filter) and the filter cake was washed with 2 L of a 10% acetone, 90% di-n-butyl ether (v/v) solution. The cake was dried at room temperature in a drying oven with a nitrogen bleed until a constant weight was achieved (about 2 days).

The yield of Form 1 AD obtained was 50–54% of the theoretical yield from PMEA and the purity was 97–98.5% by HPLC by area normalization.

### Example 4

#### Preparation of Form 1 Crystals

A 3 neck, 3 L, round bottom flask was charged with 273.14 g PMEA (1 mole), followed by 1.09 L of NMP at room temperature. Slow mechanical agitation was initiated (sufficient to keep solid PMEA suspended but without splashing flask contents) to suspend the PMEA and 0.418 L of TEA (3 equivalents) was then charged to the flask, followed by addition of 0.72 L of pivaloyloxymethyl chloride (5 equivalents). The flask was then purged with nitrogen and the reaction was heated to 60° C. over 30–45 minutes. Gentle agitation was maintained for 2–2.5 hours with the reaction at 60°. Completion of the reaction was determined by HPLC. The reaction was terminated by charging the flask with 3.74 L of cold (0–3°) isopropyl acetate when the yield of AD reached 68–70% by area normalization. The agitation was increased to moderate agitation (moderate vortex but no

**30**

splashing of contents) and the mixture was allowed to stand at room temperature for 30 minutes with the moderate agitation while solids (e.g., TEA.HCl, mono(POM)PMEA) precipitated from the solution. The reaction mixture was filtered using a glass-sinter funnel (40–60 μm) and the filter cake was washed with 1.26 L of isopropyl acetate (room temperature). The filtrate was then extracted twice with 1.01 L of potable water at room temperature for each extraction. The combined aqueous phases were back extracted twice with 1.26 L of isopropyl acetate (room temperature). All organic phases were combined and extracted once with 492 mL of potable water. The organic phase was isolated and concentrated in vacuo for about 1–2 hours at a temperature of 35–39° at a vacuum of about 30 mm Hg to obtain 0.6 kg of yellow oil. The oil was transferred to a 3 neck, 3 L flask and cooled to room temperature by allowing the temperature to fall over about 30 minutes. Then the flask was charged with 314 mL of acetone (room temperature) and then charged with 1.57 L of di-n-butyl ether. Slow agitation was initiated and the solution was heated to 35° over about 5–20 minutes. When the temperature reached 35°, heating was discontinued and no further temperature increase occurred. The solution was cooled to below 30° (20–29°) over about 30 minutes. During the cooling period Form 1 crystals formed in the crystallization mixture while slow agitation was maintained. An additional volume of 1.15 L of room temperature di-n-butyl ether was added to the crystallization mixture. Moderate agitation was continued at room temperature for about 16 hours. The crystals were then filtered (Tyvek™ filter) and the cake was washed with 1 L of a 10% acetone, 90% di-n-butyl ether (v/v) solution and this solution was then removed by filtering. The cake was dried at room temperature in a drying oven with a nitrogen bleed until a constant weight was achieved (about 2 days).

The yield of Form 1 AD obtained was 55–58% of the theoretical yield from PMEA and the purity was 99–100% by HPLC by area of normalization.

### Example 5

#### Preparation of AD Crystals Using Isopropyl Acetate as the Crystallization Solvent

43.7 mL of NMP at room temperature was added to PMEA (10.93 g) under nitrogen in a 3 neck flask fitted with a stirring apparatus. The mixture was stirred to suspend the PMEA. TEA (27.9 mL) at room temperature was then added, followed by addition of pivaloyloxymethyl chloride (28.9 mL) at room temperature. The temperature was increased to 45° and the suspension was stirred for 12 hours at 45°. The resulting thick, yellow suspension was diluted with isopropyl acetate (150 mL) at room temperature and stirred vigorously for 75 minutes at room temperature. The solids were removed by filtration with a "C" sintered glass frit and the solids were washed with 50 mL isopropyl acetate at room temperature. The filtrates were combined and washed twice with deionized water using 40 mL per wash. The combined water washes were back-extracted twice with 40 mL isopropyl acetate per extraction. All organic phases were combined, washed once with 20 mL deionized water and the aqueous and organic phases were allowed to separate and remain in contact for 2 hours at 17°. During this time long rod-like crystals were observed to form at the aqueous-organic interface. The crystals were collected by filtration using an "M" glass sintered frit and dried, affording 512 mg of long rod-shaped crystals.

### Example 6

#### Analysis of AD by HPLC

Crystalline Form 1 AD was analyzed by HPLC to assess purity, to isolate or identify by-products and to exemplify the

Copy provided by USPTO from the PIRS Image Database on 01/22/2013

US 6,451,340 B1

31

use of by-products as reference standards for AD. Levels of compounds present were analyzed by the area normalization method. HPLC analyses were performed within 12 hours of standard or sample preparation.

A liquid chromatograph equipped with a fixed volume sample injector, variable wavelength absorbance detector and an electronic integrator was used with a column (Alltech Mixed Mode Anion Exchange™ C8, 7 μm, 100 Å pore size, 250 mm×4.6 mm (i.d.), Alltech, Deerfield, Ill.) and guard column (20 mm xx4.6 mm (i.d.), dry packed with Pellicular C8 particles, Alltech, Deerfield, Ill.). Chromatographic quality water was used. Chemicals used were chromatographic grade acetonitrile (Burdick & Jackson, Muskegon, Mich.) anhydrous analytical grade potassium phosphate monobasic (KH$_2$PO$_4$, Mallinckrodt, Paris, Ky.), anhydrous analytical grade potassium phosphate dibasic (K$_2$HPO$_4$, Mallinckrodt, Paris, Ky.) and A.C.S. reagent grade phosphoric acid (Mallinckrodt, Paris, Ky.). Aqueous potassium phosphate solutions were filtered (0.45 μm Nylon 66 membrane filter, Rainin, Woburn, Mass.) and degassed prior to use. Equivalents of these components and compounds can also be used. Equivalent apparatus and/or reagents can also be used to obtain similar results.

Mobile phase A, which consisted of potassium phosphate buffer, pH 6.0:acetonitrile 70:30 v/v, was prepared by mixing 1400 mL of 200 mM potassium phosphate buffer, pH 6.0 with 600 mL acetonitrile. Mobile phase B, which consisted of potassium phosphate buffer, pH 6.0:acetonitrile 50:50 v/v, was prepared by mixing 1000 mL of 200 mM potassium phosphate buffer, pH 6.0 with 1000 mL acetonitrile.

Prior to sample analysis, the HPLC column was equilibrated with mobile phase A at 1.2 mL per minute for 1 hour at room temperature. A 5 μL sample of AD (about 1 mg/mL solution) containing by-products was analyzed in a 25 minute run at room temperature and at a flow rate of 1.2 mL per minute using 100% mobile phase A for 1 minute, followed by a 19-minute linear gradient to 100% mobile phase B. The column was then held at 100% mobile phase B for 5 minutes.

The sample containing AD was prepared by accurately weighing about 25 mg of an AD sample or preparation and dissolving the AD in a final volume of 25.0 mL of sample solvent. Sample solvent was prepared by mixing 200 mL of potassium phosphate buffer (3.40 g of potassium phosphate monobasic per 1 L water, adjusted to pH 3.0 with phosphoric acid) with 800 mL of acetonitrile and equilibrating to room temperature. Compounds are identified on the basis of their elution times and/or their retention times. AD usually elutes from such a gradient at about 9.8 minutes, mono(POM) PMEA elutes at about 6.7 minutes and PMEA elutes at about 3.5 minutes.

### Example 7

#### Physical Characterization of Form 1 Crystals

Form 1 crystals were analyzed by XRD by loading about 100 to 150 mg of crystals into an aluminum holder which was mounted into a diffractometer (GE model XRD-5 automated with a Nicolet automation package). Form 1 crystals were scanned between 4 and 35 degrees 2θ at a scan speed of 0.05° per 1.5 seconds by exposure to an X-ray generator operated at 40 KV and at ~20 mA using a standard focus copper X-ray tube (Viarican CA-8) with a graphite monochromator (ES Industries) and a scintillation detector. The weighted mean value of X-ray wavelengths used for the calculations was CuKα 1.541838 Å. Form 1 AD crystals

32

exhibit characteristic XRD peaks expressed in degrees 2θ at about 6.9, 11.8, 12.7, 15.7, 17.2, 20.7, 21.5, 22.5 and 23.3. An exemplary XRD pattern for Form 1 is shown in FIG. 1.

Form 1 crystals were also analyzed by differential scanning calorimetry and exhibited a thermogram as shown in FIG. 2 with a characteristic endothermic transition at approximately 102.0°, having an onset at approximately 99.8°. The thermogram was obtained using a scan rate of 10° per minute under a nitrogen atmosphere. The sample was not sealed in a container in the DSC apparatus and instead was analyzed at ambient pressure in the DSC apparatus. The calorimetry scan was obtained using a differential scanning calorimeter (TA Instruments, model DSC 2910 with a model 2200 controller). Approximately 5 mg of AD was used to obtain the thermogram. Differential scanning calorimetry has been described (see, e.g., U.S. Pharmacopoeia, vol. 23, 1995, method 891, U.S.P. Pharmacopeial Convention, Inc, Rockville, Md.).

The melting point of Form 1 crystals was determined by conventional melting point analysis. The analysis was conducted using a Mettler model FP 90 Central Processor equipped with a model FP 81 measuring cell according to the manufacturer's instructions. The sample was equilibrated for 30 seconds at an initial temperature of 63° followed by a temperature increase of 1.0°/minute. Form 1 crystals melted over a range of 99.1° to 100.7°.

The infrared absorption (IR) spectrum of Form 1 crystals was obtained using a Perkin-Elmer Model 1650 FT-IR spectrophotometer according to the manufacturer's instructions. A translucent pellet containing about 10% by weight (5 mg) of Form 1 crystals and about 90% by weight (50 mg) of dried (60° C. under vacuum overnight) potassium bromide (Aldrich, IR grade) was prepared by grinding the two powders together to obtain a fine powder. IR spectroscopy has been described (see, e.g., U.S. Pharmacopoeia, vol. 23, 1995 method 197, U.S.P. Pharmacopeial Convention, Inc, Rockville, Md.; Morrison, R. T. et al, *Organic Chemistry*, 3rd ed., Allyn and Bacon, Inc., Boston, p 405–412, 1973). The spectrophotometer sample chamber was purged for at least 5 minutes with high purity nitrogen gas at about 6 p.s.i. to reduce carbon dioxide absorbance interference to ≤3% in a background scan prior to scanning with the sample. Form 1 crystals exhibited an infrared absorption spectrum in potassium bromide with characteristic bands expressed in reciprocal centimeters at approximately 3325-3275, 3050, 2800-1750, 1700, 1625, 1575-1525, 1200-1150, 1075 and 875. An exemplary infrared absorption spectrum for Form 1 is shown in FIG. 3.

Form 1 crystals usually appear as an opaque white or off-white powder when dry. The crystals obtained from a given preparation are usually polydisperse and have a range of crystal habits including tablets, needles, plates and aggregates of tablets, needles and plates. Form 1 crystals typically range in size from about 1 μm to about 300 μm in length and are irregular tablet shaped with fractured or angular edges. Form 1 crystals obtained at low temperature, usually about 2–4°, from preparations using acetone and di-n-butyl ether as crystallization solvents are typically aggregates that comprise mostly needles and some plates. FIGS. 4–7 are photographs showing Form 1 crystals obtained from crystallization in acetone and di-n-butyl ether at temperatures above 15°. These photographs show tablet or plate-shaped and needle-shaped crystals that range in size from about 10 μm to about 250 μm in length. FIG. 9 shows Form 1 crystals obtained from crystallization in acetone and di-n-butyl ether at temperatures between about 2–4°. The photograph shows plate-shaped and needle-shaped crystal aggregates that

Copy provided by USPTO from the PIRS Image Database on 01/22/2013

US 6,451,340 B1

| 33 | 34 |

range in diameter from about 30 $\mu$m to about 120 $\mu$m. The individual crystals in the aggregates have angular edges.

Form 1 crystals were found to have a water content of less than 1% by Karl Fischer titration. We performed the water content analysis essentially as described (see, e.g., U.S. Pharmacopoeia, 1990, pages 1619–1621, U.S. Pharmacopoeial Convention).

### Example 8

#### Preparation of Form 2 Crystals

Form 1 crystals were converted to the Form 2 dihydrate by incubation in air at 94% relative humidity for 3 days at room temperature. During conversion of Form 1 to Form 2, a mixture of Form 1 and Form 2 crystals was obtained which increased over time from no detectable Form 2 in the initial Form 1 preparation. At the end of three days incubation, the final Form 2 preparation contained no detectable Form 1 crystals.

### Example 9

#### Physical Characterization of Form 2 Crystals

Form 2 crystals were analyzed by XRD by the same method that was used for Form 1. Form 2 AD crystals had characteristic XRD peaks expressed in degrees 2θ at approximately 8.7–8.9, 9.6, 16.3, 18.3, 18.9, 19.7, 21.0, 21.4, 22.0, 24.3, 27.9, 30.8 and 32.8. An exemplary XRD pattern for Form 2 is shown in FIG. 11.

Form 2 crystals were also analyzed by differential scanning calorimetry by the same method used to analyze Form 1 crystals and exhibited a thermogram as shown in FIG. 12 with a characteristic endothermic transition at about 72.7°, having an onset at about 69.5°.

The melting point of Form 2 crystals was determined by conventional melting point analysis. The analysis was conducted using the same method as described for Form 1. Form 2 crystals melted over a range of 70.9° to 71.8°.

The IR spectrum of Form 2 crystals was obtained using the same method as that described for Form 1 crystals. The IR spectrum is shown in FIG. 13 and exhibits the following characteristic absorption bands, expressed in reciprocal centimeters at approximately 3300–3350, 3050, 2800-1750, 1700, 1625, 1575-1525, 1200-1150, 1075 and 875. These bands are similar to those associated with Form 1 crystals, but Form 2 shows an additional O—H bond stretch band associated with water at approximately 3500.

Form 2 crystals were found to have a water content of 6.7% by Karl Fischer titration. We performed the water content analysis essentially as described (see, e.g., U.S. Pharmacopoeia, 1990, pages 1619–1621, U.S. Pharmacopoeial Convention).

### Example 10

#### Preparation of Form 3 Crystals

Sufficient Form 1 crystals (about 250 mg) were dissolved in anhydrous methanol (about 2 mL) at room temperature to obtain a solution. The solution was obtained by mixing for about 10–15 minutes until the crystals were dissolved. The solution was allowed to stand without mixing for 10–48 hours and Form 3 crystals were then recovered from the solution.

### Example 11

#### Physical Characterization of Form 3 Crystals

Form 3 crystals were analyzed by XRD by the same method that was used for Form 1. Crystalline Form 3 AD crystals were characterized as essentially having XRD peaks expressed in degrees 2θ at approximately 8.1, 8.7, 14.1, 16.5, 17.0, 19.4, 21.1, 22.6, 23.4, 24.2, 25.4 and 30.9. An exemplary XRD pattern for Form 3 is shown in FIG. 14.

### Example 12

#### Synthesis and Purification of PMEA

PMEA used for AD synthesis and crystallization was purified to increase product yield and purity. A 12 L 3 neck round bottom flask containing 548.8 g of diethyl PMEA was charged with 637.5 mL of acetonitrile at room temperature. The diethyl PMEA was dissolved by moderate agitation (moderate vortex with little or no splashing of the flask contents). The flask was purged with nitrogen and 803.8 g of bromotrimethylsilane was slowly added (about 2–5 minutes). The flask contents were heated to reflux (65°) for 2 hours until ≦1% monoethyl PMEA remained by HPLC area of normalization analysis. Volatiles were distilled off at ≦80° and ~20 mm Hg. The flask was then charged with 1500 mL of room temperature water. The pH of the solution in the flask was then adjusted to 3.2 with 25% w/v NaOH. The flask contents were then heated to 75° for 2 hours and the contents were then cooled to 3–4° over 15–20 minutes and held at 3–4° for 3–3.5 hours. The flask contents were then filtered with a glass frit filter and the cake was washed with 150 mL of cold (3–4°) water. The washed cake was transferred to a clean 12 L 3 neck flask and the flask was charged with 2025 mL of water and the flask was heated to 75° and held at that temperature for 2 hours. Heating was discontinued and the flask was cooled and held at 3–4° for 3–3.5 hours. The flask contents were then filtered with a glass frit filter and the cake was washed with 150 mL of cold (3–4°) water and then washed with 1050 mL of room temperature acetone. The cake was dried to constant weight by heating at 65–70° at ~20 mm Hg. PMEA yield was 85.4% with 99% purity by either area of normalization or external standard HPLC analysis.

### Example 13

#### Single Crystal X-ray Crystallography of Form 1

About 200 mg of lot 840-D-1 AD drug substance was dissolved in 200 mg of acetone. The solution was heated to about 60° C. Di-n-butyl ether, at ambient temperature, was slowly added to the solution at 60° C. until the appearance of the first trace of precipitate. The mixture was then shaken and re-heated to about 60° C. to form a clear and homogeneous solution. The solution was allowed to cool to ambient temperature overnight and was held at ambient temperature for about 2 days. The resulting crystals were highly polydisperse with some having long dimensions of up to 1 mm. The supernatant was decanted and the remaining crystals were washed with a total of about 1 mL of di-n-butyl ether over four cycles to remove the residual supernatant. A crystal having approximate dimensions of 150×200×320 $\mu$m was subjected to analysis using single crystal X-ray diffraction.

All measurements were made on a Siemens SMART diffractometer (Siemens Industrial Automation, Inc., Madison, Wis.) with graphite monochromated Mo—Kα radiation (λ=0.71069 Å). The crystal was mounted on a glass fiber using Paratone N™ hydrocarbon oil. Data acquisition was carried out at −135±1° C. Frames for an arbitrary hemisphere of reciprocal space were collected using w scans of 0.3° per frame counted for 10 seconds per frame.

Copy provided by USPTO from the PIRS Image Database on 01/22/2013

US 6,451,340 B1

## 35

5967 integrated reflections, measured out to a maximum $2\theta$ of 51.6°, were averaged to yield 3205 Friedel unique reflections ($R_{int}$=0.044). The structure was solved with the non-hydrogen atoms refined anisotropically. The hydrogen atoms were introduced in idealized positions. The final cycle of full matrix least squares refinement, based on 2438 observed reflections having I>3σ and 306 variable parameters, converged at R=0.048 ($R_w$=0.054).

Cell constants and an orientation matrix obtained from a least squares refinement using the measured positions of 3242 reflections with I>10σ in the range 3.00<2θ<45.00° corresponded to a C-centered monoclinic cell specified as follows: a=12.85 Å, b=24.50 Å, c=8.28 Å, β=100.2°, Z=4, space group Cc.

FIGS. 27, 28 and 29(a) and (b), and the following tables, show data obtained from the study.

### Fractional atomic coordinates for Form 1 AD.[a]

| Atom | x | y | z |
|------|------|------|------|
| P1 | 1.0808 | 0.22760(05) | 0.6554 |
| O1 | 0.8826(03) | 0.23934(12) | 0.6680(04) |
| O2 | 1.1005(04) | 0.26242(16) | 0.5213(05) |
| O3 | 1.0440(03) | 0.16716(14) | 0.6037(05) |
| O4 | 1.0034(04) | 0.12075(16) | 0.3651(05) |
| O5 | 0.9271(05) | 0.16940(19) | 0.1501(06) |
| O6 | 1.1768(03) | 0.21530(12) | 0.7951(04) |
| O7 | 1.3179(03) | 0.17817(13) | 0.6942(04) |
| O8 | 1.3518(04) | 0.13595(19) | 0.9392(06) |
| N1 | 0.6976(04) | 0.09182(15) | 0.7806(05) |
| N2 | 0.6997(04) | 0.06321(14) | 0.3428(05) |
| N3 | 0.6929(04) | 0.15993(15) | 0.3987(05) |
| N4 | 0.6929(04) | 0.17777(13) | 0.6860(05) |
| N5 | 0.7041(04) | −0.00364(15) | 0.5388(05) |
| C1 | 0.6935(05) | 0.14417(19) | 0.8165(06) |
| C2 | 0.7000(04) | 0.09175(17) | 0.6147(06) |
| C3 | 0.7008(04) | 0.04924(19) | 0.4599(06) |
| C4 | 0.6945(05) | 0.11622(19) | 0.3029(06) |
| C5 | 0.6962(04) | 0.14452(17) | 0.5538(05) |
| C6 | 0.6968(05) | 0.23782(18) | 0.6890(06) |
| C7 | 0.8026(04) | 0.25795(18) | 0.7733(06) |
| C8 | 0.9855(05) | 0.25344(20) | 0.7701(07) |
| C9 | 0.9597(06) | 0.15570(03) | 0.4715(08) |
| C10 | 0.9798(05) | 0.13190(02) | 0.2018(07) |
| C11 | 1.0283(04) | 0.08975(19) | 0.1036(06) |
| C12 | 1.1460(06) | 0.1018(03) | 0.1244(10) |
| C13 | 1.0105(06) | 0.0329(02) | 0.1618(08) |
| C14 | 0.9783(07) | 0.0959(03) | −0.0773(08) |
| C15 | 1.2825(05) | 0.22414(20) | 0.7731(06) |
| C16 | 1.3473(05) | 0.1340(02) | 0.7942(09) |
| C17 | 1.3650(05) | 0.0841(02) | 0.6937(09) |
| C18 | 1.4337(07) | 0.0440(03) | 0.8045(12) |
| C19 | 1.4160(05) | 0.1000(02) | 0.5486(09) |
| C20 | 1.2561(06) | 0.0599(03) | 0.6340(11) |
| H1 | 0.6911 | 0.1572 | 0.9239 |
| H2 | 0.6915 | 0.1239 | 0.1897 |
| H3 | 0.7060 | −0.0145 | 0.6494 |
| H4 | 0.7044 | −0.0304 | 0.4560 |
| H5 | 0.6836 | 0.2511 | 0.5796 |
| H6 | 0.6439 | 0.2511 | 0.7458 |
| H7 | 0.8166 | 0.2445 | 0.8826 |
| H8 | 0.8025 | 0.2967 | 0.7751 |
| H9 | 0.9977 | 0.2379 | 0.8768 |
| H10 | 0.9916 | 0.2920 | 0.7786 |
| H11 | 0.9032 | 0.1380 | 0.5107 |
| H12 | 0.9346 | 0.1884 | 0.4165 |
| H13 | 1.1770 | 0.0992 | 0.2371 |
| H14 | 1.1785 | 0.0762 | 0.0630 |
| H15 | 1.1561 | 0.1377 | 0.0851 |
| H16 | 0.9367 | 0.0263 | 0.1513 |
| H17 | 1.0404 | 0.0072 | 0.0974 |
| H18 | 1.0430 | 0.0293 | 0.2736 |
| H19 | 0.9919 | 0.1315 | −0.1138 |
| H20 | 1.0079 | 0.0696 | −0.1405 |

## 36

### -continued

### Fractional atomic coordinates for Form 1 AD.[a]

| Atom | x | y | z |
|------|------|------|------|
| H21 | 0.9041 | 0.0903 | −0.0902 |
| H22 | 1.2855 | 0.2557 | 0.7074 |
| H23 | 1.3266 | 0.2293 | 0.8768 |
| H24 | 1.3999 | 0.0345 | 0.8938 |
| H25 | 1.4441 | 0.0122 | 0.7442 |
| H26 | 1.5002 | 0.0604 | 0.8454 |
| H27 | 1.4811 | 0.1181 | 0.5869 |
| H28 | 1.4288 | 0.0681 | 0.4897 |
| H29 | 1.3701 | 0.1237 | 0.4784 |
| H30 | 1.2125 | 0.0863 | 0.5708 |
| H31 | 1.2623 | 0.0287 | 0.5684 |
| H32 | 1.2254 | 0.0497 | 0.7257 |

[a]Numbers in parentheses denote standard deviation in the last significant figures

### Example 14

### Preparation of Form 4 Crystals

Form 1 AD (10.05 g) was dissolved in isopropanol (50 mL.) with warming (about 35° C.) and then filtered through a glass frit (M frit, ASTM 10–15 μm). The filtrate was added to a stirred solution of isopropanol (49 mL) at about 35° C. containing dissolved fumaric acid (2.33 g) and the mixture was allowed to passively cool to room temperature. Form 4 crystals, AD.fumaric acid (1:1) spontaneously formed in the mixture shortly after the AD solution was added to the isopropanol solution. The crystals were allowed to form for 2 days at room temperature, recovered by filtration and dried in vacuo under nitrogen at room temperature.

### Example 15

### Preparation of Form 4 Crystals

Form 1 AD (1005.1 g) was dissolved in warm (about 45° C.) isopropanol (3.0 L). The warm AD solution was added over about 20 minutes with moderate agitation to a stirred solution of isopropanol (6.0 L) at about 45° C. in a 12 L flask containing dissolved fumaric acid (233.0 g). The mixture temperature was maintained at 40–45° C. for 10 minutes and warming was discontinued when thick precipitate formed. Several minutes after the all of the AD solution was added, the mixture became hazy and then a few minutes later the precipitate became thick, at which point agitation was discontinued (mixture temperature 42° C.). Precipitate was allowed to form for an hour. Slow agitation was started and continued for about 2 hours, followed by immersing the 12 L flask in room temperature water with slow stirring continued overnight to facilitate mixture cooling. The precipitate was recovered by a first filtration (Tyvek™ filter) and a second filtration (M glass frit) and dried in vacuo at room temperature under nitrogen.

### Example 16

### Preparation of Crystalline AD Salts from Organic and Inorganic Acids

Form 1 AD (500 mg, 1.0 mmol) was dissolved in isopropyl alcohol (5 mL) with warming (<40° C.). Acid (1.0 mmol) dissolved in 2 mL of isopropyl alcohol, or a larger volume as needed to dissolve the acid, was added to the AD solution. The solution was stored in a tightly capped scintillation vial at room temperature. In some cases, precipi-

Copy provided by USPTO from the PIRS Image Database on 01/22/2013

US 6,451,340 B1

**37**

tated salts were observed shortly after the solution was capped (about 1 minute). For other salts, precipitate began to form at times up to several months after the solution was capped. Melting points for all 13 salts is shown below. XRD data (degrees 20) for nine salts is also shown below. The XRD data shows most of the highest intensity peaks for these salts.

| Acid | melting point (° C.) | XRD spectrum peaks |
|---|---|---|
| hemisulfate | 131–134 | 8.0, 9.5, 12.0, 14.6, 16.4, 17.0, 17.5–17.7*, 18.3, 19.0, 20.2, 22.7, 24.1, 28.2 |
| HBr | 196–199 (decomp.) | 13.2, 14.3, 15.9, 17.8, 20.7, 21.8, 27.2, 28.1 |
| HCl | 204–205 (decomp.) | ND*** |
| HNO₃ | 135–136 (decomp.) | 8.0, 9.7, 14.1, 15.2, 16.7, 17.1, 18.3, 18.9, 19.4, 20.0, 21.2, 22.3, 23.2, 24.9, 27.6, 28.2, 29.4, 32.6 |
| CH₃SO₃H | 138–139 | 4.8, 15.5, 16.2, 17.5, 18.5, 20.2, 23.8, 25.4, 29.5 |
| C₂H₅SO₃H | 132–133 | 4.4, 8.8, 18.8, 23.0–23.3*, 27.3 |
| β-naphthalene sulfonic acid | 156–157 | 9.8, 13.1, 16.3, 17.4, 19.6, 21.6–22.3*, 23.4, 24.1–24.5**, 26.6 |
| α-naphthalene sulfonic acid | 122–128 | 8.3, 9.8, 11.5, 15.6, 16.3, 16.7–17.4**, 19.6, 21.0, 22.9, 23.7, 25.0, 26.1 |
| (S)-camphor sulfonic acid | 160–161 | 5.4, 6.5, 13.7, 15.5, 16.8–17.2*, 19.6, 20.4–20.7*, 21.2, 23.1, 26.1, 27.5, 28.4, 31.3, 32.2 |
| fumaric acid | 144–145 | ND |
| succinic acid | 122–124 | 4.7, 9.5, 10.6, 14.9, 16.3, 17.4, 17.9, 19.9, 20.8, 22.1, 23.9–24.2*, 26.5, 27.6, 28.2 |
| maleic acid | 72–75 | ND |
| ascorbic acid | 210–212 | ND |
| nicotinic acid | 192–193 | ND |

*present as two peaks or as a peak with shoulder
**3–4 peaks present in broad peak
***ND = XRD analysis not done

### Example 17

### AD Formulation

Form 1 AD was formulated with several excipients in tablets containing 30, 60 or 120 mg AD per tablet as follows.

| Component | 30 mg Tablet | | 60 mg Tablet | | 120 mg Tablet | |
|---|---|---|---|---|---|---|
| | % w/w | mg/ tab. | % w/w | mg/ tab. | % w/w | mg/ tab. |
| Adefovir dipivoxil | 7.5 | 30.0 | 15.0 | 60.0 | 30.0 | 120.0 |
| Pregelatinized Starch, NF | 5.0 | 20.0 | 5.0 | 20.0 | 5.0 | 20.0 |
| Croscarmellose Sodium, NF¹ | 6.0 | 24.0 | 6.0 | 24.0 | 6.0 | 24.0 |
| Lactose Monohydrate, NF¹ | 74.5 | 298.0 | 67.0 | 268.0 | 52.0 | 208.0 |
| Purified Water, USP² | — | — | — | — | — | — |
| Talc, USP | 6.0 | 24.0 | 6.0 | 24.0 | 6.0 | 24.0 |

**38**

-continued

| Component | 30 mg Tablet | | 60 mg Tablet | | 120 mg Tablet | |
|---|---|---|---|---|---|---|
| | % w/w | mg/ tab. | % w/w | mg/ tab. | % w/w | mg/ tab. |
| Magnesium Stearate, NF | 1.0 | 4.0 | 1.0 | 4.0 | 1.0 | 4.0 |
| Total | 100.0 | 400.0 | 100.0 | 400.0 | 100.0 | 400.0 |

¹To be incorporated into the dosage form in two portions (intragranular and extragranular) during the manufacturing process.
²The quantity of water added is sufficient to produce a suitable wet granulation. Water was removed to a level of not more than 3% loss on drying (LOD).

Tablets containing Form 1 AD were made by blending croscarmellose sodium, pregelatinized starch and lactose monohydrate in a granulator. Water was added and the contents were mixed in a granulator until a suitable wet granulation formed. The wet granulation was milled, dried in a dryer to a moisture content of not more than 3% loss on drying and the dried granules were passed through a mill. The milled granules were combined with extragranular excipients, lactose monohydrate, croscarmellose sodium and talc, and blended in a blender to obtain a powder blend. Magnesium stearate was added, blended in a blender, and compressed into tablets. The tablets were filled into high density polyethylene or glass bottles along with polyester fiber packing material and optionally with a silica gel desiccant.

### Example 18

### AD Formulation

Form 1 AD was formulated with several excipients in tablets weighing 100 mg each and containing either 25 or 50 mg AD per tablet as follows. The tablets were prepared by wet granulation in a manner similar to that described above.

| Component | per unit content | |
|---|---|---|
| | % w/w | % w/w |
| Form 1 AD | 25.0 | 50.0 |
| Lactose Monohydrate, NF | 40.5 | 26.5 |
| Microcrystalline Cellulose, NF | 31.0 | 20.0 |
| Croscarmellose Sodium, NF | 2.0 | 2.0 |
| Silicon Dioxide, NF | 0.5 | 0.5 |
| Magnesium Stearate, NF | 1.0 | 1.0 |

We claim:

1. A composition comprising crystalline adefovir dipivoxil.

2. The composition of claim 1 wherein the crystalline adefovir dipivoxil is Form 1 adefovir dipivoxil.

3. The composition of claim 2 comprising a C-centered monoclinic cell specified substantially as follows: a=12.85 Å, b=24.50 Å, c=8.28 Å, β=100.2°, Z=4, space group Cc.

4. The composition of claim 2 having an X-ray powder diffraction spectrum peak using Cu—Kα radiation, expressed in degrees 2θ at about 6.9.

5. The composition of claim 4 having a DSC endothermic transition at about 102° C.

6. The composition of claim 1 wherein the crystalline adefovir dipivoxil is Form 2 adefovir dipivoxil.

7. The composition of claim 6 having an X-ray powder diffraction spectrum peak using Cu—Kα radiation,

US 6,451,340 B1

| 39 | 40 |
|---|---|

expressed in degrees 2θ at about 9.6, about 18.3, about 22.0 and about 32.8.

**8.** The composition of claim 7 having a DSC endothermic transition at about 73° C.

**9.** The composition of claim 1 wherein the crystalline adefovir dipivoxil is Form 3 adefovir dipivoxil.

**10.** The composition of claim 9 having an X-ray powder diffraction spectrum peak at about Cu—Kα radiation, expressed in degrees 2θ at about 8.1, about 19.4, about 25.4 and about 30.9.

**11.** The composition of claim 10 having a DSC endothermic transition at about 85° C.

**12.** The composition of claim 1 wherein the crystalline adefovir dipivoxil is Form 4 adefovir dipivoxil.

**13.** The composition of claim 12 having an X-ray powder diffraction spectrum peak using Cu—Kα radiation, expressed in degrees 2θ at about 9.8, about 15.2, about 26.3 and about 31.7.

**14.** The composition of claim 12 having a DSC endothermic transition at about 148° C.

**15.** The composition of claim 1 comprising a crystalline salt of adefovir dipivoxil.

**16.** The composition of claim 15 wherein the crystalline salt is a salt of an organic acid.

**17.** The composition of claim 15 wherein the crystalline salt is a salt of an inorganic acid.

**18.** The composition of claim 1 wherein the crystalline adefovir dipivoxil is a crystalline salt of adefovir dipivoxil selected from the group consisting of hemisulfate, hydrobromide, hydrochloride, nitrate, mesylate, ethane sulfonate, β-naphthylene sulfonate, α-naphthylene sulfonate, (S)-camphor sulfonate, succinic acid, maleic acid, ascorbic acid or nicotinic acid.

**19.** The composition of claim 1 comprising a pharmaceutically acceptable excipient.

**20.** A method comprising administering to a subject an antivirally effective amount of the composition of claim 19.

**21.** A method comprising contacting a crystallization solvent and adefovir dipivoxil.

**22.** The method of claim 21 wherein the adefovir dipivoxil is in a solution.

**23.** The method of claim 22 wherein the crystallization solvent is mixed with the solution to obtain a second solution, which is allowed to form crystals.

**24.** A method comprising crystallizing adefovir dipivoxil from a solution comprising about 6–45% adefovir dipivoxil and about 55–94% crystallization solvent wherein the crystallization solvent is selected from the group consisting of (1) a mixture between about 1:10 v/v to about 1:3 v/v of acetone:di-n-butyl ether, (2) a mixture between about 1:10 v/v to about 1:3 v/v of ethyl acetate:di-n-propyl ether, (3) a mixture between about 1:10 v/v to about 10:1 v/v of t-butanol:di-n-butyl ether, (4) a mixture between about 1:10 v/v to about 1:3 v/v of methylene chloride:di-n-butyl ether, (5) a mixture between about 1:10 v/v to about 10:1 v/v of diethyl ether:di-n-propyl ether, (6) a mixture between about 1:10 v/v to about 1:3 v/v of tetrahydrofuran:di-n-butyl ether, (7) a mixture between about 1:10 v/v to about 1:3 v/v of ethyl acetate:di-n-butyl ether, (8) a mixture between about 1:10 v/v to about 1:3 v/v of tetrahydropyran:di-n-butyl ether, (9) a mixture between about 1:10 v/v to about 1:3 v/v of ethyl acetate:diethyl ether, (10) 1-butyl-methyl ether, (11) diethyl ether, (12) di-n-butyl ether, (13) t-butanol, (14) toluene, (15) isopropyl acetate, (16) ethyl acetate, and (17) a mixture consisting essentially of (A) a first crystallization solvent consisting of a first dialkyl ether of the formula R³—O—R² wherein R³ is an alkyl group having 1, 2, 3, 4,

5 or 6 carbon atoms, R² is an alkyl group having 2, 3, 4, 5 or 6 carbon atoms wherein R¹ and R² are the same or different, or both R¹ and R² are linked together to form a 5-, 6-, 7-, or 8-membered ring, provided that the dialkyl ether is not methyl-ethyl ether, and (B) a second crystallization solvent selected from the group consisting of (a) a second dialkyl ether of the formula R¹—O—R², wherein the second dialkyl ether is different from the first dialkyl ether, (b) toluene, (c) tetrahydrofuran, (d) t-butanol, (e) ethyl acetate, (f) methylene chloride, (g) propyl acetate and (h) isopropanol.

**25.** A method for preparing Form 2 adefovir dipivoxil comprising forming adefovir dipivoxil crystals in the presence of water.

**26.** The method of claim 25 wherein the Form 2 adefovir dipivoxil is produced by (1) hydrating Form 1 adefovir dipivoxil crystals, and/or (2) crystallizing adefovir dipivoxil in the presence of water.

**27.** A method comprising contacting adefovir dipivoxil with methanol.

**28.** A method for preparing Form 4 adefovir dipivoxil comprising forming crystals comprising adefovir dipivoxil in the presence of fumaric acid.

**29.** A method for preparing adefovir dipivoxil comprising contacting 9-[2-(phosphonomethoxy)ethyl]adenine with chloromethyl pivalate in 1-methyl-2-pyrrolidinone and a trialkylamine and recovering adefovir dipivoxil.

**30.** The method of claim 29 wherein the trialkylamine is triethylamine.

**31.** The method of claim 30 comprising contacting 1 molar equivalent of 9-[2-(phosphonomethoxy)ethyl]adenine and about 5.6–56.8 molar equivalents of 1-methyl-2-pyrrolidinone.

**32.** The method of claim 29 comprising contacting 1 molar equivalent of 9-[2-(phosphonomethoxy)ethyl]adenine and about 2–5 molar equivalents of triethylamine.

**33.** A method comprising contacting 9-[2-(phosphonomethoxy)ethyl]adenine containing less than about 2% salt with chloromethyl pivalate.

**34.** The method of claim 33 wherein the salt is NaBr or KBr.

**35.** A product produced by the process of compressing a mixture comprising Form 1 adefovir dipivoxil and a pharmaceutically acceptable excipient.

**36.** The product of claim 35 wherein the compression results in a tablet.

**37.** A product produced by the process of preparing wet granules from a mixture comprising a liquid, Form 1 adefovir dipivoxil and a pharmaceutically acceptable excipient.

**38.** The product of claim 37 wherein the liquid is water.

**39.** The product of claim 37 wherein the process further comprises drying the wet granules.

**40.** A composition comprising a tablet containing adefovir dipivoxil, 20 mg pregelatinized starch, 24 mg croscarmellose sodium, lactose monohydrate, 24 mg talc and 4 mg magnesium stearate, wherein the adefovir dipivoxil comprises at least about 70% form 1 adefovir dipivoxil.

**41.** The composition of claim 40 wherein the tablet contains 60 mg adefovir dipivoxil and 268 mg lactose monohydrate.

**42.** The composition of claim 41 wherein the tablet weighs about 400 mg.

**43.** The composition of claim 41 wherein the adefovir dipivoxil comprises at least about 80% form 1 adefovir dipivoxil.

**44.** The composition of claim 40 wherein the tablet contains 120 mg adefovir dipivoxil and 208 mg lactose monohydrate.

Copy provided by USPTO from the PIRS Image Database on 01/22/2013

US 6,451,340 B1

41

**45**. The composition of claim **44** wherein the tablet weighs about 400 mg.

**46**. The composition of claim **44** wherein the adefovir dipivoxil comprises at least about 80% form 1 adefovir dipivoxil.

42

**47**. A method for preparing 9-[2-(diethylphosphonomethoxy)ethyl]-adenine comprising contacting sodium alkoxide and 9-(2-hydroxyethyl)adenine.

\* \* \* \* \*

| ORDER NUMBER | | | 7398060 | | | Page 1 of 1 |
|---|---|---|---|---|---|---|
| REFERENCE ORDER NUMBER | | | 0 | | | |
| BIN NUMBER | | | 0 | | | |
| DELIVERY INSTRUCTIONS | | | | | | |

| ORDER DATE/TIME | PALM NUMBER | CUSTOMER NUMBER | CONTACT PHONE NUMBER | PAYMENT METHOD | TOTAL COST OF ORDER |
|---|---|---|---|---|---|
| 2013/01/22 12:35:15 | | IDON893717 | (312) 552-3116 | DEPOSIT ACCOUNT | $ 500.00 |

| BROADCAST MESSAGE |
|---|
| |

| ORDER INFORMATION | | | | | |
|---|---|---|---|---|---|
| ORDER LINE | PRODUCT TYPE | DOCUMENT IDENTIFIER | COPIES | STATUS | CUSTOMER REFERENCE |
| 4 | G1 | 05663159 | 1 | FILLED | 270538 |
| 3 | G1 | 06451340 | 1 | FILLED | 270538 |

| E-MAIL |
|---|
| kstaubin@leydig.com |

| FAX NUMBER |
|---|
| |

| CARRIER |
|---|
| |

| CARRIER TRACKING NUMBER |
|---|
| |

| CARRIER ACCOUNT NUMBER |
|---|
| |

# Addendum 4

United States Patent No. 5,663,159

A92-A111



UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office

**January 23, 2013**

THIS IS TO CERTIFY THAT ANNEXED HERETO IS A TRUE COPY FROM THE RECORDS OF THIS OFFICE OF:

U.S. PATENT: *5,663,159*
ISSUE DATE: *September 02, 1997*

By Authority of the
Under Secretary of Commerce for Intellectual Property
and Director of the United States Patent and Trademark Office

P. SWAIN
Certifying Officer



US005663159A

# United States Patent [19]

## Starrett, Jr. et al.

[11] **Patent Number:** 5,663,159

[45] **Date of Patent:** Sep. 2, 1997

[54] **PRODRUGS OF PHOSPHONATES**

[75] Inventors: **John E. Starrett, Jr.**, Middletown; **Muzammil M. Mansuri**; **John C. Martin**, both of Cheshire; **David R. Tortolani**, Meriden; **Joanne J. Bronson**, Madison, all of Conn.

[73] Assignees: **Institute of Organic Chemistry and Biochemistry of the Academy of Sciences of the Czech Republic**, Czech Rep.; **Rega Stichting v.z.w.**, Belgium

[21] Appl. No.: **320,632**

[22] Filed: **Oct. 11, 1994**

### Related U.S. Application Data

[63] Continuation of Ser. No. 153,556, Nov. 16, 1993, abandoned, which is a continuation of Ser. No. 583,906, Sep. 14, 1990, abandoned.

[51] Int. Cl.[6] .................... **A61K 31/675; C07F 9/6512; C07F 9/6584**

[52] U.S. Cl. ................................ **514/181; 544/244**

[58] Field of Search ..................... 544/244; 514/181

[56] **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 3,929,840 | 12/1975 | Christensen et al. | 260/348 A |
| 4,724,233 | 2/1988 | De Clercq et al. | 514/81 |
| 4,808,716 | 2/1989 | Holy et al. | 544/244 |
| 4,816,447 | 3/1989 | Ashton | 514/81 |
| 4,816,570 | 3/1989 | Farquhar | 536/27 |
| 4,968,788 | 11/1990 | Farquhar | 536/27 |
| 5,032,680 | 7/1991 | Kawai | 536/23 |
| 5,055,458 | 10/1991 | Bailey | 544/243 |
| 5,413,996 | 5/1995 | Bodor | 514/169 |

#### FOREIGN PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 0205826 | 12/1986 | European Pat. Off. . | |
| 206459 | 12/1986 | European Pat. Off. | 544/244 |
| 253412 | 1/1988 | European Pat. Off. | 544/244 |
| 0 270 885 | 6/1988 | European Pat. Off. . | |
| 269947 | 6/1988 | European Pat. Off. | 544/244 |
| 1135029 | 11/1968 | United Kingdom . | |
| WO 92/09611 | 6/1992 | WIPO . | |

#### OTHER PUBLICATIONS

Rosenberg, Coll. Czech Chem. Comm 52, p. 2792 (1987).
Farquhar, J. Pharm Sci 72, 324 (1983).
Kunar, J Med Chem 33, 2368 (1990).
Germershauson, Anti. Agents. & Chemo. 29, 1025 (1986).
Farrow, J. Med Chem 33, 1400 (1990).
Iyer, Tet. Letters, 30, 7141 (1989).
Rosenberg, Coll. Czech. Chem Comm 53, 2753 (1988).
Srivastva, Bioorganic Chemistry 12, 118 (1984).
de Clercq, Anti Viral Research 8, 261 (1987).
Bacon, Antiviral Res 23, Suppl p. 99 (1994).
Spadavi, Drug News and Perspective ®2, p. 333 (1989).
Beris J. Med. Chem. 29, 1243–1249 (1986).
Eto, Agric. Biol. Chem 55 (8) 1999 (1991).
Maccross, Biochem. Biophys. Res. Comm. 85, 714 (1978).
"Drug Evaluations Manual" 1993, p. 1723 (American Medical Assocation).

Orchin, "Vocabulary of Organic Chemistry" 1980, pp. 60–61.

Barditch–Crovo et al., "A Randomized, Double–Blind, Placebo–Controlled Phase I/II Evaluation of 9–[–2–(bispialoyloxy–methyl)phosphonyl–methoxyladenin (bis–POM PMEA), an Orally Bioavailable Prodrug of the Anti–HIV Nucleotide, PMEA," 8th International Conference on Antiviral Research, Santa Fe, NM Abstract #9;A229 (Apr. 23–28, 1995).

Barditch–Crovo et al., "Copy of Slides of the Abstract #9 Presentation," 8th International Conference on Antiviral Research, Santa Fe, NM 14 pages (Apr. 23–28, 1995).

De Clercq, "Broad-Spectrum Anti-DNA Virus and Anti-Retrovirus Activity of Phosphonylmethoxyalkylpurines and –Pyrimidines," Biochem Pharm 42(5):963–972 (1991).

Naesens, "Pharmacokinetics in Mic of Bis(POM)–PMEA, the Bis(pivaloyloxymethyl) Ester Prodrug of 9–(2–Phosphonylmethoxyethyl)adenine," 8th International Conference on Antiviral Research, Santa Fe, NM Abstract #98:A277 (Apr. 23–28, 1995).

Naesens et al, "Antiviral Efficacy in Mice of Oral Bis–(POM)–PMEA, the Bis(pivaloyloxymethyl) Ester of Prodrug of 9–(2–Phosphonylmethoxyethyl)adenine," 8th International Conference on Antiviral Research, Santa Fe, NM Abstract #96:A229 (Apr. 23–28, 1995).

Rosenberg et al, "Synthesis of Potential Prodrugs and Metabolites of 9–(S)–(3–Hydroxy–2–Phosphonylmethoxypropyl)Adenines," Collect Czech Chem Commun 52;2792–2800 (1987).

Snoeck et al, "Antiviral activity of anti–cytomegalovirus agents (HPMPC, HPMPA) assessed by a flow cytometric method and DNA hybridization technique," Antiviral Res 16:1–9 (1991).

Vahlenkamp et al., "(R)–9–(2–Phosphonylmethoxypropyl)–2,6–Diaminopurine Is a Potent Inhibitor of Feline Immunodeficiency Virus Infection," Antimicro AG & Chemo 39(3):746–749 (1995).

De Clercq et al., "Antiviral activity of phosphonylmethoxyalkyl derivatives of purine and pyrimidines," Antiviral Res 8:261–272 (1987).

De Clercq et al., "Efficacy of Phosphonylmethoxyalkyl Derivatives of Adenine in Experimental Herpes Simplex Virus and Vaccinia Virus Infections in Vivo," Antimicro AG & Chemo 33(2):185–191 (1989).

Lin et al, "Novel Acyclic Adenosine Analogs Inhibit Epstein–Barr Virus Replication," Antimicro AG & Chemo 31(9):1431–1433 (1987).

(List continued on next page.)

*Primary Examiner*—Mark L. Berch
*Attorney, Agent, or Firm*—Max D. Hensley

[57] **ABSTRACT**

There are disclosed novel oral prodrugs of phosphonate nucleotide analogs which are hydrolyzable under physiological conditions to yield compounds which are useful as antiviral agents, especially as agents effective against RNA and DNA viruses. They may also find use as antitumor agents.

**18 Claims, No Drawings**

Copy provided by USPTO from the PIRS Image Database on 01/22/2013

5,663,159
Page 2

## OTHER PUBLICATIONS

Yokota et al, "Comparative Activities of Several Nucleoside Analogs against Duck Hepatitis B Virus in Vitro," Antimicro AG & Chemo 34:1326–1330 (1990).

Snoeck et al., "New Acyclic Nucleoside Phosphonate Derivatives as Inhibitors of Human Cytomegalovirus," 29th International Conference on Antimicrobial Agents and Chemotherapy (1989) Abstract 1334 on p. 327.

Balzarini et al, Antimicrobial Agents and Chemotherapy, "Differential Antiherpesvirus and Antiretrovirus Effects of the (S) and (R) Enantiomers of Acyclic Nucleoside Phosphonates: Potent and Selective In Vitro and In Vivo Anti-retrovirus Activities of (R)–9–(2–Phosphonomethoxypropyl)–2,6–Diaminopurine", 37(2):332–338 (Feb. 1993).

Bronson et al, Nucleotide Analogues, "Synthesis and Antiviral Activity of Phosphonylmethoxyethyl Derivatives of Purine and Pyrimidine Bases", 401:72–87 (1989).

Hartmann et al, Antiviral Chemistry & Chemotherapy, "In vitro activity of acyclic nucleoside phosphonate derivatives against feline immunodeficiency virus in Crandell feline kidney cells and feline peripheral blood lymphocytes", 5(1):13–19 (1994).

Holy et al, Nucleotide Analogues, "Phosphonylmethyl Ethers of Nucleosides and Their Acyclic Analogues", 51–71 (1989).

Hoover et. al, Antiviral Research, "Early therapy of feline leukemia virus infection (FeLV–FAIDS) with 9–(2–phosphonylmethoxyethyl)adenine (PMEA)", 16:77–92 (1991).

Midoux, Biochem. Biophys. Res. Comm., "Drug Targeting: Anti–HSV–1 Activity of Mannosylated Polymer–Bound 9–(2–Phosphonylmethoxyethyl Adenine", 167(3):1044–1049 (1990).

Naesens et al, Antiviral Research, "Single–dose administration of 9–(2–phosphonylmethoxyethyl)adenine (PMEA) and 9–(2–phosphonylmethoxyethyl–2,6–diaminopurine (PMEDAP) in the prophylaxis of retrovirus infection in vivo", 16:53–64 (1991).

De Clercq et al, "Antiviral Activity of Phosphonylmethoxy-alkyl Derivatives of Pyrimidines," Chemical Abstracts 108(21):179636k (1988).

Holy et al, "Synthesis of N–(2–Phosphonylmethoxyethyl) Derivatives of Heterocyclic Bases," Chemical Abstracts 112(19):179685h (1990).

Naesens et al, Journal of Medical Virology, "Efficacy of Oral 9–(2–phosphonylmethoxyethyl)–2,6–diaminopurine (PMEDAP) in the Treatment of Retrovirus and Cytomegalovirus Infections in Mice", 39:167–172 (1993).

Starrett et al, Antiviral Research, "Synthesis and in vitro evaluation of a phosphonate prodrug: bis(pivaloyloxymethyl) 9–(2–phosphonylmethoxyethyl)adenine", 19:267–273 (1992).

Starrett et al, J. Med. Chem., "Synthesis, Oral Bioavailability Determination, and in Vitro Evaluation of Prodrugs of the Antiviral Agent 9–[2–(Phosphonomethoxy)ethyl]adenine (PMEA)", 37:1857–1864 (1994).

Yokota et al, Antiviral Chemistry & Chemotherapy, "Inhibitory effects of acyclic nucleoside phosphonate analogues on hepatitis B virus DNA synthesis in HB6511 cells", 5(2):57–63 (1994).

Copy provided by USPTO from the PIRS Image Database on 01/22/2013

A94

5,663,159

1

## PRODRUGS OF PHOSPHONATES

This is a continuation of application Ser. No. 08/153,556 filed on Nov. 16, 1993 abandoned, which is a continuation of application Ser. No. 07/583,906 filed on Sep. 14, 1990 abandoned.

## BACKGROUND OF THE INVENTION

### 1. Field of the Invention

The present invention relates to novel orally active prodrugs of phosphonate nucleotide analogs, their pharmaceutically acceptable acid addition salts, a process for their production, and to their use. The prodrugs of the present invention exhibit antitumor activity and a broad spectrum of antiviral activity.

### 2. Description of the prior art

Infectious viral diseases are recognized as an important medical problem. Progress against infectious viral diseases requires the development of drugs with selective antiviral activity while remaining benign to normal cell lines. Among the antiviral agents currently under study, which seem to possess selectivity, are phosphonate nucleotide analogs. In general, these compounds are structural analogs of the monophosphates nucleoside analogs.

A number of phosphonate nucleoside analogs have been described in the literature. These nucleoside analogs have been described as potent and selective antiviral agents with activity against a broad spectrum of DNA and RNA viruses.

For example, 9-(3-hydroxy-2-phosphonylmethoxypropyl (HPMP) and (2-phosphonylmethoxy)ethyl (PME) analogs of purine (adenine (A), guanine (G), 2,6-diaminopurine (DAP), 2-monoaminopurine (MAP), hypoxanthine (Hx) and pyrimidine (cytosine (C), uracil (U), thymine (T) were evaluated for antiviral properties. (S)-HPMPA, (S)-cyclic HPMPA, (S)-HPMPC, (S)-HPMPG, (S)-HPMPDAP, PMEDAP, PMEG and PMEA were active against herpes simplex virus, type 1 and 2 (HSV-1 and -2). (S)-HPMPA and (S)-cyclic HPMPA were active against varicella zoster virus (VZV). (S)-HPMPC was active against human cytomegalovirus (HCMV), a common cause of opportunistic infection in AIDS patients. (S)-HPMPA and (S)-cyclic HPMPA are active against adenovirus and vaccinia virus. PMEA, PMEDAP, and PMEEMAP are active against human immunodeficiency virus (HIV) the human retrovirus responsible for AIMS. De Clercq, et al, *Antiviral Research*, 8: 261–272 (1987).

Bronson, et al., report on the series of acyclic nucleotide analogs having a common PME side chain attached to a purine or pyrimidine base which were prepared and selected for in vivo antiviral activity against retroviruses and herpes viruses. The adenine analog, PMEA, showed good in vitro activity against HIV and Rauscher murine leukemia virus (R-MuLV), and was more potent in vivo than 3'-azido-3'-deoxythymidine (AZT) in the treatment of R-MuLV in mice. PMEA also had a significant antiviral effect in vivo against murine cytomegalovirus (MCMV), and in vitro activity against HCMV. The guanine analog, PMEG, was exceptionally potent in vitro against herpes viruses. In vivo, PMEG was >50-fold more potent than acyclovir against HSV 1 infection in mice. *Nucleotide Analogs as Antiviral Agents*; ACS Symposium Series 401; Martin, J. C. Ed.: Washington, DC, 1989, Chapter 5, pp. 72–87. Kim., et al., in *J. Med. Chem.*, 33: 1207–1213 (1990), describe a similar series of compounds.

De Clercq, et al, in *Nature*, 323: 464–467. (1986) state that (S)-HPMPA has potent and selective activity against a

2

broad spectrum of DNA viruses, including HSV-1 and 2, VZV, thymidine kinase-deficient (TK⁻) mutants of herpes simplex HCMV, phocid herpesvirus type 1 (seal herpesvirus, SeHV), the simian herpesvirus platyrrhinae (HVP), suid herpesvirus type 1 (SHV-1, or pseudorabies virus or Aujeszky's disease virus), bovid herpesvirus type 1 (infectious bovine rhinotracheitis virus, BHV-1), equid herpesvirure type 1 (equine abortion virus, EHV-1), African swine fever (ASF) virus, vaccinia virus; and human adenoviruses, and retroviruses such as murine sarcoma virus (MSV). It is also reported that, in mice and rabbits in vivo, the compound is effective against both local and systemic infections with herpes simplex virus type 1, including herpetic keratitis caused by a TK⁻ mutant which is resistant to the classical anti-herpes drugs.

European Patent Application 205,826, to De Clercq, et al, published Dec. 30, 1986, discloses that HPMPA analogs are active against Moloney mouse sarcoma virus, and are expected to be effective against retroviruses in general.

Reist and Sturm in U.S. Pat. No. 84/00737, published Dec. 6, 1984 disclosed new phosphonic acid analogs of nucleoside phosphates which are useful as antivirals for incorporation into viral DNA.

Adenine phosphonic acid analogs and their synthesis are disclosed in the United Kingdom Patent application of Holy, et al., GB 2,134,907A. published on Aug. 22, 1984, and its related U.S. Pat. No. 4,659,825. A preferred example of one of these compounds, is known as (S)-9-((3-hydroxy-2-phosphonylmethoxy)propyl]adenine (HPMPA). HPMPA was disclosed by E. DeClercq, et al., in *Nature*, 323: 464–467, (1986), in *Antiviral Research*, 8: 261–272, (1987), and earlier by A. Holy, et al., *Nucleic Acids Research*, Symposium Series No. 14: 277–278, (1984).

Phosphonylmethoxyalkylpurine analogs have also been evaluated for their antitumor activity in murine tumor models. HPMPA, PMEA, and PMEG were found to be active against intraperitoneal P388 leukemia. PMEG was also found to be active against B16 melanoma. Rose, et al, *J. of the Nat. Cancer Inst.*, Vol. 82, No. 6 (1990).

A problem with nucleotides and other ionic organophosphate esters is their inability to traverse biological membranes. Liebman, et al, *J. Biol. Chem.*, 216: 823 (1955); Roll, et al, *J. Biol. Chem.*, 220: 439 (1956). These compounds must, therefore, be given parenterally in order to achieve adequate serum levels to exert an antiviral effect.

Parenteral treatment is highly undesirable, especially with HIV infected patients. With HIV infected patients oral treatment is preferred since (i) HIV infected patients are very ill and need to be on chronic chemotherapy programs to maintain their health; (ii) the risk of using needle stick and presence of blood is high for health workers; (iii) disposal of infected needles is a problem; and (iv) the need for long-term maintenance therapy.

The inventors of this invention have carried out studies in order to circumvent the above-mentioned problem. The present application, thus, relates to the preparation and use of a number of oral prodrugs of phosphonate nucleotide analogs.

In *J. Med. Chem*, 32:1457–1463 (1989), Bronson et al., disclose the synthesis of HPMPC wherein the following compound is disclosed as an intermediate

Copy provided by USPTO from the PIRS Image Database on 01/22/2013

5,663,159

3



In *Nucleotide Analogs as Antiviral Agents,* ACS Symposium Series 401, J. C. Martin, Ed., p. 72, American Chemical Society, Washington, D.C. (989), Bronson et al., disclose the synthesis of phosphonylmethoxy ether derivatives wherein the following compound was disclosed as an intermediate



wherein R is ethyl or isopropyl.

European Patent Application EP-270,885 of Webb, et al., published Jun. 15, 1988 discloses a process for the preparation of purin-9-ylalkylenoxymethyl phosphonic acids, wherein several intermediates are produced in the practice of the process. One such intermediate is dialkylphosphonylmethyl which has the general structural formula



wherein R¹ and R² independently are selected from C₁₋₆ alkyl.

European Patent Application EP 253,412 of Holy, et al., published Jan. 20, 1988, discloses the preparation of a series of N-phosphonylmethoxyalkyl derivatives of pyrimidine and purine bases exhibiting antiviral activity, wherein in the practice of the process.. several intermediates are produced. One such intermediate has the general structural formula



European Patent Application EP-269,947 of R. R. Webb, II, et al., published on Jun. 8, 1988, discloses a series antiviral agents which are phosphonomethoxyalkylene purine and pyrimidine derivatives having the following general structure

4



wherein R³ and R⁴ are independently selected from hydrogen, C₁₋₆ alkyl, phenyl and phenyl-C₁₋₄-alkylene.

The art compounds are generally distinguished from the compounds of the instant invention by the nature of the groups attached to the phosphorous atom. There is no disclosure or suggestion in the above references, or combination thereof, which would make obvious the use of a suitably protected phosphonate derivative prodrug for oral use.

## SUMMARY OF THE INVENTION

This invention relates novel prodrugs of phosphonate nucleotide analogs which exhibit antitumor activity and a broad spectrum of antiviral activity and some of which may be used orally. The compounds of the present invention may be represented by the general formula (I):

FORMULA I

$$R^2-\overset{\overset{O}{\|}}{\underset{\underset{R^1}{|}}{P}}-CH_2-O-R^3-B$$

wherein

B represents adenine (A), cytosine (C), guanine (G), thymine (T), Uracil (U), 2.6-diamino purine (DAP), hypoxanthine (Hx), or Z;

R¹ and R² are identical or different and independently of one another are each OR⁴, NH₂, NHR⁵, or N(R⁵)₂; in some cases, R¹ and R² are linked with each other to form a cyclic group, in other cases, R¹ or R² is linked to R³ to form a cyclic group;

R³ represents C₁-C₆ alkyl which may be substituted or unsubstituted by substituents independently selected from the group consisting of hydroxy, oxygen, nitrogen and halogen; when R³ is CH(CH₂OR⁶)CH₂, R¹ and R² each independently represent OH, and R⁶ is a hydrolyzable ester group;

R⁴ represents a physiologically hydrolyzable ester group such as CH₂C(O)NR'₂, CH₂C(O)OR⁵, CH₂OC(O)R⁵, CH(R⁵)OC(O)R⁵ (R. S, or RS stereochemistry), CH₂C(R⁵)₂CH₂OH, or CH₂OR⁵; R⁴ may also be R⁵provided that R⁴ and R⁵are not simultaneously alkyl;

R⁵ represents C₁-C₂₀ alkyl, aryl or aryl-alkyl which may be substituted or unsubstituted by substituents independently selected from the group consisting of hydroxy, oxygen, nitrogen and halogen;

R⁵represents C₄-C₂₀ alkyl, aryl or aryl-alkyl which may be substituted or unsubstituted by substituents independently selected from the group consisting of hydroxy, oxygen, nitrogen and halogen; and

Copy provided by USPTO from the PIRS Image Database on 01/22/2013

5,663,159

## 5

Z is independently chosen from



Q is independently chosen from H, Cl, $NHR^5$, $NR^5_2$, $NHC(O)R^5$, $N(C(O)R^5)_2$, OH or $NCHN(R^5)_2$.

Also included within the scope of the invention are the pharmaceutically acceptable acid addition salts, the metal salts and the solvate of the compounds of Formula I which may exist in various tautomeric forms.

In another aspect, the application relates to a process for the preparation of the compounds of Formula I.

In yet another aspect, the application relates to the use the compounds of Formula I as a method for the treatment of viral infections in a mammal, which comprises administering an effective non-toxic dose of at least one compound of Formula I.

Another aspect of the application relates to the use of the compounds of Formula I as a method for inhibiting growth of a tumor in a mammal bearing a tumor which comprises administering an effective non-toxic dose of at least one compound of Formula I.

### DETAILED DESCRIPTION OF THE INVENTION

This invention relates novel prodrugs of phosphonate nucleotide analogs which exhibit broad spectrum of antiviral activity, some of which may be used orally. The compounds of the instant invention comprise a diester-phosphonate link to nucleoside analogs of pyrimidine and purine bases. More particularly, it relates to compounds of the general structural formula as shown in Formula I



FORMULA I

wherein

B represents adenine (A), cytosine (C), guanine (G), thymine (T), Uracil (U), 2,6-diamino purine (DAP), hypoxanthine (Hx), or Z;

$R^1$ and $R^2$ are identical or different and independently of one another are each $OR^4$, $NH_2$, $NHR^5$, or $N(R^5)_2$; in some cases, $R^1$ and $R^2$ are linked with each other to form a cyclic group, in other cases, $R^1$ or $R^2$ is linked to $R^3$ to form a cyclic group;

$R^3$ represents $C_1$–$C_{20}$ alkyl which may be substituted or unsubstituted by substituents independently selected from the group consisting of hydroxy, oxygen, nitrogen and halogen; when $R^3$ is $CH(CH_2OR^6)CH_2$, $R^1$ and $R^2$ each independently represent OH, and $R^6$ is a hydrolyzable ester group;

$R^4$ represents a physiologically hydrolyzable ester group such as $CH_2C(O)NR^5_2$, $CH_3C(O)OR^5$, $CH_2OC(O)R^5$, $CH(R^5)OC(O)R^5$ (R, S, or RS stereochemistry), $CH_2C(R^5)_2CH_2OH$, or $CH_2OR^5$; $R^4$ may also be $R^5$ provided that $R^4$ and $R^5$ are not simultaneously alkyl;

$R^5$ represents $C_1$–$C_{20}$ alkyl, aryl or aryl-alkyl which may be substituted or unsubstituted by substituents independently selected from the group consisting of hydroxy, oxygen, nitrogen and halogen;

## 6

$R^5$ represents $C_4$–$C_{20}$ alkyl, aryl or aryl-alkyl which may be substituted or unsubstituted by substituents independently selected from the group consisting of hydroxy, oxygen, nitrogen and halogen; and

Z is independently chosen from



Q is independently chosen from H, Cl, $NHR^5$, $NR^5_2$, $NHC(O)R^5$, $N(C(O)R^5)_2$, OH or $NCHN(R^5)_2$.

The compounds of Formula I are prodrugs of phosphonate nucleotides and have the same utility as the known or parent nucleotide analog. Thus the compounds of Formula I are useful as antiviral and antitumor agents.

The novel compounds of the present invention provide marked advantages over-known nucleotides or analogs thereof in that these novel compounds are orally active.

The most preferred compounds of the invention are listed below, and experimental details for their preparation and characterization follow. Those which are not shown by specific example are readily prepared by analagous procedures.

A preferred example of the compounds of the instant invention are the compounds having the general structural formula as shown in Formula (II):



FORMULA II

wherein

B, $R^1$ and $R^2$ are as described in Formula I, provided that when Q is $NCHN(R^5)_2$, then $R^5$ is not $CH_3$;

X represents hydrogen, methyl, $CH_2OR^6$ (R;S; or RS stereochemistry), hydroxymethyl or substituted or unsubstituted lower alkyl; when X is $CH_2OR^6$, $R^1$ and $R^2$, may additionally be independently chosen from OH; and

$R^6$ is a hydrolyzable group; provided that when X is $CH_2OR^6$, $R^6$ is not $CH_2Ph$, and $R^1$ and $R^2$ are not both ethoxy; further, when $R^1$ is methoxy and $R^2$ is hydrogen, $R^6$ is not methyl; and further provided that when $R^1$ is methoxy and $R^2$ is hydrogen, $R^6$ is not octyl.

Another preferred example of the compounds of the instant invention are the compounds having the general structural formula as shown in Formula (III):



FORMULA III

wherein

B, and $R^1$ are as previously described in Formula I;

X is as described in Formula II;

$R^7$ represents OH, $NH_2$, $NHR^5$, or $NR^5_2$; and

$R^5$ is as described in Formula I.

Still another preferred example of the compounds of the instant invention are the compounds having the general structural formula as shown in Formula (IV):

Copy provided by USPTO from the PIRS Image Database on 01/22/2013

5,663,159

7



FORMULA IV

wherein

$R^8$ and $R^9$ are identical or different and independently of one another are each $NR^{12}$, or oxygen;

$R^{10}$ and $R^{11}$ are identical or different and independently of one another are each hydrogen, or $R^5$;

$R^{12}$ represents hydrogen or a lower alkyl;

m and n are identical or different and independently of one another are each 0 or 1;

B and $R^5$ are as described in Formula I; and

X is as described in Formula II.

Yet another preferred example of the compounds of the instant invention are the compounds having the general structural formula as shown in Formula V



FORMULA V

*stereochemistry is R, S, or RS

wherein

$R^{13}$ represents $OR^4$, $NHR^5$, $NR^5{}_2$, or OH, provided that $R^{13}$ is not OH when B is A or C; and

B, $R^4$ and $R^5$ are as described in Formula I.

The term "$C_1$ to $C_{20}$ alkyl" as used herein and in the claims (unless the context indicates otherwise) means saturated or unsaturated, branched or straight chain hydrocarbon group having 1 to 20 carbon atoms such as methyl, ethyl, propyl, isopropyl, butyl, isobutyl, t-butyl, etc. Unless otherwise specified in the particular instance, the term "substituted or unsubstituted" as used herein and in the claims is intended to mean any hydrocarbon group wherein an atom, element or group is regarded as having replaced a hydrogen atom, said substituted alkyl groups are preferably substituted with a member selected from the group consisting of hydroxy, oxygen, nitrogen and halogen.

The term "prodrug" as used herein and in the claims (unless the context indicates otherwise) denotes a derivative of an active drug which is converted after administration back to the active drug. More particularly, it refers to derivatives of nucleotide phosphonates antiviral drugs which are capable of undergoing hydrolysis of the ester moiety or oxidative cleavage of the ester or amide moiety so as to release active, free drug. The physiologically hydrolyzable groups serve as prodrugs by being hydrolyzed in the body to yield the parent drug per se, and thus, the prodrugs of the present invention are preferably administered orally.

Synthesis of the phosphonate nucleotide analogs

The phosphonate nucleotide analogs are known compounds and therefore, the compounds as such and their chemical synthesis are not a part of the present invention. The synthesis of a number of phosphonate nucleotide analogs have been described in the literature.

For example, the synthesis of the phosphonates PMEA is disclosed in Holy and Rosenberg, Collect. Czech. Chem. Commun., 52:2801, (1987), and Bronson, et al, Nucleotide Analogues as Antiviral Agents, ACS Symposium Series 401, J. C. Martin, Ed., p. 72, American Chemical Society, Washington, D.C. (1989).

8

Bronson, et al, J. Med. Chem., 32: 1457–1463 (1989) discloses the preparation of HPMPC from (R)-2,3-O-isopropylideneglycerol.

European Patent Application 253,412, published Jan. 20, 1988 to Holy, et al, discloses methods for the preparation of PME and HPMP analogs of pyrimidine and purine bases.

Recently Holy et al Collect. Czech. Chem. Commun., 54: 2190–2210 (1989), described the preparation of N-(2-phosphonylmethoxy-ethyl) ("PME") analogs of purine and pyrimidine bases, as analogs of the antiviral 9-(2-phosphonylmethoxyethyl)adenine ("PMEA). The synthesis consists of alkylation of alkali metal salts of heterocyclic bases or their N- or O-substituted analogs with diethyl 2-p-toluenesulfonyloxyethoxymethylphosphonate, 2-chloroethoxymethylphosphonate, or 2-bromoethoxymethyl-phosphonate. The obtained N-(2-diethoxyphosphonylmethoxyethyl) analogs of heterocyclic bases were treated with bromotrimethylsilane to give phosphonic acids. The phosphonic acids were prepared from pyrimidines (uracil, cytosine and their 5-methyl analogs), purines (adenine and its $N^{-6}$ and C(2)-substituted analogs, hypoxanthine, guanine, 6-hydrazinopurine and 6-methylthiopurine etc.) and their analogs (3-deazaadenine etc.).

The synthesis of HPMPA is disclosed in Holy, Rosenberg, and Dvorakova, Collect. Czech. Chem. Commun. 54:2190 (1989).

Synthesis of dialkyl phosphonates

Quast, et al, Synthesis 490 (1974), has shown that dichlorophosphonates can be prepared by reacting phosphonates with PCl5:



Moedritzer, K. CA 82, 86340, has shown that dichlorophosphonates can be prepared by reacting dimethylphosphonates with thionyl chloride.



Stowell, et al, (Tetrahedron Lett., 3261, (1990)) has shown that dichlorophosphonates can be reacted with alcohols or amines to give dialkylesters or dialkylamides:



The substituted phosphonates of the present invention were prepared by several methods: 1) Reaction of the phosphonate with thionyl chloride to give the dichlorophosphonate which was reacted further to give the disubstituted phosphonate:

Copy provided by USPTO from the PIRS Image Database on 01/22/2013

5,663,159

**9**

-continued



2) Mono substituted phosphonates were obtained by the basic hydrolysis of the disubstituted phosphonate:



3) The monosubstituted phosphonates were chlorinated as before and reacted with a different alcohol or amine to give variably substituted phosphonates:



4) Diacyloxyalkyl phosphonates were obtained by reaction of the unsubstituted phosphonate with a substituted chloromethyl ether:



### PROTOCOL FOR DETERMINING ORAL BIOAVAILABILITY OF PRODRUGS

Groups of rats, 3 rats per group were given a single iv dose of 30 mg/kg of PMEA or a single oral dose of 30 mg—equiv/kg of PMEA or PMEA prodrug. Urine was collected in 0–24 hr and 24–48 hr intervals and analyzed for concentration of PMEA. The bioavailability of PMEA based on urinary excretion data and the bioavailability of PMEA when given as a prodrug was determined. The results are summarized below.

**10**

ORAL BIOAVAILABILITY OF SELECTED PMEA PRODRUGS IN RATS

| COMPOUND OF EXAMPLE NO. | ABSOLUTE BIOAVAILABILITY |
|---|---|
| 1 (PMEA) | 7.8 |
| 9 | 17.0 |
| 12 | 15.4 |
| 13 | 14.6 |
| 14 | 34.9** |
| 15 | 6.5 |
| 16 | 14.2 |
| 22 | 16.2 |
| 34 | 14.0 |
| 35 | 11.1 |

**DETECTED AS THE MONOETHYL ESTER

IN VITRO ACTIVITY OF SELECTED PMEA PRODRUGS AGAINST HSV-2 (G STRAIN)

| COMPOUND OF EXAMPLE NO. | $ID_{50}$ (ug/mL)* | TOXICITY (ug/mL) |
|---|---|---|
| 1 (PMEA) | 39 | >166 |
| 9 | 0.28 | 100 |
| 12 | 0.17 | 100 |
| 13 | <0.1 | 100 |
| 14 | 3.3 | 100 |
| 15 | 8.1 | 100 |
| 16 | >100 | 100 |
| 22 | 110 | >166 |
| 34 | 42 | >166 |
| 35 | 34 | >166 |

*DOSE WHICH GIVES A 50% REDUCTION OF PLACQUE FORMATION

The compounds of Formula I may be formulated for oral or parenteral use in a conventional manner using known pharmaceutical carriers and excipients, and they may be presented in unit dosage form or in multiple dose containers. The compositions may be in the form of tablets, capsules, solutions, suspensions or emulsions. These compounds may also be formulated as suppositories utilizing conventional suppository bases such as cocoa butter or other fatty materials. The compounds may, if desired, be administered in combination with other antiviral antibiotics.

When provided in unit dosage forms, the compositions may contain from about 0.1 to about 100 mg/kg/dose of the active ingredient of Formula I. The dosage of the compounds of Formula I is dependent on such factors as the weight and age of the patient, as well as the particular nature and severity of the disease, and within the discretion of the physician. The dosage for adult human treatment may vary depending on the frequency and route of administration.

The following examples are intended for illustrative purpose only and are not to be construed as limiting the invention in sphere or scope. All temperatures are understood to be in degrees in C when not specified. The nuclear magnetic resonance (NMR) spectral characteristics refer to chemical shifts (δ) expressed in parts per million (ppm) versus tetramethylsilane (TMS) as reference standard.

Except where otherwise noted, [1]H spectra were recorded at 300 MHz and [13]C spectra were recorded at 75 MHz. The relative area reported for the various shifts in the proton NMR spectral data corresponds to the number of hydrogen atoms of a particular functional type in the molecule. NMR assignments are based on the numbering system shown below:

5,663,159

| 11 | 12 |



The nature of the shifts as to multiplicity is reported as broad singlets (bs), singlets (s), multiplet (m), doublet (d), doublet of doublets (dd), triplet (t), or quartet (q). Coupling constants are given in hertz. When not specified, abbreviations

employed are standard American Chemical Society (ACS) abbreviations as entered on the ACS Style Guide. The infrared (IR) spectral descriptions include only absorption wave numbers ($cm^{-1}$) having functional group identification value. All compounds gave satisfactory elemental analyses, or high resolution mass spectrometry (HRMS).

## I. GENERAL EXPERIMENTAL METHODS FOR COMPOUNDS LISTED IN TABLE I:

The compounds listed in Table I were synthesized by the corresponding method given at the end of the table. The reaction time, temperature and yield are given in Table I. The structure of the examples corresponds to either FIG. 1 or FIG. 2 given at the top of Table I. Spectral data for all compounds are given in the Examples which follow.

### TABLE I

STRUCTURES AND EXPERIMENTAL DATA FOR PMEA PRODRUGS



FIG. 1          FIG. 2

| | | STRUCTURE | | | EXPERIMENTAL | | | |
|---|---|---|---|---|---|---|---|---|
| Example No. | FIG. | R1 | R2 | R3 | Method | Temp °C. | Time(h) | Yield % |
| 2 | 1 | iPrO | = R¹ | NH₂ | * | | | |
| 3 | 1 | PhO | CH₃O | NH₂ | * | | | |
| 4 | 1 | iPrO | HO | OH | * | | | |
| 5 | 1 | iPrO | = R¹ | Cl | * | | | |
| 6 | 1 | iPrO | = R¹ | H | * | | | |
| 9 | 1 | t-BuC(O)OCH₂O | = R¹ | NH₂ | * | — | — | — |
| 10 | 1 | t-BuC(O)OCH₂O | iPrO | NH₂ | * | — | — | — |
| 11 | 1 | (CH₃)₃N(+)(CH₂)₃O | O⁻ | NH₂ | * | — | — | — |
| 12 | 1 | EtC(O)OCH₂O | = R¹ | NH₂ | * | | | |
| 13 | 1 | iPrC(O)OCH₂O | = R¹ | NH₂ | * | | | |
| 14 | 1 | tBuC(O)OCH₂O | CH₃CH₂O | NH₂ | * | | | |
| 15 | 1 | tBuC(O)OCH₂O | OH | NH₂ | * | | | |
| 16 | 1 | iPrO | PhO | NH₂ | * | | | |
| 17 | 1 | t-BuC(O)OCH₂O | Et₂NC(O)CH₂O | NH₂ | * | | | |
| 18 | 2 | O | H | NH₂ | Cᵇ | 22 | 16 | |
| 19 | 1 | Et₂N | = R¹ | NH₂ | C | 22 | 16 | 18 |
| 20 | 1 | iPrO | O⁻ | NH₂ | B | 60 | 24 | 75 |
| 21 | 2 | O | CH₃ | NH₂ | C | 40 | 24 | 56 |
| 22 | 1 | HO(CH₂)₂O | O⁻ | NH₂ | B | 60 | 2 | 50 |
| 23 | 1 | CH₃(CH₂)₇O | HO | NH₂ | E | 70 | 16 | 29 |
| 24 | 1 | CH₃O | = R¹ | NH₂ | A | 65 | 4 | 47 |
| 25 | 1 | CH₃O | O⁻ | NH₂ | B | 60 | 2 | 78 |
| 26 | 1 | H₂NCH₂C(CH₂)₂CH₂NH— | HO | NH₂ | B | 60 | 1.5 | 61 |
| 27 | 1 | HOCH₂C(CH₃)₂CH₂O | HO | NH₂ | D | 60 | 1.5 | 80 |
| 28 | 2 | NH | CH₂ | NH₂ | C | 40 | 24 | 46 |
| 29 | 2 | NCH₃ | H | NH₂ | F | 82 | 24 | 27 |
| 30 | 1 | Et₂NC(O)CH₂O | O⁻ | NH₂ | F;Dᴬ⁺ᵈ | 0;22 | 20;0.3 | 19 |
| 31 | 1 | HOC(O)CH₂O | HO | NH₂ | D | 22 | 0.1 | 66 |
| 32 | 1 | BuOC(O)CH₂O | = R¹ | NH₂ | F | 82 | 1 | 44 |
| 33 | 1 | EtOC(O)CH₂O | = R¹ | NH₂ | F | 82 | 2 | 51 |
| 34 | 1 | PhO | O⁻ | NH₂ | D | 22 | 1 | 76 |
| 35 | 1 | PhO | = R¹ | NH₂ | F | 22 | 20 | 38 |
| 36 | 1 | iPr₂NC(O)CH₂O | O¹ | NH₂ | F, Dᴬ⁺ᵈ | 22;22 | 0.8;0.3 | 8 |
| 37 | 1 | pNO₂PhCH₂O | = R¹ | NH₂ | F | 82 | 1 | 15 |
| 38 | 1 | pNO₂PhCH₂O | O⁻ | NH₂ | D | 60 | 20 | 78 |
| 39 | 1 | CCl₃CH₂O | = R¹ | NH₂ | F | 82 | 20 | 44 |
| 40 | 1 | CCl₃CH₂O | HO | NH₂ | D | 60 | 1 | 69 |
| 41 | 1 | PhC(O)OCH₂O | = R¹ | NH₂ | * | 22 | 20 | 9 |

Copy provided by USPTO from the PIRS Image Database on 01/22/2013

A100

5,663,159

13      14

## TABLE I-continued

### STRUCTURES AND EXPERIMENTAL DATA FOR PMEA PRODRUGS



FIG. 1



FIG. 2

| | | STRUCTURE | | | EXPERIMENTAL | | | |
|---|---|---|---|---|---|---|---|---|
| Example No. | FIG. | R1 | R2 | R3 | Method | Temp °C. | Time(h) | Yield % |
| 42 | 1 | pCF₂PhCH₂O | =R¹ | NH₂ | F | 82 | 3 | 15 |
| 43 | 1 | HOCH₂CF₂CH₂O | HO | NH₂ | F,D^{a,d} | 82;22 | 1;1 | 18 |
| 44 | 1 | pCF₂PhCH₂O | HO | NH₂ | D | 60 | 20 | 82 |
| 45 | 1 | CH₂(CH₂)₃NH | =R¹ | NH₂ | F | 82 | 20 | 27 |
| 46 | 1 | (CH₃)₂CHCH₂O | =R¹ | NH₂ | A | 60 | 3 | 75 |
| 47 | 1 | (CH₃)₂CH(CH₂)₂O | =R¹ | NH₂ | A | 80 | 1.5 | 77 |

$^a$The crude product obtained from method F was employed directly in method D. Temperature and time are given for methods F and D, respectively.
$^b$The impure product obtained from column chromatography was recrystallized from 25% MeOH/CH₃CN.
$^c$The impure product obtained from column chromatography was recrystallized from CH₃CN.
$^d$See detailed experimental section for synthesis of hydroxyacetamides and difluoroalcohol.
$^e$Where no method is given, see detailed experimental section for specific examples.

## METHOD OF SYNTHESIS FOR THE COMPOUNDS OF TABLE 1

A: A suspension of 1.00 g (3.66 mmol) of PMEA (1) in 50 mL of thionyl chloride was refluxed for 1 h (see eq. 1). The homogeneous, orange-red solution was cooled and the solvents were removed in vacuo to afford crude dichlorophosphonate 2. The dichloride was taken up in alcohol or amine 3 and stirred at the temperature and the time given in Table I. After cooling the reaction to room temperature the solvents were removed in vacuo. The residue was purified on a 30 mm flash chromatography column, eluting with 10% MeOH/CH₂Cl₂ to afford 4. (See eq. I)



(eq. 1)

B: An aqueous suspension of 4 was treated with 4 equivalents of NaOH for the time and temperature given in Table I (see eq. 2). The mixture was cooled to room temperature and acidified until pH 8. The majority of the solvent was evaporated and the residue was purified on a C-18 silica gel column, eluting with a gradient of 0–25% MeOH/H₂O. The fractions containing the product were combined and evaporated to give 5. (See eq. 2)



(eq. 2)

C: This reaction was performed similarly to method A, except crude dichlorophosphonate 2 was suspended in 30 mL of methylene chloride before adding alcohol or amine 3 (see equation 1).

D: This reaction was performed similarly to method B, except after cooling to room temperature, the reaction was acidified to pH 1.5. (See equation 2).

E: This reaction was run similarly to method B, except after cooling to room temperature the reaction was suspended in 20 mL of water. The mixture was acidified until pH approximately 3–4. The resulting solid was collected and washed with water. The filtrate was cooled to 0° C. and the resulting solid was collected and washed with cold water. The solids were combined and dried overnight at 0.005 mm to afford 106 mg (0.23 mmol) of monooctyl-PMEA.

F: This reaction was performed similarly to method A, except crude dichlorophosphonate 2 was suspended in 30 mL of acetonitrile before adding alcohol or amine 3 (see equation 1).

Copy provided by USPTO from the PIRS Image Database on 01/22/2013

5,663,159

## 15

### SPECIFIC EXPERIMENTAL METHODS FOR COMPOUNDS LISTED IN TABLE I.

#### EXAMPLE 1

Synthesis of 9-(2-Phosphonylmethoxy)ethyladenine (PMEA).

A solution of PMEA disopropyl ester (75.5 g, 0.21 mol) in 800 mL of anhydrous acetonitrile was treated with bromotrimethylsilane (258 g, 1.69 mol). The resulting clear, yellow solution was stirred at room temperature under argon for about 16 hours. The reaction mixture was concentrated in vacuo and the yellow residue was placed under high vacuum for about 5 hours. 400 mL of water was added next, causing immediate formation of a white precipitate. 500 mL of acetone was added and the pale yellow slurry was stirred at room temperature for about 14 hours. The solid was collected by filtration, washing twice with 150 mL of acetone and once with 150 mL of anhydrous ether. An additional portion of solid was collected from the filtrate to provide a total of 55.0 g (90%) of PMEA as an off-white crystalline solid.

m.p.>250° C.; $UV_{max}$ ($H_2O$) 260 nm (ε=19,600) 260 nm (ε=14,100); $UV_{max}$ (0.1 N HCl) 210 nm (ε=19,000) 260NM (ε=13,700); $UV_{max}$ (0.1 N NaOH) 216 nm (ε=9,600) 262 nm (ε=14,500); $^1$H NMR (DMSO-$d_6$) δ 8.14 (s, 1 H), 8.13 (s, 1 H), 7.27 (br s, 2 H, $NH_2$), 4.32 (t, J=5, 2 H, H-1'), 3.87 (t, J=5, 2H, H-2'), 3.59 (d, J=9, 2H, H-4'); $^{13}$C NMR (DMSO-$d_6$) δ151.10 (c-6), 148.70 (C-2), 146.28 (C-4), 143.80 (C-8), 118.05 (C-5), 69.94 (d, J=10, C-2'), 66.27 (d, J=160, C-4 '), 43.15 (C-1 ').

#### EXAMPLE 2

Synthesis of PMEA, diisopropyl ester

A slurry of adenine (21.2 g, 157 mmol), 2-[ (diisopropylphosphonyl)methoxy]ethyl methanesulfonate (50.0 g. 157 mmol, prepared according to the procedure described by J. J. Bronson et al, in *J. Med. Chem.*, 32: 1457, (1989)), and cesium carbonate (56.0 g, 173 mmol) in 160 mL of anhydrous DMF was heated to 120° C. in a 3-necked. 500-mL, round-bottomed flask equipped with a mechanical stirrer and argon inlet adapter. The reaction mixture was stirred at 120° C. for about 5 hours and then was allowed to cool to room temperature. Insoluble material was removed by filtration and the filtrate was concentrated in vacuo to give 66 g of a yellow solid. Purification by column chromatography on silica gel (10:1, elute with 3% to 5% to 7% $MeOH/CH_2Cl_2$) provided 33 g of an off-white solid. Recrystallization from ethyl acetate provided 30.1 g (54%) of PMEA, diisopropyl ester as a white solid.

Mp 136–138° C.; $UV_{max}$ (MeOH) 262 nm (ε=14,360); $^1$H NMR (DMSO-$d_6$) δ 8.15 (s, 1H), 8.09 (s, 1H), 7.21 (br s, exch. 2H. $NH_2$), 4.50 (apparent octet, J=6.5 H, 2H, 2POCH), 4.34 (t, J=5 H, 2H, $NCH_2$), 3.91 (t, J=5 Hz, 2H, $CH_2OCH_2P$), 3.79 (d, J=8 Hz, 2H, $OCH_2P$), 1.18 (d, J=6.5 H, 6H, POCH($CH_3$)$_2$], and 1.13 (d, J=6.5 Hz, 6H, POCH ($CH_3$)$_2$]); $^{13}$C NMR (DMSO-$d_6$) δ 155.86 (C-6), 152.23 (C-2), 149.46 (C-4), 140.90 (C-8), 118.57 (C-5), 70.22 (d, J=10 Hz, POCH), 70.05 (d, J=12 Hz, $CH_2OCH_2P$), 64.50 (d, J=165 Hz, $OCH_2P$), 42.35 ($NCH_2$), 23.61 (d, J=7 H, POCH($CH_3$)$_2$], and 23.52 [d, J=7 Hz, POCH($CH_3$)$_2$]; mass spectrum (methane DCI), m/me (rel intensity) 358 (MH+, 100), 344 (10), 316 (10).

Anal. Calc. for $C_{14}H_{24}N_5O_4P$: C, 47.06; H, 6.77; N, 19.60. Found: C, 47.06; H, 7.04; N, 19.65.

## 16

#### EXAMPLE 3

Synthesis of PMEA, (monomethyl, monophenyl) ester

The crude residue from the reaction of phenol with dichlorophosphonyl-PMEA (see General Method F) was purified on a flash chromatography column, eluting with 10% $MeOH/CH_2Cl_2$. Two compounds were obtained. PMEA, diphenyl ester eluted first (38%), followed by PMEA, monomethyl, monophenyl ester (16%).

Mp 70–72° C. $^1$H NMR (d6-DMSO) 8.13 (1H, s, H-8), 8.08 (1H, s, H-2), 7.32 (2H, t, J=8, ArH), 7.20 (2H, s, NH2). 7.17 (1H, t, J=7, ArH), 7.00 (2H, d, J=8.5, ArH), 4.34 (2H, t, J=5, H-1'), 4.02. (2H, dd, J=8.3, H-4'), 3.91 (2H, t, J=5, H-2'), 3.67 (3H, d, J=11, $CH_3$). $^{13}$C NMR (d6-DMSO): 9.0 MHz), 156.20 (C-6), 152.84 (C-2), 150.07 (ARC, d, J=8), 149.85 (C-4), 141.79 (c-8), 130.31, 125.64, 120.77 (ARC), 118.84 (C-5), 70.87 (C-2', d, J=11). 63.53 (C-4', d, J=163), 53.83 ($CH_3$, d, J=8). 43.01 (C-1'. IR (KBr) 3270. 3110, 1670. 1600. 1484. MS (FAB) 364 (MH+. 100).

Anal. Calcd for $C_{15}H_{18}N_5O_4P$. 0.16 $H_2O$: C, 49.20; H. 5.04; N, 19.13. Found: C, 49.51; H, 4.92; N, 18.73.

#### EXAMPLE 4

Synthesis of 9-(2-Phosphonylmethoxy)ethylhypoxanthine (PMEHx), monoisopropyl ester.

A solution of 6-chloro-9-(2-phosphonylmethoxy) ethylpurine, diisopropyl ester (1 g, 2.65 mmol) in 27 mL of 1 N NaOH was heated at reflux for 1 h, cooled to room temperature, acidified to pH 1 with 1 N HCl and concentrated in vacuo. The residue was purified by C-18 silica gel column chromatography, eluting with 20% $MeOH/H_2O$ to afford 0.51 g (68%) of the title compound.

Mp 192–194° C. $^1$H NMR (d$_6$-DMSO) 12.27 (1H, br s, NH), 8.04, 8.02 (2H, 2s, H-2, H-8), 4.39 (1H, septet, J=6, CH($CH_3$)$_2$), 4.30 (2H, t, J=5, H-1'), 3.85 (2H, t, J=5, H-2'), 3.65 (2H, d, J=8.5, H-4'), 1.10 (6H, d, J=6, $CH_3$). $^{13}$C NMR ($D_2O$) 157.57 (C=O), 149.94, 149.72 (C-2, C-4), 143.02 (C-8), 119.94 (C-5), 72.09 (CH($CH_3$)$_2$, d, J=6), 71.70 (C-2', d, J=13), 67.80 (C-4', d, J=160), 47.05 (C-1'), 25.28 (CH$_3$, d, J=4), IR (KBr) 3423, 2979, 1716, 1642, 1587, 1562. MS (FAB) 317 (M+H, 100).

Anal. Calcd for $C_{11}H_{17}N_4O_5P$·0.4 $H_2O$: C, 40.95; H, 5.53; N, 17.37. Found: C, 41.19; H, 5.68; N, 17.51.

#### EXAMPLE 5

Synthesis of 6-Chloro-9-(2-Phosphonylmethoxy) ethylpurine, diisopropyl ester.

To a rapidly stirred solution of 9.86 g (63.8 mmol) of 6-chloropurine in 350 mL of anhydrous DMF was added 1.91 g (63.8 mmol) of sodium hydride (80% in mineral oil). The heterogeneous mixture was heated at 95 ° C. for about 20 hours, cooled to room temperature and concentrated in vacuo. The residue was purified by silica gel chromatography, eluting with 5% $MeOH/CH_2Cl_2$ to give 4.53 g of the title compound.

$^1$H NMR (d$_6$-DMSO) 8.76 (1H, s, H-8), 8.63 (1H, s, H-2), 4.82 (2H, t, J=5, H-1'), 4.42 (2H, septet, J=6, CH($CH_3$)$_2$, 3.93 (2H, t, J=5, H-2'), 3.75 (2H, d, J=8, H-4'), 1.11 (6H, d, J=6, $CH_3$), 1.05 (6H, d, J=6, $CH_3$). $^{13}$C NMR (d$_6$-DMSO) 152.44 (C-6). 151.88 (C-2). 149.39 (C-4). 148.13 (C-8). 131.13 (C-5). 70.24 (CH(CH3)2, d, J=6). 70.00 (C-2', d, J=11), 64.64 (C-4', d, J=165), 43.43 (C-1'), 23.65 (CH$_3$, d, J=4.5). 23.47 (CH$_3$, d, J=4.5). IR (KBr) 3459, 3077, 2982, 2936, 1564. MS (methane/DCI) 377 (M+H, 100).

Anal. Calcd for $C_{14}H_{22}N_4O_4Cl_1$ P$_1$: C, 44.63; H, 5.89; N. 14.87. Found: C, 44.40; H, 5.93; N, 14.53.

Copy provided by USPTO from the PIRS Image Database on 01/22/2013

5,663,159

## 17

### EXAMPLE 6

Synthesis of 9-(2-phosphonylmethoxy)ethylpurine, diisopropyl ester.

A solution of 6-Chloro-9-(2-phosphonylmethoxy) ethylpurine, diisopropyl ester (0.94 g, 2.5 mmol) in 20 ml of ethanol/cyclohexene (1:1) was treated with 0.5 g of Pd(OH)$_2$C The reaction was stirred at reflux for about 20 minutes, diluted with hot ethanol and filtered through celite. The filtrate was concentrated in vacuo and the residue was purified by flash column chromatography, eluting with 10% MeOH/CH$_2$Cl$_2$ to afford 0.49 g (58%) of the title purine as a clear yellow oil.

[1]H NMR (d$_6$-DMSO) 9.14, 8.92, 8.55 (3H, 3s. H-2, H-6, H-8), 4.47 (2H, t, J=5, H-1'), 4.42 (2H, septet, J=6, CH(CH$_3$)$_2$), 3.94 (2H, t, J=5, H-2'), 3.77 (2H, d, J=8, H-4'), 1.12 (6H, d, J=6, CH$_3$), 1.05 (6H, d, J=6, CH$_3$). IR 3459, 2982, 2937, 1597, 1581, 1506. MS (methane/DCI) 343 (M+H, 100), 329 (12), 301 (50).

Anal. Calcd for C$_{14}$H$_{23}$N$_4$O$_4$P·0.25 H$_2$O: C, 48.50; H, 6.83; N, 16.16. Found: C, 48.55; H, 6.71; N, 15.88.

### EXAMPLE 7

Synthesis of hydroxyacetamides necessary for preparation of Example 21 and Example 27.

(a) 2-hydroxy-N-N-diethylacetamide

A solution of 10.5 g (0.0702 mol) of 2-chloro-N-N-diethylacetamide in 35 mL of glacial acetic acid was refluxed for about 16 hours. The solvents were removed in vacuo, the last traces of acetic acid being azeotropically removed with toluene. The residue was dissolved in 125 mL of methanol and treated with 10.85 g (0.20 mol) of sodium methoxide. The reaction was stirred for about 3 hours and neutralized with Dowex 50X8-200 acidic ion exchange resin. The solvents were removed in vacuo and the residue was purified on a flash chromatography column, eluting with hexane/ethyl acetate 1:1 to give 6.75 g (73%) of 2-hydroxy-N-N-diethyl- acetamide.

(b) 2-hydroxy-N-N-diisopropylacetamide

To a solution of 44.5 g (0.44 mol) of N-N-diisopropyl amine in 125 mL of hexane cooled to –78° C. was added dropwise 17.6 mL (0.22 mol) of chloroacetyl chloride. After completion of the addition, the cooling bath was removed and stirring was continued for about 30 minutes. The isopropylammonium chloride was removed by filtration through celite and the filtrate was stripped to give 30.5 g (77%) of 2-chloro-N-N-diisopropylacetamide. Hydrolysis of this compound as described above afforded a 45% yield of 2-hydroxy-N-N-diisopropylacetamide.

### EXAMPLE 8

Synthesis of the difluoroalcohol necessary for the preparation of Example 34.

(a) 2,2-Difluoro-3-hydroxy-propan-1-ol

A solution of 9.07 g (0.0521 mol) of 1,3-diacetyl acetone in 20 mL of DAST was stirred at 22° C. for 2 days, diluted with ethyl acetate, washed with saturated NaHCO$_3$ and water, then dried over Na$_2$SO$_4$ and concentrated to yield 9.54 g of 1,3-diacetyl-2,2- difluoropropane. The diacetyl-difluoropropane (7.53 g, 38.4 mmol) was dissolved in 300 mL of methanol and treated with 6.45 g (119 mmol) of sodium methoxide. After stirring at 22° C. for about 2.5 hours, the reaction was neutralized with Dowex 50X8-200 acidic ion exchange resin, filtered and stripped to give 3.7 g (86%) of the title compound.

## 18

### EXAMPLE 9

Synthesis of PMEA, di(pivaloyloxymethyl ester).

To a rapidly stirred solution of 1.00 g (3.66 mmol) of PMEA in 15 ml of anhydrous DMF was added 2.08 g (7.32 mmol) of N,N'-dicyclohexyl-4-morpholine carboxamidine and 2.75 g (18.33 mmol) of chloromethyl pivalate. The heterogeneous mixture became homogeneous after about 15 minutes and was then allowed to stir at 22° C. for about 36 hours. The insolubles were filtered off and the filtrate was concentrated in vacuo. The residue was then partitioned between (50 ml) water and (50 ml) toluene, separated and the water layer was then extracted with (2×50 ml) toluene. The toluene layers were combined and concentrated in vacuo. The residue was purified by silica gel chromatography, eluting with 5% MeOH/CH$_2$Cl$_2$ to give 0.59 g (32%) of the title compound.

[1]H NMR(CDCl$_3$) 8.32(1H, s, H-8), 7.91(1H, s, H-2), 5.77(1H, s, NH$_2$), .5.63(4H, m, CH$_2$OP), 4.37(2H, t, J=5.0, H-1 '), 3.92 (2H,t,J=5.0,H-2'), 3.82 (2H, d, J=7.7, H-4'), 1.18(18H, s, CH$_3$). [13]C NMR (CDCl$_3$) 177.55(C═O), 156.23(C-6), 153.45(C-2), 150.48(C-4), 142.05(C-8), 119.85(C-5), 82.04 (CH$_2$OP,d,J=6.0), 71.70(C-2', d, J=9.8), 65.86(C-4', d, J=167), 43.63(C-1'), 38.95(CC(═O), 27.11 (CH$_3$). IR(KBr) 3366, 3178, 2976, 1754, 1660, 1600. MS(Isobutane/DCI) 502 (M+H, 100).

Anal. Calcd. for C$_{20}$H$_{32}$N$_5$O$_8$P$_1$: C, 47.90; H, 6.43; N, 13.96. Found: C, 48.02; H, 6.27; N, 13.63.

### EXAMPLE 10

Synthesis of PMEA, (mono isopropyl, mono pivaloyloxymethyl) ester

To a rapidly stirred solution of 200 mg (0.6 mmol) of monoisopropyl PMEA (example 11) in 5 ml of anhydrous DMF was added 0.83 ml (6.0 mmol) of Et$_3$N and 0.45 g (3.0 mmol) of chloromethylpivalate. The heterogeneous mixture became homogeneous after addition of Et$_3$N and was then allowed to stir at 22° C. for about 3 days. The mixture was concentrated in vacuo and the residue was purified by silica gel chromatography, eluting with 10% MeOH/CH$_2$Cl$_2$ to give 190 mg (74%) of the title compound.

[1]H NMR(CDCl$_3$) 8.30(1H, s, H-8), 7.91(1H, s, H-2), 5.94(2H, s, NH$_2$), 5.57(2H, d, J=5.3, CH$_2$O), 4.73 (1H, septet, J=6.2, CH), 4.36(2H, t, J=5.0, H-1'), 3.90(2H, t, J=5.0, H-2'), 3.75(2H, d, J=8.0, H-4', 1.25(6H, d, J=6.2, CH$_3$), 1.17(9H, s, CH$_3$). [13]C NMR (CDCl$_3$) 177(C═O), 155.51(C-6), 152.91(C-2), 149.8 (C-4). 141.43(C-8), 119.36 (C-5), 81.90(CH$_2$OP, d, J=5.6), 72.18(CHOP, d, j=7.0), 71.19(C-2', d, J=10.0), 65.78 (C-4', d, J=167), 43.37 (C-1'), 38.68((CH$_3$)$_3$C), 26.84((CH$_3$)$_3$C), 23.92(CH$_3$CH, d, J=7), 23.85(CH$_3$CH, d, J=7). IR(KBr) 3432, 1754, 1668, 1602. MS (FAB) 430 (M+H, 100).

Anal. Calcd. for C$_{17}$H$_{28}$N$_5$O$_6$P$_1$·0.50 H$_2$O: C, 46.56; H, 6.66; N, 15.98. Found: C, 46.50; H, 6.61; N, 15.81.

### EXAMPLE 11

Synthesis of PMEA, monocholine ester

A suspension of 2.00 g (7.33 mmol) of PMEA in 30 ml of thionyl chloride was refluxed for about 1 hour. The homogeneous, orange-red solution was cooled and the solvents were removed in vacuo to afford crude dichlorophosphonate. The dichloride was taken up in 40 ml of acetonitrile and then treated with 2.00 g (32.34 mmol) of anhydrous ethylene glycol at reflux for about 16 hours. After cooling to 22° C. the solvents were removed in vacuo. The residue was

Copy provided by USPTO from the PIRS Image Database on 01/22/2013

5,663,159

**19**

purified by silica gel chromatography, eluting with MeOH/$CH_2Cl_2$/$NH_4OH$ 30/70/1 to give 1.42 g (65%) of mono (chloroethyl).ester.

A suspension of 460 mg (1.37 mmol) of the above compound in 30 ml of MeOH was saturated with $Me_3N$ gas at 0° C. The reaction mixture was then sealed in a metal bomb and heated at 65° C. for about 2 days. After cooling the reaction to 22° C. the solvents were removed in vacuo and the residue was purified by C-18 chromatography, eluting with 15% MeOH/$H_2O$ to give 270 mg (35% from PMEA) of the title compound. $^1$H NMR($CD_3OD$) 8.24(1H, s, H-8), 8.20(1H, s, H-2), 4.42(2H, t, J=5.0, H-1'), 4.12(2H, $CH_2CH_2OP$), 3.89(2H, t, J=5.0, H-2'), 3.64(2H,d,J=9.0,H-4'), 3.47 (2H, m, $CH_2OP$), 3.14(9H, s, $CH_3$). $^{13}$C NMR ($CD_3OD$) 157.55(C-6), 154.03(C-2), 151.02(C-4), 144.02 (C-8), 120.15(C-5), 72.04(C-2'), 68.24(C-4',d, J=159), 68.05 ($CH_2OP$), 60.10($CH_2CH_2OP$,d,J=4.9), 55.02($CH_3$), 54.98 ($CH_3$). 54.92($CH_3$), 44.95(C-1'). IR(KBr) 3396, 1648, 1602, 1480. MS(FAB) 359(M+H30).

Anal. Calcd. for $C_{13}H_{23}N_6O_4P_1$·2.5H20: C. 38.60; H, 7.00; N, 20.78. Found: C. 38.26; H. 6.60; N, 20.47.

**EXAMPLE 12**

Synthesis of PMEA, di-(propionyloxymethyl ester)

To a rapidly stirred solution of 1.00 g (3.66 mmol) of PMEA in 15 ml of anhydrous DMF was added 2.08 g (7.32 mmol) of N,N'-dicyclohexyl-4-morpholine carboxamidine and 2.23 g (18.3 mmol) of chloromethylpropionate. The heterogeneous mixture became homogeneous within 30 minutes and was then allowed to stir at 22° C. for about 5 days. The insolubles were filtered off and the filtrate was concentrated in vacuo. The residue was purified twice by silica gel chromatography (200:1), eluting with 5%MeOH/$CH_2Cl_2$ to give 0.14 g (9%) of the title compound.

$^1$H NMR(CDCl$_3$) 8.29(1H, s, H-8), 7.88(1H, s, H-2), 5.65(2H, s, $NH_2$), 5.60(4H, m, $CH_2OP$), 4.35(2H, t, J=5.0, H-1'), 3.89(2H, t, J=5.0, H-2') 3.80(2H, d, J=7.8, H-4'), 2.34(4H, q, J=7.5, $CH_3CH_2$). 1.10 (6H, t, J=7.5, $CH_3$). IR(KBr) 3290, 3122, 1766, 1666, 1602. MS(FAB) 446(M+H, 100).

Anal. Calcd. for $C_{15}H_{24}N_5O_6P_1$: C, 43.15; H, 5.43; N, 15.72. Found: C, 43.07; H. 5.46; N, 15.42.

**EXAMPLE 13**

Synthesis of PMEA, di-(isobutyryloxymethyl ester)

To a rapidly stirred solution of 1.00 g (3.66 mmol) of PMEA in 15 ml of anhydrous DMF was added 2.08 g (7.32 mmol) of N,N'-dicyclohexyl-4-morpholine carboxamidine and 2.48 g (18.3 mmol) of chloromethylisobutyrate. The heterogeneous mixture became homogeneous within 30 minutes and was then allowed to stir at 22° C. for 5 days. The mixture was concentrated in vacuo, partitioned between (50 ml) water and (50 ml)toluene. The aqueous layer was extracted with (250 ml) toluene and the combined organic layer was concentrated in vacuo. The residue was purified by silica gel chromatography, eluting with 5% MeOH/$CH_2Cl_2$ to give 0.16 g (9%) of the title compound.

$^1$H NMR(CDCl$_3$) 8.31(1H, s, H-8), 8.28(1H, s, H-2), 5.68(2H, s, $NH_2$), 5.59(4H, m, $CH_2OP$), 4.33(2H, t, J=5.0, H-1'), 3.88(2H, t, J=5.0, H-2 ), 3.78(2H, d, J=7.7H, H-4 ), 2.52(2H, apparent heptet, J=7.0, CH). 1.11(6H, d, J=7.0, $CH_3$). IR (KBr) 3360, 2980, 1758, 1660, 1602. MS(Isobutane/DCI) 474(M+H, 100).

Anal. Calcd. for $C_{16}H_{26}N_5O_6P_1$·0.65 $H_2O$: C, 44.56; H, 6.09; N, 14.44. Found: C, 45.67; H, 5.96; N, 14.79.

**20**

**EXAMPLE 14**

Synthesis of PMEA, (mono ethyl, mono isobutyryloxymethyl) ester

To a rapidly stirred solution of 400 mg (1.33 mmol) of monoethyl PMEA in 15 ml of anhydrous DMF was added 2.00 ml (14.3 mmol) of $Et_3N$ and 1.0 g (6.7 mmol) of chloromethylpivalate. The heterogeneous mixture became homogeneous after addition of $Et_3NN$ and was then allowed to stir at 22° C. for 2 days. The mixture was concentrated in vacuo and the residue was purified by silica gel chromatography, eluting with 10% MeOH/$CH_2Cl_2$ to give 180 mg (33%) of the title compound.

$^1$H NMR(CDCl$_3$) 8.32(1H, s, H-8). 7.92(1H. s, H-2), 5.74(2H, s, $NH_2$), 5.62(2H, m, OCH$_2$OP), 4.38 (2H, t, J=5.0, H-1 ), 4.10(2H, m, $CH_3CH_2OP$), 3.92(2H, t, J=5.0, H-2'), 3.79(2H, d, J=8.0, H-4'), 1.27 (3H, t, J=7.0, $CH_3CH_2$). 1.18 (9H, s, ((CH$_3$)C). $^{13}$C NMR (CDCl$_3$) 176.87(C=O), 155.40 (C-6). 152.94(C-2), 149.8(C-4), 141.51(C-8), 119.7(C-5), 81.85(CH$_2$OP, d, J=6.2), 71.26(C-2', d, J=10.2), 65.46(C-4', d, J=167), 62.73(CH$_2$CH$_3$, d, J=7.0), 43.49(C-1), 38.70( (CH$_3$)$_3$C), 26.84((CH$_3$)$_3$C) . 16.27(CH$_2$CH3, d, J=5.8), IR(KBr) 3288, 3120, 2982, 1752, 1666, 1600. MS(FAB) 416 (M+H, 100).

Anal. Calcd. for $C_{16}H_{26}N_5O_6P_1$·0.5$H_2O$: C, 45.28; H, 6.41; N, 16.51. Found: C, 45.47; H. 6.34; N, 16.55.

**EXAMPLE 15**

Synthesis of PMEA, mono pivaloyloxymethyl ester

To a solution of sodium hydride(0.95 g, 80%, 31.7 mmol) and benzylalcohol (6.8 ml, 63.5 mmol) in anhydrous DMSO (50 ml) was added with stirring a solution of PMEA, diphenyl ester (3.4 g, 8 mmol, example 26) in DMSO(50 ml). The mixture was allowed to stir at 22° C. for 1 h and concentrated to a volume of approximately 25 ml. EtOAc (200 mL) was added and the precipitate was collected by vacuum filtration. The precipitate was purified by C-18 chromatography eluting with 20% MeOH/$H_2O$ to give 2.09 g (68%) of PMEA, monobenzylester, sodium salt.

To 600 mg (1.56 mmoles) of the above compound in 14 ml of anhydrous DMF was added 2.16 ml (15.5 mmoles) of $Et_3NN$ and 1.44 g (9.61 mmol) of chloromethylpivalate. The mixture was allowed to stir at 22° C. for 2 days, concentrated in vacuo and the resulting residue was used crude in the following step.

To a stirred solution of the crude mixed ester (300 mg) in 17 ml of EtOH and 17 ml of $H_2O$ was added 3.45 ml of cyclohexene and 0.225 g of 20% Pd(OH)$_2$/C. The mixture was heated at reflux for 1 h, concentrated in vacuo and the residue purified by C-18 chromatography, eluting with 100% $H_2O$ to give 270 mg (31% from PMEA, diphenyl ester) of the title compound.

$^1$H NMR(d$_6$-DMSO) 8.09(2H, s, H-8, H-2), 7.17(2H. s, $NH_2$), 5.44(2H, m, CH$_2$OP), 4.26(2H, t, J=5.0, H-1'), 3.83 (2H,t. J=5.0, H-2 ), 3.47(2H, d, J=8.0, H-4 ), 1.04(9H, s, $CH_3$). $^{13}$C NMR (d$_6$-DMSO ) 176.70(C=O) . 155.98(C-6), 152.39(C-2), 149.55(C-4), 141.30(C-8), 118.59(C-5), 83.14 (CH$_2$OP), 69.89 (C-2'), 64.5 (C-4'), 42.84 (C-1'), 38.13 ((CH$_3$)$_3$C) 26.69(CH$_3$). IR(KBr) 3360, 1742, 1648, 1602. MS (FAB) 386 (M-H, 100). HRMS:

Calculated: 388.1386. Found: 388.1377.

**EXAMPLE 16**

Synthesis of PMEA, (mono isopropyl, monophenyl) ester

A suspension of 0.75 g (2.1 mmol) of monophenyl PMEA in 20 ml of thionyl chloride was refluxed for 1 h. The

Copy provided by USPTO from the PIRS Image Database on 01/22/2013

**A104**

5,663,159

21

homogeneous, orange-red solution was cooled and the solvents were removed in vacuo to afford crude monochlorophosphonate. The residue was taken up in 40 ml of isopropyl alcohol and stirred for 16 h at 22° C.. The solvents were removed in vacuo and the residue was purified by silica gel chromatography, eluting with 10% MeOH/CH$_2$Cl$_2$ to give 0.24 g (29%) of the title compound.

Mp 96°–99° C. $^1$H NMR(CDCl$_3$) 8.31(1H, s, H-8), 7.87 (1H, s, H-2), 7.19(5H, m, Ph), 5.96(2H, s, NH$_2$), 4.80 (1H, apparent heptet, J=6.2, CH), 4.36(2H, t, J=5.0, H-1'), 3.93 (2H, t, J=5.0. H-2'), 3.86(2H, d, J=7.9, H-4'), 1.26(3H, d, J=6.2, CH$_3$), 1.21(3H, d, J=6.2 CH$_3$). $^{13}$C NMR (CDCl$_3$) 155.52(C-6), 152.88(C-2), 150.13(ARC, d J=8.3), 149.89 (C-4), 141.46(C-8), 129.71(ARC), 125.14(ARC), 120.50 (ARC, d, J=4.5), 119.43(C-5), 72.65(CH, d, J=7.3), 71.18 (C-2', d, J=10.6), 65.27(C-4', d, J=167.5), 143.45(C-1'), 23.93(CH$_3$, d. J=4.5), 23.82(CH$_3$, d, J=4.5). IR(KBr) 3290, 3116 1670, 1600. MS(Isobutane/DCl) 392(M+H, 100).

Anal. Calcd. for. C$_{17}$H$_{22}$N$_5$O$_4$P$_1$: C.52.17; H, 5.66; N, 17.89. Found: C, 52.01; H, 5.57; N, 17.64.

## EXAMPLE 17

Synthesis of PMEA, (mono-N,N-diethylacetamide, mono pivaloyloxymethyl) ester

To a suspension of 0.100 g (0.239 mmol) of PMEA, mono-N,N-diethylacetamide ester (sodium salt) (Example 27) in 2.5 mL of CH$_3$CN was added 0.25 mL of Et$_3$N, whereupon the reaction became homogeneous. To this mixture was added 0.17 mL (1.19 mmol) of chloromethyl pivalate. The reaction was stirred at 22° C. for 24 h, evaporated to dryness in vacuo, and purified on a 20 mm flash column. The title compound eluted with 10% MeOH/ CH$_2$Cl$_2$ to give 25 mg (21%) of a colorless oil.

$^1$H NMR (CDCl$_3$) 8.25 (1H, s, H-8), 7.94 (1H, s, H-2), 6.26 (2H, s, NH$_2$), 5.65 (1H, dd, J=12.3, 5.4, OCH$_2$O), 5.60 (1H, dd, J=12.3, 4.8, OCH$_2$O ), 4.75 (1H, dd, J=14.7, 10.8, OCH$_2$C(O)), 4.56 (1H, dd, J=14.5, 14.3, OCH$_2$C(O)), 4.32 (2H, dd, J=5.7, 4.4, H-1'), 3.97 (2H, d, J=8.4, H-4'), 9, 3.91 (2H, t, J=4.8, H-2'), 3.28 (2H, q, J=7.5, CH$_2$CH$_3$), 3.09 (1H, q, J=7.2, CH$_2$CH$_3$), 1.12 (9H, s, (CH$_2$)3), 1.07 (3H, m, CH$_3$CH$_2$),

$^{13}$C NMR (CDCl$_3$) 177.85 1.05, (3H, t, J=6.9, CH$_3$CH$_2$), (C(O)O), 166.25 (C(O)N), 156.34 (C-6), 153.48 (C-2), 150.49 (C-4), 142.22 (C-8), 119.79 (C-5), 81.94 ((CH$_3$)$_3$C), 81.71 (OCH$_2$O ) , 71.55 (C-2', d, J=10) , 65.10 (C-4', d, J=165), 63.99 (CCH$_2$OP), 43.53 (C-1'), 41.03 (NCH$_2$), 40.78 (NCH$_2$), 27.00 ((CH$_3$)$_3$), 14.21 (CH$_2$CH$_3$), 13.00 (CH$_3$CH$_2$). MS (FAB) 501 (M+H, 100). IR 3500–3000, 2978, 1750. 1654, 1600, 1480, 1250.

Anal. Calcd for: C$_{20}$H$_{33}$N$_6$O$_7$P·0.5 H$_2$O C, 47.15; H, 6.72; N, 16.50. Found: C, 47.30; H, 6.58; N, 16.14.

The following examples were prepared by the methods given in Table I.

## EXAMPLE 18

PMEA, cyclic propanyldiester

Mp 195°–199° C. $^1$H NMR (d$_6$-DMSO ) 8.13 (1H, s, H-8), 8.12 (1H, s, H-2), 4.35 (2H, t, J=4.8, H-1'), 4.2 (4H, m, CH$_2$O P), 3.95 (2H, d, J=8.8, H-4'), 3.86 (2H, t, J=4.8, H-2'). 1.98 (1H, m, CH$_2$CH$_2$CH$_2$), 1.55 (1H, m, CH$_2$CH$_2$CH$_2$). $^{13}$C NMR (d$_6$-DMSO) 156.01 (C-6), 152.48 (C-2), 149.69 (C-4), 141.11 (C-8), 118.68 (C-5), 70.71 (C-2', d, J=13.8), 68.30 (CH$_2$OP, d, J=6.9), 64.55 (C-4', d, J=158), 42.52 (C-1'), 25.85 (CH$_2$CH$_2$CH$_2$, d, J=9.0). IR (KBr) 3351, 3169,.1660, 1601, 1256, 1063. MS (FAB) 314 (M+H, 100).

22

Anal. Calcd for: C$_{11}$H$_{16}$N$_5$O$_4$P·1.5 H$_2$O C, 38.85; H, 5.63; N, 20.60. Found: C, 38.63; H, 5.46; N, 20.49.

## EXAMPLE 19

PMEA, bis-diethylamide

Mp 93°–96° C. $^1$H NMR (d$_6$-DMSO ) 8.11 (1H, s, H-8), 8.07 (1H, s, H-2), 7.18 (2H, s, NH$_2$), 4.31 (2H, t, J=4.8, H-1'), 3.85 (2H, t, J=4.8, H-2'), 3.68 (2H, d, J=8.1, H-4'), 2.70 (8H, m, CH$_3$CH$_2$), 0.86 (12H, t, J=7.0, CH$_3$). $^{13}$C NMR (d$_6$-DMSO ) 155.98 (C-6), 152.33 (C-2), 149.63 (C-4), 141.04 (C-8), 118.75 (C-5), 70.30 (C-2', d, J=13.0), 66.30 (C-4', d, J=133), 42.63 (C-1'), 37.53 (CH$_3$CH$_2$), d, J=4.1), 13.93 (CH$_3$, d, J=1.9). IR (KBr) 3370–2935, 2875, 1680, 1649, 1605, 1211. MS (FAB) 384 (M+H, 100).

Anal. Calcd for: C$_{16}$H$_{30}$N$_7$O$_2$P·0.5 H$_2$O C, 48.96; H, 7.96; N, 24.99. Found: C, 48.85; H, 7.77; N, 24.92.

## EXAMPLE 20

PMEA, isopropyl ester (sodium salt)

Mp 77°–85° C. turned to glass and melted over next 40° C. NMR (d$_6$-DMSO) 8.19 (1H, s, H-8), 8.13 (1H, s, H-2), 7.22 (2H, s, NH$_2$), 4.30 (2H, t, J=4.4, H-1'), 4.10 (1H, m, OCH), 3.76 (2H, t, J=4.4, H-2'), 3.31 (2H, d, J=8.6, H-4'), 0.90 (6H, d, J=6.0, CH$_3$). $^{13}$C (d$_6$-DMSO ; 90 MHz), 155.90 (C-6), 152.35 (C-2), 149.54 (C-4), 141.39 (C-8), 118.53 (C-5), 70.23 (OCH, d, J=10), 68.70 (C-4', d, J=192), 65.55 (C-2', d, J=5), 42.72 (C-1'), 24.43 (CH$_3$). IR (Film) 3321, 3163, 1647, 1601, 1578. MS (FAB) 338 (M+H, 70).

Anal. Calcd for: C$_{11}$H$_{17}$N$_5$O$_4$P$_1$Na$_1$·H$_2$O C, 37.18; H, 5.38; N, 19.71. Found: C, 37.11; H, 5.49; N, 19.71.

## EXAMPLE 21

PMEA, cyclic (2,2-dimethyl)propanyl diester

Mp 224°–226° C. $^1$H NMR (d$_6$-DMSO) 8.11 (2H, s, H-8, H-2), 7.21 (2H, s, NH$_2$), 4.34 (2H, t, J=5.0, H-1'), 3.99 (2H, d, J=8.7, H-4'), 3.91 (2H, t, J=5.0,.H-2'), 3.95–3.75 (4H, m, CH$_2$C(CH$_3$)$_2$CH$_2$), 1.06 (3H, s, CH$_3$), 0.67 (3H, s, CH$_3$). $^{13}$C NMR (d$_6$-DMSO ; 50 MHz) 155.89 (C-6), 152.33 (C-2), 149.53 (C-4), 140.86 (C-8), 118.57 (C-5), 76.67 (CH$_2$C (CH$_3$)$_2$CH$_2$, d, J=6.8), 70.44 (C-2', d, J=13.7), 64.43 (C-4', d J=157), 42.43 (C-1'), 31.70 (C(CH$_3$)$_2$, d, J=7.6), 21.05 (CH$_3$), 19.46 (CH$_3$). IR (KBr) 3417, 3324, 3152, 2970, 1668, 1650, 1602. MS (FAB) 342 (M+H, 100).

Anal. Calcd for: C$_{13}$H$_{20}$N$_5$O$_4$P·0.25 H$_2$O C, 45.18; H, 5.97; N, 20.27. Found: C, 45.58; H, 6.05; N, 20.05.

## EXAMPLE 22

PMEA, 3-hydroxypropanyl ester, (sodium salt)

$^1$H NMR (d$_6$-DMSO) 8.17 (1H, s, H-8), 8.11 (1H, s, H-2), 7.20 (2H, s, NH$_2$), 5.11 (1H, t, OH), 4.28 (2H, t, J=4.7, H-1'), 3.76 (2H, t, J=4.7, H-2'), 3.64 (2H, q, J=6.6, CH$_2$CH$_2$OP), 3.41 (2H, d, J=8.0, H-4'), 3.35. (2H, t, J=6.2, HOCH$_2$), 1.45 (2H, m, HOCH$_2$CH$_2$). $^{13}$C NMR (d$_6$-DMSO ; 50 MHz) 155.82 (C-6), 152.25 (C-2), 149.43 (C-4), 141.38 (C-8), 118.43 (C-5), 69.77 (C-2', d, J=10), 67.42 (C-4', d, J=152), 59.33 (CH$_2$CH$_2$OP, d, J=6), 56.88 (HOCH$_2$), 42.60 (C-1 '), 33.91 (HOCH$_2$CH$_2$; d, J=4). IR (KBr) 3412, 2956, 1647, 1604, 1482, 1421. MS (FAB) 354 (M+H, 17).

Anal. Calcd for: C$_{11}$H$_{17}$N$_5$O$_5$P$_1$Na$_1$·2.5 H$_2$O C, 33.17; H, 5.56; N, 17.59. Found: C, 33.32', H, 5.28; N, 17.63.

Copy provided by USPTO from the PIRS Image Database on 01/22/2013

5,663,159

## 23

### EXAMPLE 23

PMEA, monooctyl ester

$^1$H NMR (d5-pyridine) 9.47, 9.34 (2H, 2s, H-2, H-8), 5.46 (2H, t, J=4.5), 5.3–5.1 (6H, m, H-2', H-4', $CH_2CH_2CH_2O$ ), 2.68 (2H, m, $CH_2CH_2CH_2O$ ), 2.33 (2H, m, $CH_2CH_2CH_2O$ ), 2.1 (8H, m, $CH_2(CH_2)_4$)). 1.79 (3H, t, J=6.5, $CH_3$). IR (KBr) 3416, 2928, 1690, 1065. MS (FAB) 386 (M+H, 100).

Anal. Calcd for: $C_{16}H_{28}N_5O_4P \cdot H_2O \cdot Na \cdot 0.6$ NaCl C, 41.59; H, 6.54; N, 15.15. Found: C, 41.80; H, 6.87; N, 15.02.

### EXAMPLE 24

PMEA, dimethyl ester

Mp 133°–135° C. $^1$H NMR (d$_6$-DMSO) 8.14 (1H, s, H-8), 8.10 (1H, s, H-2), 7.29 (2H, s, NH$_2$), 4.33 (2H, t, J=5.0, H-1'), 3.90 (2H, d, J=8.3, H-4'), 3.85 (2H, t, J=5.0, H-2'), 3.57 (6H, d, J=10.6, CH$_3$). $^{13}$C NMR (d$_6$-DMSO) 155.87 (C-6), 152.87 (C-2), 149.59 (C-4), 141.27 (C-8), 118.65 (C-5), 70.40 (C-2', d, J=11.5), 63.17 (C-4', d, J=182), 52.79 (CH3, d, J=6.4), 42.48 (C-1'). IR (KBr) 3400, 3188, 1671, 1647, 1605. MS (methane/DCI) 302 (M+H, 100)

Anal. Calcd for: $C_{10}H_{16}N_5O_4P \cdot 0.6$ H$_2$O C, 38.43; H, 5.56; N, 22.41. Found: C. 38.76; H, 5.45; N, 22.18.

### EXAMPLE 25

PMEA, monomethyl ester, (sodium salt)

$^1$H NMR (d$_6$-DMSO) 8.19 (1H, s, H-8), 8.11 (1H, s, H-2), 7.17 (2H, s, NH$_2$), 4.27 (2H, t, J=5.0, H-1'), 3.77 (2H, t, J=5.0, H-2'), 3.45 (2H, d. J=8.0, H-4'), 3.24 (3H, d, J=10.0. CH$_3$). $^{13}$C (d$_6$-DMSO; 90 MHz) 155.87 (C-6), 152.26 (C-2), 149.49 (C-4), 141.44 (C-8), 118.51 (C-5), 69.69 (C-2', d, J=9), 67.09 (C-4', d. J=152), 50.78 (CH$_3$, d, J=5), 42.64 (C-1'). IR (KBr) 3421, 3195, 1649, 1605, 1578, 1516. MS (FAB) 310 (M+H, 23).

Anal. Calcd for C$_9$H$_{13}$N$_5$O$_4$P$_3$Na$_1$·3H$_2$O·NaCl C, 25.63; H, 4.54; N, 16.61. Found: C, 25.39; H, 4.84; N, 16.73. HRMS Calcd 310.0681 Found: 310.0688

### EXAMPLE 26

PMEA, mono- 3-amino -2.2-dimethylpropyl amide

$^1$H NMR (D$_2$O) 8.13 (1H, s, H-8), 8.11 (1H, s, H-2), 4.36 (2H, t, J=5, H-1'), 3.90 (2H, t, J=5, H-2'), 3.53 (2H, d. J=8.5, H-4'), 2.71 (2H, s, NH$_2$CH$_2$), 2.07 (2H, d, J=9.4, CH$_2$NH), 0.70 (6H, s, CH$_3$). $^{13}$C NMR (D$_2$O) 157.25 (C-6), 154.19 (C-2), 150.78 (C-4), 144.73 (C-8), 120.03 (C-5), 72.24 (C-2', d. J=12.5), 69.63 (C-4', d. J=143), 50.05 (CH$_2$NH), 48.41 (H$_2$NCH$_2$), 45.53 (C-1'), 35.36 (C(CH$_3$)$_2$, d, J=4), 24.09 (CH$_3$). IR (KBr) 3786, 3381, 1648, 1605, 1478. MS (FAB) 380 (M+H, 20). HR-MS (M+H)

Anal. Calcd for C$_{13}$H$_{23}$N$_7$O$_3$P$_1$Na$_1$: 380. 1576. Found: 380.1567.

### EXAMPLE 27

PMEA, mono-hydroxy-2,2-dimethylpropyl ester

$^1$H NMR (d$_6$-DMSO) 8.14 (1H, s, H-8), 8.09 (1H, s, H-2), 7.16 (2H, s, NH$_2$), 5.84 (1H, t, OH), 4.27 (2H, t, J=4.9, H-1'), 3.77(2H. t. J=4.9, H-2'), 3.33 (2H. d. J=8.7, H-4'), 3.24 (2H, d, J=10, C(CH$_3$)$_2$CH$_2$OP), 3.00 (2H. d, HOCH$_2$), 0.63 (6H, s, CH$_3$). $^{13}$C NMR (d$_6$-DMSO . 50 MHz), 155.84 (C-6), 152.21 (C-2), 149.45 (C-4), 141.26 (C-8), 118.48 (C-5), 69.71 (C-2', d, J=9.2), 68.27 (C(CH$_3$)$_2$CH$_2$OP, d. J=6.2), 67.48 (C-4', d, J=152), 65.93 (HOCH$_2$), 42.57 (C-1'), 36.71 (C(CH$_3$)$_2$, d, J=2.5), 21.35 (CH$_3$). IR (KBr) 3426, 2960. 2883, 1645, 1478, 1417. MS (FAB) 360 (M+H, 100).

## 24

Anal. Calcd. for C$_{13}$H$_{22}$N$_5$O$_5$P·1.3 H$_2$O: C, 40.77; H, 6.48; N, 18.29. Found: C, 40.96; H, 6.16; N, 17.95

### EXAMPLE 28

PMEA, cyclic-2,2-dimethyl-propanyl diamide

$^1$H NMR (d$_6$-DMSO) 8.11 (1H, s, H-8), 8.10 (1H, s, H-2), 7.18 (2H, s, NH$_2$), 4.30 (2H, t, J=5.0, H-1'), 3.83 (2H, t, J=5.0, H-2'). 3.63 (2H, d, J=7.5, H-4'), 4.27 (2H, s, NH, NH), 2.65–2.40 (4H, m, CH$_2$C(CH$_3$)$_2$CH$_2$). 0.98 (3H, s, CH$_3$), 0.64 (3H, s, CH$_3$). $^{13}$C NMR (d$_6$-DMSO ) 156.01 (C-6), 152.42 (C-2), 149.60 (C-4), 141.24 (C-8). 118.68 (C-5), 70.35 (C-2', d. J=11.2), 68.53 (C-4', d. J=131), 52.72 (CH$_2$C (CH$_2$)$_2$CH$_2$, d, J=2.3), 42.78 (C-1'), 30.54 (C(CH$_3$)$_2$. d, J=5.6), 24.82 (CH$_3$), 23.25 (CH$_3$). IR (KBr) 3100, 2980, 2940, 1650, 1605. MS (FAB) 340 (M+H, 100). HR-MS (M+H)

Anal. Calcd for C$_{13}$H$_{22}$N$_7$O$_2$P: 340. 1651. Found: 340.1647.

### EXAMPLE 29

PMEA, N,N'-dimethyl-cyclic propanyl diamide

$^1$H NMR (d$_6$-DMSO ) 8.08 (1H, s, H-8, H-2), 7.14 (2H, s, NH$_2$), 4.28 (2H, br s, H-1'), 3.80 (2H, br s, H-2'), 3.73 (2H, dd, 'J=7.6, 2.8 H-4'), 2.85–2.60 (4H, m, CH$_2$NCH$_2$), 1.8–1.3 (2H, m, CH$_2$CH$_2$CH$_2$), 2.36 (3H, d, J=3, NCH$_3$), 2.33 (3H, d, J=3, NCH$_3$). $^{13}$C NMR (d$_6$-DMSO ) 156.02 (C-6), 152.44 (C-2), 149.77 (C-4), 141.09 (C-8), 118.74 (C-5), 70.44 (C-2', d, J=4), 65.42 (C-4', d. J=164), 50.22 (NCH$_3$), 42.85 (C-1'), 34.28 (CH$_3$NCH$_2$), 24.79 (CH$_2$CH$_2$CH$_2$)-. IR (KBr) 3300, 3180, 2930. 2877, 1651, 1600. MS (methane/DCI) 340 (M+H, 100).

Anal. Calcd for C$_{13}$H$_{22}$N$_7$O$_2$P·0.9 HCl: C, 42.93; H, 6.22; N, 26.33. Found: C. 42.33; H. 6.19; N, 25.93. HR-MS (M+H) Calcd for C$_{13}$H$_{22}$N$_7$O$_2$P: 340.1651. Found: 340.1649.

### EXAMPLE 30

PMEA, mono-N,N-diethylacetamide ester

Mp 189°–191° C. $^1$H NMR (d$_6$-DMSO) 8.16 (1H, s, H-8), 8.14 (1H, s, H-2), 7.55 (2H, s, NH$_2$), 4.80 (2H, J=9.0, C(O)CH$_2$O), 4.31 (2H. t, J=5.0. H-1'), 4.03 (2H. t, J=5.0. H-2'), 3.74 (2H. d. J=8.5, H-4'), 3.22 (2H. q. J=7, CH$_3$CH$_2$), 3.16 (2H. q. J=7, CH$_3$CH$_2$), 1.01 (3H, t, J=7, CH$_2$), 1.01 (3H, t, J=7, CH$_2$). $^{13}$C NMR (CF$_3$CO$_2$D; 90 MHz) 166.10 (C=O), 150.04, 148.67 (C-6, C-4), 144.74, 144.55 (C-2, C-8), 117.96 (C-5), 70.05 (C-2', d. J=10), 65.37 (C-4', d. J=162), 62.87 (C(O)CH$_2$, d, J=5), 43.44 (C-1'), 14.06 (CH$_3$), 12.91 (CH$_3$). IR (KBr) 3392, 3093, 1692, 1650, 1515. MS (methane/DCI) 500 (M+H, 30), 132 (100). HR-MS (M+H)

Anal. Calcd for C$_{14}$H$_{23}$N$_6$O$_5$P: 387. 1546. Found: 387. 1543.

### EXAMPLE 31

PMEA, mono-acetic acid ester

Mp 197°–200° C. $^1$H NMR (d$_6$-DMSO ) 8.19 (1H, s, H-8), 8.17 (1H, s, H-2), 7.75 (2H, s, NH$_2$), 4.34 (2H, d. J=4, C(O)CH$_2$O), 4.32 (2H, t, J=5, H-1'), 3.86 (2H, t, J=5. H-2'), 3.71 (2H, d, J=8, H-4'). $^{13}$C NMR (d$_6$-DMSO ) 177.19 (C=O, d, J=6) 156.84 (C-6), 153.72 (C-2), 150.03 (C-4). 144.05 (C-8), 19.44 (C-5), 71.66 (C-2', d, J=11), 67.39 (C-4'. d. J=157), 4.90 (C(O) CH$_2$O, d, J=6), 44.59 (C-1'). IR (KBr) 3366, 3109, 1690, 1611, 1516, 1415. MS (FAB) 332 (M+H. 55).

Copy provided by USPTO from the PIRS Image Database on 01/22/2013

**A106**

5,663,159

## 25

Anal. Calcd for $C_{10}H_{14}N_5O_8P\cdot0.3\ H_2O$: C, 35.74; H, 4.38; N, 20.85. Found: C, 35.41; H, 4.43; N, 20.60.

### EXAMPLE 32

PMEA, di(butylacetate ester)

Mp 78°–80° C. $^1$H NMR ($d_6$-DMSO) 8.11 (1H, s, H-8), 8.06 (1H, s, H-2), 7.18 (2H, s, $NH_2$), 4.62 (4H, d, J=11, C(O)$CH_2$OP), 4.31 (2H, t, J=5.0, H-1'), 4.07 (4H, t, J=7, $CH_2OC(O)$), 4.00 (2H, d, J=8, H-4'), 3.90 (2H, t, J=5, H-2'), 1.54 (4H, apparent quintet, J=7, $CH_3CH_2CH_2$), 1.31 (4H, apparent hextet, J=7,7, $CH_3CH_2$), 0.86 (6H, t, J=7, $CH_3$). $^{13}$C NMR ($d_6$-DMSO) 168.16 (C=O, d, J=4.7), 156.03 (C-6), 152.44 (C-2), 149.59 (C-4), 141.10 (C-8), 118.65 (C-5), 70.58 (C-2', d, J=10), 64.70 ($CH_2$ C(O)), 64.19 (C-4', d, J=165), 62.05 ($CH_2$OP, d, J=6), 42.45 (C-1'), 30.10 ($CH_3CH_2CH_2$), 18.53 ($CH_3CH_2$), 13.56 ($CH_3$). IR (KBr) 3339, 3158, 2994, 2962, 1764, 1662, 1600. MS (methane/DCI) 502 (M+H, 100).

Anal. Calcd for $C_{20}H_{32}N_5O_8P$: C, 47.90; H, 6.43; N, 13.97. Found: C. 47.94; H, 6.40; N. 13.90.

### EXAMPLE 33

PMEA, di(ethylacetate ester)

Mp 82°–84° C. $^1$H NMR ($d_6$-DMSO) 8.11 (1H, s, H-8), 8.06 (1H, s, H-2), 7.16 (2H, s, $NH_2$), 4.59 (4H, d, J=11, C(O)$CH_2$O ), 4.30 (2H, t, J=5.0, H-1'), 4.13 (4H, q, J=7.0, $CH_2CH_3$), 4.00 (2H, d, J=8.0, H-4'), 3.98 (2H, t, J=5.0, H-2'), 1.18 (6H, t, J=7.0, $CH_3$). $^{13}$C NMR ($D_2O$) 171.44 (C=O, d, J=5), 156.90 (C-6), 153.85 (C-2), 150.56 (C-4), 144.66 (C-8), 119.86 (C-5), 73.02 (C-2 ', d, J=10.5), 66.12 (C-4 ', d, J=166), 64.85 ($CH_3CH_2$), 64.75 (C(O) $CH_2$), 45.57 (C-1'), 15.22 ($CH_3$). IR (KBr) 3296, 3122, 1764, 1667, 1602. MS (methane/DCI) 446 (M+H, 100).

Anal. Calcd for $C_{16}H_{24}N_5O_8P$: C, 43.15; H, 5.43; N, 15.72. Found: C, 43.04; H. 5.33; N. 15.58.

### EXAMPLE 34

PMEA, monophenyl ester (sodium salt).

Mp 223°–228° C. $^1$H NMR ($d_6$-DMSO ) 8.14 (1H, s, H-8), 8.13 (1H, s, H-2), 7.50 (2H, s, $NH_2$), 7.25 (2H, t, J=8, ArH), 7.07 (1H, t, J=8, ArH), 7.01 (2H, d, J=8, ArH), 4.33 (2H, t, J=5, H-1'), 3.89 (2H, t, J=5, H-2'), 3.73 (2H, d, J=8, H-4'). $^{13}$C NMR (D20; Partial spectrum) 131.46, 126.06 (ARC), 122.27 (ARC, d, J=3.5), 72.27 (C-2; d, J=12), 67.68 (C-4', d, J=160), 46.08 (C-1'). IR (KBr) 3389, 3068, 1693, 1594. MS (FAB) 350 (M+H, 40). Anal. Calcd for $C_{14}H_{16}N_5O_4P\cdot H_2O\cdot0.45$ Na: C, 44.45; H, 4.81; N, 18.51. Found: C, 44.45; H, 4.45; N, 18.45.

### EXAMPLE 35

PMEA, diphenyl ester

Mp 103°–114° C. $^1$H NMR ($d_6$-DMSO) 8.15 (1H, s, H-8), 8.11 (1H, s, H-2), 7.40 (4H, s, $NH_2$), 7.34 (4H, t, J=7, ArH), 7.20 (2H, t, J=7, ArH), 7.04 (4H, t, J=7, ArH), 4.38 (2H, t, J=5, H-1'), 4.24 (2H, d, J=8, H-4'), 3.98 (2H, t, H-2'). $^{13}$C NMR ($d_6$-DMSO ) 155.51 (C-6), 151.77 (C-2), 149.57 (C-4), 141.46 (C-8), 130.02, 125.49, (ARC), 120.56 (ARC, d, J=4), 118.71 (C-5), 70.58 (C-2'd J=12), 63.52 (C-4, J=164), 42.68 (C-1'). IR (KBr) 3270, 3100, 1675, 1646, 1601, 1490. MS (FAB) 426 (M+H, 100).

Anal. Calcd for $C_{20}H_2O\ N_5O_4P\cdot0.25\ H_2O$: C, 55.87; H, 4.81; N, 16.29. Found: C, 55.80; H, 4.65; N, 15.98.

## 26

### EXAMPLE 36

PMEA, mono-N,N-diisopropylacetamide ester (sodium salt)

Mp 219°–221° C. $^1$H NMR ($d_6$-DMSO) 8.14 (1H, s, H-8), 8.13 (1H, s, H-2), 7.37 (2H, s, $NH_2$), 4.45 (2H, d, J=9, $CH_2$OP), 4.31 (2H, t, J=5, H-1'), 3.88 (2H, t, J=5, H-2'), 3.74 (2H, d, J=8, H-4'), 3.43 (2H, m, CH(CH3)2), 1.26 (6H, d, J=6, $CH_3$), 1.08 (6H, d, J=6, $CH_3$). $^{13}$C NMR ($d_6$-DMSO /$D_2O$) 170 (C=O), 156.90 (C-6), 153.89 (C-2). 150.35 (C-4), 144.29 (C-8), 119.68 (C-5), 71.89 (C-2', d, J=12), 67.81 (C-4', d, J=158), 65.25 ($CH_2$OP, d, J=5), 49.72 (CH $(CH_3)_2$), 47.30 (CH$(CH_3)_2$), 45.00 (C-1'), 21.21 ($CH_3$). IR (KBr) 3425, 2969, 1691, 1643, 1515. MS (FAB) 415 (M+H, 100).

Anal. Calcd for $C_{16}H_{27}N_6O_5P\cdot0.67\ H_2O\cdot0.5$ Na: C, 43.87; H, 6.52; N, 19.19. Found: C, 43.92; H, 6.17; N, 18.79.

### EXAMPLE 37

PMEA, di-(p-nitro-benzyl ester)

Mp 190°–193 C. $^1$H NMR ($d_6$-DMSO) 8.16 (4H, d, J=8, ArH), 8.09 (1H, s, H-8), 8.08 (1H, s, H-2), 7.51 (4H, d, J=8, ArH), 7.17 (2H, s, $NH_2$), 5.10 (4H, d, J=8, Ar$CH_2$O ), 4.32 (2H, t, J=5, H-1'), 4.07 (2H, d, J=8, H-4'), 3.90 (2H, t, J=5, H-2'). $^{13}$C NMR ($d_6$-DMSO) 155.97(C-6), 152.94 (C-2), 149.62 (C-4), 147.19, 143.96 (ARC), 141.13 (C-8), 128.15, 123.56 (ARC), 118.65 (C-5), 70.62 (C-2'd, J=7) 65 86 (Ar$CH_2$O, d, J=6), 63.75 (C-4'd, J=162), 42.49 (C-1'). IR (KBr) 3420, 3268, 3110, 1674, 1642, 1604. MS (FAB) 544 (M+H, 60).

Anal. Calcd for $C_{23}H_{24}N_7O_8P$: C, 48.63; H, 4.09; N, 18.05. Found: C, 48.61; H, 4.01; N, 18.04.

### EXAMPLE 38

PMEA, mono-p-nitro-benzyl ester, (sodium salt)

Mp 230°–240° C. $^1$H NMR ($d_6$-DMSO) 8.19 (2H, d, J=8.6, ArH), 8.12 (1H, s, H-8), 8.11 (1H, s, H-2), 7.54 (2H, d, J=8.6, ArH), 4.93 (2H, d, J=7.7, Ar$CH_2$O ), 4.63 (2H, t, J=5, H-1'), 4.31 (2H, t, J=5, H-2'), 3.72 (2H, d, J=8.6, H-4'). IR (KBr) 3742, 1930, 1692, 1606, 1518. MS (FAB) 409 (M+H, 27).

Anal. Calcd for $C_{15}H_{17}N_6O_6P\cdot0.75\ H_2O\cdot0.5$ Na: C, 41.58; H, 4.30; N, 19.40. Found: C. 41.37; H, 3.92; N, 19.03.

### EXAMPLE 39

PMEA, di-(2,2,2-trichloroethyl ester)

Mp 155°–157 C. $^1$H NMR ($d_6$-DMSO) 8.11 (1H, s, H-8), 8.08 (1H, s, H-2), 7.16 (2H, s, $NH_2$), 4.68 (2H, d, J=7, C$Cl3CH_2$), 4.67 (2H, d, J=7, C$Cl_3CH_2$), 4.34 (2H, t, J=5, H-1'), 4.18 (2H, d, J=8, H-4'), 3.95 (2H, t, J=5, H-2'). $^{13}$C NMR ($d_6$-DMSO ) 156.09 (C-6), 152.59 (C-2), 149.71 (C-4), 141.28 (C-8), 118.75 (C-5), 95.42 (CCl3, d, J=8.6), 75.48 (CCl3$CH_2$, d, J=5.7), 70.92 (C-2', d, J=7), 63.99 (C-4', d, J=163), 42.72 (C-1'). IR (KBr) 3372, 3334, 3210, 1658, 1604, 1576. MS (methane/DCI) 536 (100), 534 (50), 192 (95). Anal. Calcd for $C_{12}H_{14}N_5O_{14}PCl_6$: C, 26.89; H, 2.63; N, 13.07. Found: C, 26.85; H, 2.55; N, 12.86.

### EXAMPLE 40

PMEA, mono-(2,2,2-trichloroethyl ester)

Mp 218°–225° C. $^1$H NMR ($d_6$-DMSO ) 8.51 (2H, s, $NH_2$), 8.30, 8.24 (2H, 2s, H-8, H-2). 4.36 (2H, t, J=5, H-1'), 4.33 (2H, d, J=6, $Cl_3CCH_2$), 3.72 (2H, d, J=8, C-4'). 3.91 (2H, t, J=5, H-2'). $^{13}$C NMR ($d_6$-DMSO ) 153.03 (C-6), 148.91 (C-2), 148.22 (C-4), 142.78 (C-8), 118.27 (C-5),

Copy provided by USPTO from the PIRS Image Database on 01/22/2013

5,663,159

| 27 | 28 |

97.05 (CCl$_3$), 75.67 (CCl$_3$CH$_2$, d, J=5), 69.99 (C-2', d, J=10), 66.11 (C-4', d, J=159), 43.12 (C-1'). IR (KBr) 3424, 1930, 1690, 1614, 1514, 1414. MS (methane/DCI) 404 (M+H, 1). 136 (40). 113 (100).

Anal. Calcd for C$_{10}$H$_{13}$N$_5$O$_4$PCl$_3$·0.3 CCl$_3$CH$_2$OH: C, 28.34; H, 3.05; N, 15.59. Found: C, 28.19; H, 3.17; N, 15.59.

### EXAMPLE 41

PMEA, di-(benzoyloxymethyl ester)

Mp 49°–52° C. $^1$H NMR (d$_6$-DMSO ) 8.09 (1H, s, H-8). 7.99 (1H, s, H-2), 7.92 (4H, d, J=7, ArH), 7.67 (2H, t, J=7.5, ArH), 7.49 (2H, t, J=7.5, ArH), 7.18 (2H, s, NH$_2$), 5.82 (4H, d, J=13. OCH$_2$O ), 4.22 (2H, t, J=5, H-1'), 4.04 (2H, d, J=8, H-4'), 3.82 (2H, d, J=5, H-2'). $^{13}$C NMR (d$_6$-DMSO ) 164.35 (C=O), 156.02 (C-6), 152.45 (C-2), 149.55 (C-4), 140.99 (C-8), 134.22 (ArH), 129.60 (ArH), 128.98 (ArH), 128.35 (ArH), 118.70 (C-5), 70.62 (C-2', d, J=11.5), 64.17 (C-4', d, J=163), 42.29 (C-1'). IR (KBr) 3328, 3182, 1739, 1644, 1602. MS (FAB) 542 (M+H, 45).

Anal. Calcd for C$_{24}$H$_{24}$N$_5$O$_8$P·0.66 H$_2$O: C, 52.09; H, 4.61; N, 12.65. Found: C, 52.09; H, 4.36; N, 12.37.

### EXAMPLE 42

PMEA, di-(p-trifluoromethyl benzyl ester)

Mp 115°–125° C. $^1$H NMR (d$_6$-DMSO ) 8.18 (1H, s, H-8), 8.17 (1H, s, H-2), 7.66 (4H, d, J=8, ArH) 7.47 (4H, d, J=8, ArH), 7.57 (2H, s, NH$_2$), 5.09 (4H, d, J=8, ARCH$_2$), 4.35 (2H, t, J=5, H-1'), 4.04 (2H, d, J=8, H-4'), 3.91 (2H, t, J=5, H-2 '). $^{13}$C NMR (d$_6$-DMSO ) 154.99 (C-6), 151.13 (C-2), 149.44 (C-4), 141.7 (C-8), 141.12 (ArC), 128.63 (CF$_3$-ArC, q, J=31.8), 127.93, 125.31 (ArC), 124.17 (CF$_3$, q, J=275), 118.53 (C-5). 70.46 (C-2', d, J=11), 66.14 (ArCH$_2$, d, J=5.5), 63.78 (C-4', d, J=167.1), 42.61 (C-1'). IR (KBr) 3292, 3118, 1670, 1602, 1476. MS (FAB) 590 (M+H, 100).

Anal. Calcd for C$_{24}$H$_{22}$N$_5$O$_4$PF$_6$·0.5 H$_2$O: C. 48.17; H, 3.87; N, 11.70. Found: C, 47.81; H, 3.55; N, 11.30.

### EXAMPLE 43

PMEA, mono-(2,2-difluoro-3-hydroxy propyl ester)

$^1$H NMR (d$_6$-DMSO ) 8.20 (1H, s, H-8, H-2), 7.80 (1H, s, NH$_2$), 4.34 (2H, t, J=5.0, H-1'), 4.04 (2H, dt, J=13.2, 7.9), CF$_2$CH$_2$OP), 3.87 (2H, t, J=5.0, H-2'), 3.70 (2H, d, J=8.0, H-4'), 3.60 (2H, t, J=15, HOCH$_2$). $^{13}$C NMR (d$_6$-DMSO/NaOD) 157.34 (C-6), 154.24 (C-2), 150.67 (C-4), 144.72 (C-8), 123.54 (CF$_2$t, J=30), 120.12 (C-5), 72.40 (C-2', d, J=12), 67.75 (C-4', d, J=159), 64.94 (CF$_2$CH$_2$OP, dt, J=30, 5), 63.28 (HOCH$_2$, d, J=27), 45.49 (C-1'). IR (KBr) 3310, 3112, 1694, 1602, 1514. MS (FAB) 368 (M+H, 55). HR-MS (M+H).

Anal. Calcd for C$_{11}$H$_{16}$N$_5$O$_5$F$_2$P: 368.0935. Found: 368.0930.

### EXAMPLE 44

PMEA, mono-(p-trifluoromethylbenzyl ester)

$^1$H NMR (d$_6$-DMSO ) 8.13 (2H, s, H-8, H-2), 7.69 (2H, d, J=8, ArH), 7.49 (2H, d, J=8, ArH), 7.34 (2H, s, NH$_2$), 4.92 (2H, d, J=8, ArCH$_2$O), 4.32 (2H, t, J=5, C-1'), 3.87 (2H, t, J=5, H-2'), 3.75 (2H, d, J=8, H-4'). IR (KBr) 3062, 1696, 1602, 1514, 1418. MS (FAB) 432 (M+H, 80). HR-MS (M+H).

Anal. Calcd for C$_{16}$H$_{17}$N$_5$O$_4$PF$_3$: 432.1048. Found: 432.1039.

### EXAMPLE 45

PMEA, dibutylamide

Mp 117°–119° C. $^1$H NMR (d$_6$-DMSO) 8.12 (2H, s, H-8, H-2), 7.19 (2H, s, NH$_2$), 4.29 (2H, t, J=5, H-1'), 3.82 (2H, t, J=5, H-2'), 3.83 (2H, s, NH), 3.52 (2H, d, J=8, H-4'), 2.64 (4H, m, C$_2$NH), 1.24 (8H, m, CH$_2$CH$_2$CH$_2$), 0.80 (6H, t, J=7, CH$_3$). $^{13}$C NMR (d$_6$-DMSO ) 155.98 (C-6), 152.61 (C-2), 149.71 (C-4), 141.52 (C-8), 118.65 (C-5), 70.46 (C-2', d, J=11), 67.28 (C-4', d, J=131), 42.83 (C-1'), 39.22 (NHCH$_2$), 34.10 (NHCH$_2$CH$_2$), 19.59 (CH$_2$CH$_2$), 13.92 (CH$_3$). IR 3278, 3242, 2952, 2928, 2872, 1682, 1608. MS (FAB) 384 (M+H, 100).

Anal. Calcd for C$_{16}$H$_{30}$N$_7$O$_2$P: C. 50.12; H, 7.89; N, 25.57. Found: C, 49.77; H, 7.79; N, 25.30.

### EXAMPLE 46

PMEA, di(2-methyl-propyl ester)

Mp 109°–110° C. $^1$H NMR(d$_6$-DMSO) 8.10(1H, S, H-8) 8.05(1H, S, H-2), 7.19(2H, S, NH$_2$), 4.31(2H, t, J=5.0, H-1'). 3.87(2H,t,J=5.0, H-2') 3.85 (2H,d,J=8.5,H-4'), 3.61 (4H,dt, J=6.8.1.4,CH$_2$OP), 1.72 (2H, apparent heptet, J=6.7,CH), 0.77 (12H,d,J=6.7,CH$_3$). $^{13}$C NMR (d$_6$-DMSO ) 156.04(C-6), 52.42(C-2), 149.60(C-4), 141.05(C-8), 118.69(C-5), 1.42 (CH$_2$OP, d, J=6.7). 70.36(C-2',d,J=11.6). 63.65(C-4',d,J=163), 42.52(C-1'), 28.72(CH,d,J=5.7), 18.45 (CH$_3$). IR(KBr) 3286, 3104, 2960, 1670, 1600. MS(FAB) 386(M+H, 100).

Anal. Calcd for C$_{16}$H$_{28}$N$_5$O$_4$P: C, 49.86; H, 7.32; N, 18.17. Found: C, '49.81; H, 7.26; N. 18.11

### EXAMPLE 47

PMEA, di-(3-methyl-butyl) ester

Mp 94°–98° C. $^1$H NMR(CDCl$_3$) 8.30(1H, S, H-8) 7.94 (1H, S, H-2). 6.21(2H, S, NH$_2$), 4.37(2H, t, J=5.0, H-1'), 4.01(4H,dt, J=6.8. 6.8, CH$_2$OP), 3.91(2H, t, J=5.0, H-2'). 3.75(2H,d,J=8.0,H-4'), 1.63 (2H, apparent heptet, J=6.6, CH), 1.47(4H,dt, J=6.7, 6.7, CH$_2$CH$_2$OP), 0.84(12H,d,J=6.5,CH$_3$). $^{13}$C NMR (CDCl$_3$) 155.28(C-6), 152.38(C-2), 150.38(C-4), 141.70(C-8). 119.76(C-5), 71.13(C-2',d,J=10.0). 65.17(C-4',d,J=166), 65.02 (CH$_2$OP,d,J=6.4), 43.46 (C-1'), 39.19(CH$_2$CH$_2$OP,d,J=5.7), 24.50(CH), 22.31(CH$_3$), 22.29(CH$_3$). IR(KBr) 3282, 3106, 2958, 1672, 1600, 1478. MS (methane/DCI) 414 (M+H, 100).

Anal. Calcd. for C$_{18}$H$_{32}$N$_5$O$_4$P·0.75H$_2$O: C. 50.63; H, 7.91; N. 16.40. Found: C, 50.67; H, 7.66; N. 16.26.

What is claimed is:

1. Antivirally active compounds or intermediates therefor of the formula I or V

Formula I

$$R^2-\overset{\overset{O}{\|}}{\underset{R^1}{P}}-CH_2-O-R^3-B$$

Formula V



*Stereochemistry R, S or RS

wherein

B represents adenyl (A), guanyl (G), or 2,6-diaminopurinyl (DAP);

R$^1$ and R$^2$ are independently each OR$^4$

Copy provided by USPTO from the PIRS Image Database on 01/22/2013

5,663,159

29

R³ represents



X represents hydrogen, methyl or hydroxymethyl;
R⁴ represents a physiologically hydrolyzable group selected from the group consisting of $CH_2OC(O)R^5$ and $CH(R^5)OC(O)R^5$ (R, S, or RS stereochemistry); and
R⁵ represents $C_1$–$C_{20}$ alkyl, aryl or aryl-alkyl which may be substituted or unsubstituted by hydroxy or halogen.

2. Antivirally active compounds or intermediates therefor of Formula III

Formula III

wherein B represents adenyl (A), guanyl (G), or diaminopurinyl (DAP);
R⁷ is OH;
X represents hydrogen, methyl or hydroxymethyl;
R¹ is OR⁴;
R⁴ represents a physiologically hydrolyzable group selected from the group consisting of $CH_2OC(O)R^5$ and $CH(R^5)OC(O)R^5$ (R, S, or RS stereochemistry); and
R⁵ represents $C_1$–$C_{20}$ alkyl, aryl or aryl-alkyl which may be substituted or unsubstituted by hydroxy or halogen.

3. The compound of claim 1 wherein X is H and R⁵ is $C_1$–$C_{20}$ alkyl.

4. The compound of claim 2 wherein X is H or hydroxymethyl.

30

5. The compound of claim 1 wherein X is H.

6. The compound of claim 1 wherein X is hydroxymethyl or methyl.

7. The compound of claim 1 wherein B is adenyl.

8. The compound of claim 7 wherein X is H and R⁴ is $CH_2OC(O)R^5$.

9. The compound of claim 1 which is 9-(2-phosphonylmethoxy) ethyladenine di(pivaloyloxymethyl) ester.

10. The compound of claim 1 which is 9-(2-phosphonylmethoxy) ethyladenine di(propionyloxymethyl) ester.

11. The compound of claim 1 which is 9-(2-phosphonylmethoxy) ethyladenine di(isobutyryloxymethyl) ester.

12. The compound of claim 1 which is 9-(2-phosphonylmethoxy) ethyladenine di(benzoyloxymethyl) ester.

13. A composition comprising the compound of claim 1 in association with a pharmaceutically acceptable substantially nontoxic carrier or excipient.

14. The compound of claim 2 wherein X is H.

15. The compound of claim 2 wherein X is hydroxymethyl or methyl.

16. The compound of claim 2 wherein R⁴ is $CH_2OC(O)R^5$.

17. The compound of claim 2 which is 9-(2-phosphonylmethoxy) ethyladenine mono (pivaloyloxymethyl)ester.

18. A method for the treatment of HSV-2, HCMV or HIV in a mammal which comprises orally administering to the mammal an antiviral effective non-toxic dose of 9-(2-phosphonylmethoxy) ethyladenine di(pivaloyloxymethyl) ester for a treatment period of sufficient duration to mitigate said infection.

* * * * *

Copy provided by USPTO from the PIRS Image Database on 01/22/2013

A109

UNITED STATES PATENT AND TRADEMARK OFFICE

# CERTIFICATE OF CORRECTION

| | | |
|---|---|---|
| PATENT NO. | : 5,663,159 | Page 1 of 1 |
| APPLICATION NO. | : 08/320632 | |
| DATED | : September 2, 1997 | |
| INVENTOR(S) | : John E. Starrett, Jr. et al. | |

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

### COLUMN 29:

Line 1, "$R^3$" should read -- O-$R^3$-B --.



Lines 3-6, "    " should read --     --.

Signed and Sealed this
Twenty-first Day of June, 2011

David J. Kappos
Director of the United States Patent and Trademark Office

Copy provided by USPTO from the PIRS Image Database on 01/22/2013

# CERTIFICATE OF SERVICE

## CERTIFICATE OF SERVICE AND FILING
## UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

I hereby certify that on July 7, 2014, the foregoing PRINCIPAL BRIEF OF DEFENDANT-APPELLANT was filed electronically with the U.S. Court of Appeals for the Federal Circuit by means of the Court's CM/ECF system. I further certify that the foregoing was served on the following counsel of record, by means of electronic mail:

Timothy J. Kelly            (tkelly@fchs.com)
Christopher Loh           (cloh@fchs.com)
Colleen Tracy            (ctracy@fchs.com)
FITZPATRICK, CELLS, HARPER & SCINTO
1290 Avenue of the Americas
New York, NY 10104

*Attorneys for Plaintiff-Appellee Gilead Sciences, Inc.*


K. Lee Marshall           (klmarshall@bryancave.com)
Robert L. Stolebarger     (robert.stolebarger@bryancave.com)
BRYAN CAVE LLP
560 Mission Street, Suite 2500
San Francisco, CA 94105


Ameer Gado             (aagado@bryancave.com)
Anthony Friedman       (anthony.friedman@bryancave.com)
BRYAN CAVE LLP
211 North Broadway, Suite 3600
One Metropolitan Square
St. Louis, MO 63102


Karen A. Confoy         (kconfoy@foxrothschild.com)
FOX ROTHSCHILD LLP
997 Lenox Drive
Building 3
Lawrenceville, NJ 08648


*Attorneys for Defendant-Appellant Sigmapharm Laboratories, LLC*

Dated:  July 7, 2014.                    /s/ Marc R. Wezowski

                                         Marc R. Wezowski
                                         LEYDIG, VOIT & MAYER, LTD.
                                         Two Prudential Plaza
                                         180 N. Stetson Ave, Suite 4900
                                         Chicago, Illinois 60601
                                         Telephone: (312) 616-5600
                                         Facsimile:  (312) 616-5700

                                         *Counsel for Defendant-Appellant
                                         Sigmapharm Laboratories, LLC*

# CERTIFICATE OF COMPLIANCE

### CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

1.      This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) because this brief contains 7,393 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Federal Circuit Rule 32(b).

2.      This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in proportionally spaced typeface using Microsoft Word 14-point Times New Roman font.  As permitted by Federal Rule of Appellate Procedure 32(a)(7)(C)(i), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.

Dated:  July 7, 2014                       /s/ Marc R. Wezowski
                                                   Marc R. Wezowski